Filed 8/25/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S049596 |
| v. | ) | |
| | ) | |
| STANLEY BRYANT, DONALD | ) | |
| FRANKLIN SMITH and LEROY | ) | |
| WHEELER, | ) | |
| | ) | Los Angeles County |
| Defendants and Appellants. | ) | Super. Ct. No. A711739 |
| _____ | ) | |

On August 28, 1988, Andre Armstrong, James Brown, Loretha Anderson, and Chemise English were shot and killed. Armstrong and Brown had run afoul of the Bryant Family gang and were shot at the entrance to a drug house. Ms. Anderson and her daughter Chemise, aged 28 months, were shot in a car parked at the curb. Anderson's son Carlos, aged 18 months, was also in the car. He was not shot and survived. A jury convicted defendants Stanley Bryant, Donald Franklin Smith, and Leroy Wheeler of various related crimes. Bryant and Wheeler were convicted of four counts of first degree murder (Pen. Code, § 187, subd. (a))[1] and one count of attempted murder (§§ 187 & 664). Smith was convicted of the first degree murder of Armstrong and Brown, second degree murder of Anderson and Chemise, and the attempted murder of Carlos. The jury

---

[1] Except as noted in footnote 25, *post*, all further undesignated statutory references are to the Penal Code.

found the multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)) was true as to each defendant. The jury was unable to reach verdicts on allegations against a fourth codefendant, Jon Preston Settle. After a penalty trial, the jury returned verdicts of death. Motions to modify were denied. (§ 190.4, subd. (e).)[2] We affirm the judgments.

## I. FACTUAL BACKGROUND

The presentation of guilt phase evidence lasted two and one-half months. It included the testimony of 121 witnesses and more than 270 exhibits including hundreds of pages of documents and a number of video and audio tapes. In the penalty phase, 41 witnesses testified over the course of seven days. We present here for background purposes a synopsis of the significant evidence, generally viewed in the light most favorable to the verdicts. Additional factual and procedural details necessary to resolve defendants' appellate claims are provided in the pertinent discussion.

### A. Guilt Phase

#### 1. Overview

The original charges included a number of noncapital offenses with additional defendants involved in the Bryant Family drug operation. The court severed and tried the capital allegations first. The prosecution's basic theory was that Bryant directed the shootings of Armstrong and Brown because Armstrong was a threat to Bryant's business. The prosecution maintained that Smith, Wheeler, and codefendant Settle were underlings who participated in the murders at Bryant's direction. After Armstrong and Brown were killed, the prosecution asserted, Wheeler shot Ms. Anderson and Chemise and attempted to murder Carlos to eliminate them as potential witnesses.

---

[2] Imposing the death sentences, the court stayed the determinate sentences as to each defendant. Settle later pleaded guilty to four counts of voluntary manslaughter and one count of attempted murder, with the use of a firearm.

2

Smith presented no evidence at the guilt phase. Wheeler testified and admitted some low-level activity in the drug business, but claimed he was not involved in the murders. Bryant also admitted he was a member of the organization. He asserted his role was less significant than the prosecution alleged, and that he had no role in the murders.

### 2. *Prosecution Evidence*

In the 1980's, Bryant and his older brother Jeff Bryant (Jeff) controlled a large-scale cocaine operation in the suburbs of Los Angeles. Their organization was known as "the Family" or "the Bryant Family" and had over 100 employees. A number of these testified at trial about Family operations. Seized records indicated the Family took in well over $1 million during three months of 1988.

The Family used a number of houses to prepare and sell drugs and process the money from sales. Typically, the houses were fortified. Windows and doors were covered and locked, metal gates with electronic locks and blackout screens were erected at front entrances to create "sally ports." Someone entering the house would be enclosed between two locked gates and unable to see farther into the residence. Barricaded or reinforced locked doors inside blocked access between rooms.

These fortifications were encountered during interdiction operations in 1984 and 1985. Ultimately, police served search warrants at several Family houses. Service of the warrants required the use of various entry tactics. Sometimes a vehicle resembling a military tank would break a hole in an exterior wall so officers could enter. As a result of these investigations, Jeff pleaded guilty to charges of selling cocaine and operating a house where narcotics were sold. Defendant Bryant pleaded guilty to conspiracy. He admitted hiring a coconspirator to sell cocaine at a Bryant Family "rock house" on Wheeler Avenue, the same house where the murders later occurred (hereinafter sometimes referred to as Wheeler Avenue). Apparently, these events were only a minor setback; widespread operations continued. When Bryant was released from custody, he

3

ran the street enterprise. Although Jeff remained imprisoned, he was still considered the overall Family leader. Houses damaged during police raids were repaired, refortified, and returned to service.

The Family also engaged in ancillary violent activities. As relevant here, in 1982, Bryant and Jeff hired Andre Armstrong to act as a "hit man." Armstrong subsequently shot Reynard Goldman for failing to pay a $50 drug debt. He killed Kenneth Gentry, who had vandalized another Bryant brother's van. Bryant, Jeff, and Armstrong were charged with the Goldman assault and Gentry murder. After the Family bribed and threatened witnesses, charges against the Bryant brothers were dropped. Armstrong, however, was convicted at trial of felony assault and first degree murder. When his convictions were reversed on appeal, he pleaded guilty to felony assault and voluntary manslaughter. He was paroled in July 1988.

While Armstrong was in prison, Bryant and other Family employees sent thousands of dollars to him and his relatives. Several months before Armstrong was paroled, the Family helped his friend James Brown set up a cocaine operation in Monterey. Nonetheless, Armstrong remained unhappy with the level of support he had received. Weeks after meeting Brown in Monterey, Armstrong decided they should return to Los Angeles. Armstrong told several people, including police officers who had interviewed him in prison, that he intended to "squeeze" the Bryants for money and part of their business. He considered them weak, and felt they failed to honor their promise to prevent his conviction. While in Monterey, Armstrong began an intimate relationship with Bryant's ex-wife, Tannis Curry. These decisions proved ill-advised.

On Friday, August 26, 1988, Brown, Andrew Greer, Elaine Webb, and Loretha Anderson and her two children moved to Los Angeles. Armstrong and Tannis had gone there a few days earlier. Bryant had provided an apartment, but it was dirty. Armstrong wanted Bryant to pay for cleaning before they moved in. On Saturday, the group went to a pool hall to meet Bryant and complain about the accommodations. On Sunday,

4

Armstrong, Brown, and Greer went to Tannis's separate apartment. Armstrong paged Bryant, then received a call. He told the others they were to meet "Stan" at a Wheeler Avenue house to pick up $500 and cleaning supplies. Armstrong told Tannis to bring a pistol, which she placed in her purse.

Before meeting Stan, the group went to the home of Tannis's aunt. When they left, Tannis remained behind. Greer was concerned about the meeting and did not attend. Anderson decided she and her children would go along to the meeting so they could all get something to eat afterwards.

Several people near the Wheeler Avenue house heard multiple gunshots at approximately 5:00 p.m. Shortly thereafter, a tall, thin African-American man emerged, went to a car parked outside, and shot into the car. He then got in the car and drove away. One witness identified a photograph of defendant Wheeler as the driver.[3] A witness also saw what might have been a car owned by Bryant leaving the house after the shooting. Another witness saw a large green car with a driver, front seat passenger, and two men in the backseat leaning against each other in an unusual way.

Within minutes of the shootings, the victims' car was found about seven blocks away. Inside were the lifeless bodies of Loretha Anderson and Chemise English. Anderson had been shot several times with both a shotgun and a handgun. Chemise had been fatally shot in the neck by a handgun at close range. Carlos was also in the car. While not shot, he was injured by flying glass.

---

[3]     Although the witness insisted that the photograph of Wheeler was of the driver of the victim's car, she repeatedly pointed to Bryant when asked if she saw the person in court. She had testified at the preliminary hearing that she had not been able to "get a good i.d." of the driver, and did not identify any defendant as the driver at those earlier proceedings.

Four days later the bodies of Armstrong and Brown were found in roadside brush approximately five miles from Wheeler Avenue. Armstrong had been shot twice with a shotgun. A shot to the center of his chest was probably fired from a distance of four feet or less. A second to his head was apparently fired with the shotgun muzzle almost touching his skin. He was also shot with a handgun. Brown was shot twice with a shotgun and twice in the chest with a handgun. The fatal shot was fired into his heart with the handgun muzzle pressed against him. Evidence at Wheeler Avenue, including blood patterns, bullet holes, and expended cartridges, indicated that Armstrong and Brown had been shot in the front entrance sally port. Their bodies were dragged through the house into the garage.

James Williams, a Bryant Family employee, was present at Wheeler Avenue before and during the crimes. He started working for the Family at the beginning of April 1988 and initially worked at Bryant's pool hall. His primary duty was to tell cocaine purchasers where to go to acquire drugs. Williams was quickly promoted to working at the Wheeler Avenue "count house." There, money from drug sales was counted and bundled. Family employees came to the house to pick up their weekly pay. People wishing to purchase larger quantities of cocaine would also arrange purchases at Wheeler Avenue.

Williams, defendant Wheeler, and Lamont Gillon normally worked daily staggered eight-hour shifts at the count house. A fourth employee, Anthony Arceneaux, would fill in for the other three on their days off. Bryant, who was referred to as "Chief," regularly visited and gave Williams directions. Williams knew defendant Smith worked for the Family because he picked up his weekly pay at the house. Williams did not know Smith's role in the organization.

On the day of the murders Williams was working when Bryant arrived around 2:00 p.m. At some point, Bryant had Williams contact Arceneaux and tell him not to come to work. Bryant moved money along with counting and adding machines, normally

kept in the house, into the garage. He also carried a heavy duffle bag from the garage into a back bedroom. Later, Wheeler and Smith arrived and joined Bryant in the back room. It was unusual for Wheeler and Smith to be there on a Sunday afternoon. Bryant also remarked several times that "Johnny" was late. Subsequently, codefendant Jon Settle, whom Williams had never seen at the house before, arrived and went into the back room also.

Sometime later, Williams heard a gunshot from the rear of the house. Bryant emerged and asked how loud a noise the shot had made. Later, Settle came out, chambered a shotgun round, and returned to the bedroom. Eventually, Bryant, Smith, and Wheeler came to the front room. Bryant said they were expecting some people and told Williams what to do when they arrived. After they entered the sally port, Williams was to release the electronic lock on the outside door so Bryant could leave. When he had done so, Williams was to go out through the garage to a green car parked in the driveway and back it into the garage. He would then walk to a nearby bus stop, watching to see if any neighbors were looking.

Eventually, Williams saw two strangers approach. After they entered the sally port, Williams unlocked the outer gate so Bryant could leave. As Williams walked back toward the garage, he heard gunshots and screams. While backing the green car inside, he saw Wheeler outside with a shotgun. Wheeler approached a car parked at the curb and Williams heard glass breaking. After parking the green car Williams saw Bryant in the garage. Bryant told him to leave. While walking to the bus stop, he saw Wheeler driving the car that had been parked in front of the house. Bryant drove away in his own car. Smith and Settle left in the green car. Bryant later called Williams and told him not to go back to the house and not to talk about what had happened.

Several days later, a Family employee told Williams he had been identified. Williams was told to leave Los Angeles; the Family would cover his expenses. He went to Pennsylvania and received a $500 wire transfer from a Family employee. Eventually

7

arrested in Harrisburg, he gave several statements about the shootings in exchange for immunity.

Bryant's and Wheeler's fingerprints were found in the Wheeler Avenue house. Bryant's prints were found on a portable telephone and on the page of an address book containing an entry for the alias victim James Brown was using. Expended cartridges from three different shotguns were found at the house. An expended .45-caliber casing was also found in a trash can. It had been fired from a handgun later recovered in Bryant's house.

The day after the shootings, Bryant and Wheeler visited Jeff at Donovan State Prison.

Six days after the murders, Bryant bought a new car using the name of a Family employee. He traded in his relatively new car, which matched the description of the one Williams said Bryant had driven to Wheeler Avenue. Examination of the trade-in yielded positive presumptive tests for the presence of blood at the driver's feet.

Bryant told Ladell Player, a drug dealer supplied by the Family, that the police had been at Wheeler Avenue because "we had some problems, but we took care of them." Bryant also told Alonzo Smith that, in essence, Brown "had to go."

On September 25, 1988, police officers searched the apartment of Wheeler's girlfriend, and found a handgun consistent with the one used to shoot Loretha Anderson and her daughter. They also recovered two newspaper articles related to the murders, and $7,650 in cash hidden in the ceiling.

On September 29, 1988, police searched Bryant's house. They found numerous items related to Family business, the handgun that had fired the expended cartridge found at Wheeler Avenue, several keys to that house, and papers with telephone numbers for James Brown and relatives of Andre Armstrong.

Extensive telephone records suggested the following. Bryant and Smith talked to Armstrong or his relatives after he was released from prison. Before the murders Bryant

and Smith exchanged numerous phone calls, Bryant and Wheeler called each other repeatedly, and each defendant made several calls to Wheeler Avenue.

In an effort to establish an apparent additional motive for Bryant to murder Andre Armstrong, and to further tie Smith to the murders, the prosecution introduced evidence of two attacks on one Keith Curry. When attacked, Curry, like victim Andre Armstrong, had been involved in an intimate relationship with Bryant's ex-wife Tannis. He also was friendly with defendant Smith. The prosecution asserted that Bryant was jealous of Armstrong's affair. Because Smith and Armstrong were friends, Smith's presence at Wheeler Avenue was designed to place Armstrong at ease before the shooting.

Curry testified that he began dating Tannis when her relationship with Bryant was unstable. Tannis moved into an apartment where Curry typically spent three or four nights a week. On the morning of March 16, 1986, Curry left the apartment and his car exploded. A bomb was triggered by the car's movement. Curry was slightly injured. Tannis told an acquaintance that Bryant said he put the bomb in Curry's car and "would do it again . . . until [Curry] was dead."

Tannis divorced Bryant and married Curry. One evening Smith and Curry were engaged in small talk when Smith suddenly shot Curry in the neck, paralyzing him. Smith was arrested later that night and police found a revolver and what appeared to be rock cocaine packaged for sale in his car. He was later released on bail after several properties connected to the Family were posted as security.

### 3. Wheeler's Evidence

Wheeler testified he joined the Family in early 1988. He began selling drugs for Eddie Barber, who ran a semiautonomous "crew." Later, at Barber's direction, Wheeler started working at Wheeler Avenue. James Williams ran Wheeler Avenue, and served as an "enforcer."

9

On the day of the murders, Wheeler completed his shift at 7:00 a.m. then spent the day with his girlfriend visiting their families in Los Angeles. At 3:00 that afternoon and again at 10:45 that evening, he received a page. In response, Wheeler called Williams who told him not to come to work.

Eddie Barber had previously instructed Wheeler to visit Jeff in prison the next day to report about drug operations. Wheeler was unaware of the shootings until he heard about them from Bryant, who was also visiting Jeff. If Wheeler had been involved in the murders he would not have visited Jeff the next day because doing so would have connected Jeff to the murders. If he had been involved, he would have fled, using money he had saved from his drug dealing.

All Wheeler knew about Bryant's role in the Family was he arranged bail when members were arrested. He had not met codefendant Jon Settle before court proceedings began.

Wheeler's girlfriend testified that she did not specifically remember what she and Wheeler did on the day of the shootings; they customarily visited family on Sundays.

### 4. Smith's Evidence

Smith offered no evidence at the guilt phase of the trial.

### 5. Bryant's Evidence

Bryant testified. While admitting his involvement in the drug business, he denied or attempted to refute evidence connecting him to the murders. He claimed he worked for his brother until Jeff went to prison. Bryant then turned the drug business over to William Settle, who was running things when the murders occurred. William Settle was the brother of codefendant Jon Settle. Bryant was never in charge. William Settle paid Bryant for the use of his pool hall in connection with the drug business. Bryant also worked at Wheeler Avenue counting money. He "probably" had been there every day in 1988. However, he was not there the day of the murders and never subsequently

10

returned. He had never been there with Williams. Bryant's activities were all done at someone else's direction.

Bryant did not arrange a meeting with Armstrong at Wheeler Avenue. He spent most of the day of the murders at home. He denied that he drove a car like the one seen leaving the house. He never spoke with Ladell Player about what had happened at the house. He visited Jeff in prison the day after the murders to get advice about how to end his association with William Settle.

Bryant was uninvolved with the attacks on Kenneth Gentry, Reynard Goldman, and Keith Curry. He did not know Gentry, and did not hire Armstrong to kill him. After they were arrested for the Gentry murder, Armstrong told Bryant he shot Gentry because they had both been dating the same woman. Armstrong had decided to preemptively kill Gentry before Gentry acted against him. Bryant had not threatened Reynard Goldman about any drug debt. He denied knowing anything about the attempts to bribe witnesses in the Gentry and Goldman shootings. He had nothing to do with the car bombing of Keith Curry, and never told Tannis that he wanted to kill him.

Through the testimony of investigating officers, Bryant presented various inconsistencies between James Williams's statements to the police and his testimony at trial.

### 6. *Codefendant Settle's Evidence*

Codefendant Settle testified and presented other evidence that he was an automobile mechanic and was only peripherally connected to the Family drug business through his brothers William and Frank. He did not participate in the murders, but did sell Bryant a green 1970 Pontiac Bonneville on the day of the shootings. According to Settle, defendant Wheeler drove Settle's brother Frank to pay for the Bonneville and to pick up another car Settle had repaired for Bryant. Frank later told Settle that the Bonneville had been used in the murders.

11

### B. Penalty Phase

#### 1. Evidence Against Bryant

Bryant had twice hired a contract killer. Walter Compton testified that Bryant offered him $10,000 to kill Sofinia Newsom, a cooperating witness in the Kenneth Gentry murder prosecution. Jeff gave Compton a handgun and getaway car. Compton followed Newsom for several days, but ultimately decided against the murder. He surrendered to the police because he feared going to prison or being killed by the Bryants.

On March 19, 1985, Clarence Johnson was shot several times while sitting in Bryant's pickup truck outside the pool hall. Johnson survived; David Hodnett pleaded guilty to the attempted murder. Although Hodnett testified that he shot Johnson for personal reasons, he had previously told police that Bryant and Jeff had hired him to kill Johnson. Hodnett was supposed to testify against the Bryants in the Johnson case. He told the investigating officer he instead pleaded guilty during the preliminary hearing and stopped cooperating in order to protect himself and his family from retaliation.

#### 2. Evidence Against Smith

While in custody for this case, Smith was twice found in possession of prisoner-made weapons. He also assaulted another inmate. Someone held the victim while Smith punched him in the face and upper torso. After deputies separated the inmates, it was discovered that the victim also had three puncture wounds in his back. Two metal shanks were found in a nearby toilet.

Smith had committed a residential burglary on July 30, 1982. The 60-year-old condominium owner came home and found a man in her bedroom. She did not remember what happened next, but was apparently knocked unconscious, suffering a head wound that required 20 stitches. The victim's daughter saw Smith leaving the residence. He was arrested one block away in possession of the victim's jewelry.

12

Documentary evidence established Smith had been convicted of assaulting a woman with intent to commit great bodily injury, attempting to murder Keith Curry, and transporting cocaine.

### 3. Evidence Against Wheeler

Wheeler was adjudged a juvenile ward in 1985 after attempting a robbery. While in custody, Wheeler assaulted another ward with a chair.

After his release he argued with one Brian Brown, ultimately pointing a handgun at Brown's head for several seconds then walking away.

While awaiting trial, Wheeler was found to have a four-inch shank hidden in his underwear. He pleaded guilty to possessing a weapon in jail. He twice attacked other jail inmates.

One night after lockdown, Wheeler and another inmate argued over a card game. The inmate was locked in his cell and Wheeler, a trustee for the tier, was outside. Wheeler threw a bucket of water into the cell then told deputies he needed to clean up a spill. When the cell door was opened he attacked the inmate with a shank. He also swung the shank at a responding deputy, cutting his arm. He ignored repeated orders to drop his weapon until deputies threatened to use a Taser gun to subdue him. The inmate was seriously injured and required extended hospitalization.

### 4. Bryant's Evidence in Mitigation

Bryant's former mother-in-law, sister, and two friends testified to his character. He was close to his young daughter and loved by all his relatives. During his divorce from Tannis, Bryant arranged for his daughter to see a therapist. The therapist testified that Bryant was a caring and loving parent.

Bryant often gave money to people in the community. He paid for funeral costs and raised funds for youth baseball teams. Many community members liked him.

13

Bryant's sister testified that he encouraged her son to attend school and avoid trouble. She believed Bryant had made "spiritual progress" since his arrest.

The witnesses considered Bryant a basically good person who did not deserve the death penalty.

### 5. *Smith's Evidence in Mitigation*

Smith's sister testified she and Smith did not live with their parents until they were six and four years old, having previously lived with their grandparents. Their parents showed the children no affection. The father was in the military and seldom present. When at home, he frequently beat Smith; their mother did not intervene. Smith saw his father molest his sister. The parents eventually separated and the children returned to their grandparents. Smith's sister had no positive recollections of life with the parents.

Clinical psychologist Donald Hoagland testified about Smith's neurocognitive and psychological assessments. Smith scored an 84 on an intelligence test, indicating "subnormal" intelligence. His school records suggested attention deficit hyperactivity disorder. Hoagland diagnosed Smith with dyslexia and various cognitive deficits. Smith had a serious and chronic mental disorder with "the potential to be psychotic under adverse conditions." He was chronically depressed and anxious, had a "seriously impaired self-image," was socially and emotionally withdrawn, impulsive, and quick to anger. Smith's pattern of psychopathology was common in those with particularly adverse family backgrounds.

### 6. *Wheeler's Evidence in Mitigation*

A number of Wheeler's relatives testified about his chaotic and abusive childhood. Wheeler's mother was a drug-addicted runaway when she met Leroy Wheeler, Sr. She was 17 and he 19 at Wheeler's birth. When Wheeler's brother was born about two years later his father began living apart from the family. Wheeler's mother could not provide a

14

stable home and moved frequently. The father visited occasionally and the children witnessed violent fights. When Wheeler was six years old his father left for good.

Wheeler's mother had frequent associations with other men, and eventually became involved with Charlie Luster. Luster was able to provide some stability but also physically abused Wheeler. Luster was a self-described "hustler" and "compulsive gambler," who was imprisoned part of the time during his relationship with Wheeler's mother. Wheeler's mother died the year of the murders.

When Wheeler was 12 or 13 years old, he began staying at relatives' homes. At age 15, he moved out on his own. Soon thereafter, he attempted a robbery and was sent to the Youth Authority. A counselor testified that Wheeler caused no major problems and was a good worker and student. He was unaffiliated with any gang.

One of Wheeler's aunts testified that when he stayed at her house, he got along well with other children and attended school. Another aunt described him as smart, industrious, and entrepreneurial. Wheeler gave his brother advice and assistance. Wheeler's relatives, as well as Charlie Luster, hoped the jury would spare his life.

Clinical psychologist Adrienne Davis evaluated Wheeler. In her opinion, he was intelligent, articulate, and capable of doing well, especially in a structured environment with well-defined expectations. There were, however, some indications that he could be overly energetic and have difficulty behaving constructively. She believed that Wheeler's history of transient living, abandonment, neglect, and abuse led him to seek out relationships with older men who would protect him and provide a secure environment. This, in turn, led to his criminal activities.

## II. PRETRIAL ISSUES

Before turning to defendants' claims, we discuss two preliminary matters. First, in their briefs, each defendant makes a blanket statement that he joins in the claims raised by each of the others, to the extent that the claims are not in some manner adverse to their own interest. It is questionable whether such cursory and unfocused statements are

sufficient under the California Rules of Court, rules 8.630(a) and 8.200(a)(5), to permit joinder of appellate claims in a multiple defendant capital appeal. Each defendant has filed opening briefs of several hundred pages raising numerous claims of error from all stages of the proceedings. In these circumstances, there are likely to be instances when a particular claim simply does not apply to all defendants, or when not all defendants pursued that issue during the trial proceedings to preserve the issue for appeal. Purporting to join in a claim when no colorable argument can be made that the claim is applicable and preserved is akin to raising a frivolous claim in the first instance. (Cf. *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)

It is not the task of the opposing party or this court to sort out what claims from the scores presented here are nonfrivolous as to the other defendants who did not identify with particularity the specific claims they wished to join. Clearly, neither the Attorney General nor this court is required to divine which aspects of a claim might be adverse to a particular defendant, rendering him unwilling to join the particular claim at issue. Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground. If a party's briefs do not provide legal argument and citation to authority on each point raised, " 'the court may treat it as waived, and pass it without consideration. [Citations.]' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) "Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations]." (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.) We strongly disapprove of this seriously improper tactic.

Nonetheless, we will treat this case as if defendants complied with the Rules of Court regarding the joinder of claims. We take this step solely to avoid further delay. Counsel in future cases should be on clear notice that we will not be inclined to do so going forward. We will not, of course, assume that each defendant has standing to raise

16

each and every claim raised in the briefs or that he preserved a claim for appeal by taking appropriate and timely action below.

Second, as to many claims defendants allege for the first time that the error complained of violated their federal constitutional rights. To the extent that in doing so defendants have raised only a new constitutional "gloss" on claims preserved below, that new aspect of the claims is not forfeited. However, "[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory . . . ." (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29 (*Scott*); see also *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn.17 (*Boyer*).)

### A. Denial of Bryant's Motion to Suppress Evidence

Bryant appeals the denial of his motion to suppress evidence seized during the warrantless search of the Wheeler Avenue house and the search of his own residence pursuant to a warrant. The trial court did not err. Bryant ultimately failed to present any competent evidence that he had a legitimate expectation of privacy in Wheeler Avenue when it was searched. The warrant authorizing the search of Bryant's home was valid. To the extent Smith and Wheeler intended to join this claim, the claim is forfeited and meritless as to them. They did not join in the motions below, nor have they alleged they had any expectation of privacy in either of the places searched.

" 'In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review.' [Citation.] On appeal we consider the correctness of the trial court's ruling

17

*itself*, not the correctness of the trial court's *reasons* for reaching its decision. [Citations.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145 (*Letner*).)

"Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal Code section 1538.5 only if exclusion is mandated by the federal Constitution." (*People v. Banks* (1993) 6 Cal.4th 926, 934.) The Fourth Amendment to the federal Constitution prohibits *unreasonable* searches and seizures. (See *Banks*, at p. 934.)

### 1. Wheeler Avenue

In order to challenge a search or seizure, a defendant must allege not only that the police action was unreasonable, but also that the defendant's personal interests were violated. "The 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person . . . has a legitimate expectation of privacy in the invaded place.' (*Rakas v. Illinois* (1978) 439 U.S. 128, 143.) A defendant has the burden to establish a legitimate expectation of privacy in the place searched. [Citations.]" (*People v. Rivera* (2007) 41 Cal.4th 304, 308, fn. 1.)

In considering this question, courts look to the totality of the circumstances. Appropriate factors include " ' " 'whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.' " ' [Citation.]" (*People v. Roybal* (1998) 19 Cal.4th 481, 507.) Essentially, a legitimate expectation of privacy is one "society is prepared to recognize as reasonable." (*Minnesota v. Olson* (1990) 495 U.S. 91, 97.)

Initially, Bryant points out that the prosecution presented evidence in the preliminary hearings to establish that he was a leader of the Bryant Family drug

18

organization that operated Wheeler Avenue. Thus, he urges, the prosecution conceded he had a legitimate expectation of privacy there. Accordingly, he contends, the trial court's contrary finding was erroneous and the Attorney General is estopped from challenging the issue on appeal. Bryant provides no authority for this novel assertion. The circumstance that Bryant ran the organization using Wheeler Avenue as a base of operations does not mean he had a legitimate expectation of privacy in the house when it was searched. As the high court observed in analogous circumstances, its precedents "clearly establish that a prosecutor may simultaneously maintain that a defendant criminally possessed [a seized item], but was not subject to a Fourth Amendment deprivation, without legal contradiction." (*United States v. Salvucci* (1980) 448 U.S. 83, 90.)

At the suppression hearing, Bryant tried to establish his expectation of privacy in Wheeler Avenue without testifying on the subject himself. He sought to call Williams as a witness and to introduce the "expert testimony" of Detective Vojtecky. He also suggested testimony by the prosecutor. The court denied the request to compel Williams, who was in a witness protection program, to appear. The prosecutor did suggest the possibility of stipulating to certain facts that Williams had testified to at the preliminary hearings. The parties, however, never actually entered into a stipulation. In fact, Bryant's counsel explicitly rejected the idea of preparing a stipulation. As to the testimony of Detective Vojtecky, the court excluded most of it, ruling the testimony was irrelevant hearsay. It also rejected the suggestion that the prosecutor testify for essentially the same reason. The prosecutor could offer no relevant testimony about Bryant's privacy expectations. Bryant did not present any evidence, such as legal documents, to show he personally held some property interest in Wheeler Avenue. He chose to testify at the hearing, but limited his testimony to facts about his residence on Judd Street. Accordingly, the court denied the motion to suppress, finding that Bryant had established no reasonable expectation of privacy in Wheeler Avenue.

19

On appeal, Bryant does not assert that the evidence actually before the trial court compelled a different result regarding his expectation of privacy. As noted, no evidence on the subject was admitted. His recitation of the preliminary hearing and subsequent trial testimony regarding Bryant's connections to and the search of Wheeler Avenue is irrelevant. That evidence was not before the trial court when it ruled on the pretrial motion. (*People v. Rundle* (2008) 43 Cal.4th 76, 132 (*Rundle*).)

Bryant does not challenge the exclusion of Vojtecky's testimony, except by way of conclusory assertions in his reply brief that the court's ruling was erroneous and unconstitutional. He makes absolutely no assertion that the ruling excluding the prosecutor's testimony was erroneous. He has therefore waived these issues. (*Stanley*, *supra*, 10 Cal.4th at p. 793.) In any event, there is no support for the conclusion that either of these witnesses could have provided admissible testimony. Clearly, neither witness had personal knowledge of Bryant's expectations of privacy. Bryant suggested at the hearing that they might testify as expert witnesses about the Bryant Family. It is true that experts may permissibly base an opinion on hearsay or other evidence that might not be directly admissible, but a trial court nonetheless has discretion to " ' " exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." ' " (*People v. Catlin* (2001) 26 Cal.4th 81, 137.) " '[P]rejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before [the trier of fact] incompetent hearsay evidence," ' " and " 'disputes in this area must generally be left to the trial court's sound judgment.' " (*Ibid.*) Moreover, Bryant never clearly articulated how any proper opinion testimony could have assisted his cause. There is no reason to disturb the court's exercise of its judgment that these witnesses could offer no competent evidence on Bryant's expectations of privacy in Wheeler Avenue.

Thus, the remaining focus of Bryant's claim is that the court erroneously declined to compel Williams to appear. He urges the ruling violated his constitutional right to "compulsory process" preventing him from carrying his burden. The argument fails.

The Sixth Amendment provides that "[i]n all criminal prosecutions," the defendant has the right "to have compulsory process for obtaining witnesses in his favor." (U.S. Const., 6th Amend.) This right is applicable to the states under the Fourteenth Amendment's due process clause. (*Washington v. Texas* (1967) 388 U.S. 14, 19.) Our state Constitution has a similar provision. (Cal. Const., art. I, § 15 [a criminal defendant has the right "to compel attendance of witnesses in the defendant's behalf"].) We will assume without deciding that the compulsory process right applies to a request to compel a witness to appear at a suppression hearing. The procedural context of Bryant's clam is relevant to determine whether his rights were violated.

A defendant claiming a denial of compulsory process must plausibly show that the missing testimony "would have been both material and favorable to his defense." (*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858, 867; see also *In re Martin* (1987) 44 Cal.3d 1, 32.) Moreover, the constitutional right to compulsory process is not "an unfettered right to offer testimony" that "automatically and invariably outweigh[s] countervailing public interests." (*Taylor v. Illinois* (1988) 484 U.S. 400, 410, 414.) A defendant claiming a violation of this right must establish both that he was deprived of the opportunity to present material and favorable evidence and that the deprivation was arbitrary or disproportionate to any legitimate purpose. (See *Holmes v. South Carolina* (2006) 547 U.S. 319, 324–325.) At bottom, " '[i]n order to declare a denial of [due process based on the denial of compulsory process] we must find that the absence of . . . fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' " (*Valenzuela-Bernal*, p. 872.)

As Bryant acknowledges in his brief, Williams was not the only witness who could have testified on this subject. Bryant himself could have done so. A defendant's

21

testimony at a suppression hearing cannot "be admitted against him at trial on the issue of guilt unless he makes no objection . . ." (*Simmons v. United States* (1968) 390 U.S. 377, 394), and, as explained in *People v. Lightsey* (2012) 54 Cal.4th 668, 717, the due process right to present a defense does not obligate a trial court to admit proffered evidence with the effect of allowing the defendant to testify without subjecting himself to cross-examination.

Bryant was, of course, free to decline to testify at the suppression hearing, but his decision against doing so did not render the hearing fundamentally unfair. Although " ' "[t]he criminal process . . . is replete with situations requiring the 'making of difficult judgments' as to which course to follow . . . [and] . . . a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." ' " (*Letner*, *supra*, 50 Cal.4th at p. 153, citation omitted.) Further, there was no suggestion that Williams could have provided important information that Bryant could not have. Indeed, as the court here mentioned and some other courts have recognized, given the subjective portion of the expectation of privacy analysis, it is questionable whether a defendant could carry his burden without presenting his own testimony. (See, e.g., *U.S. v. Mendoza* (7th Cir. 2006) 438 F.3d 792, 795 [" 'without an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest' "].) Williams's testimony, therefore was an arguably inferior substitute for Bryant's.

The trial court reasonably ruled that Bryant had not established a need for Williams's testimony outweighing the administrative burden and potential safety concern in removing Williams from the safe location where he was housed. In the past the Bryant Family had taken steps to kill and influence witnesses against it. The weighing of Bryant's interests against these concerns was neither arbitrary nor disproportionate. In sum, the denial of Bryant's request to compel Williams's testimony did not prevent a fundamentally fair hearing.

22

Bryant ultimately presented no competent evidence showing he had an expectation of privacy in Wheeler Avenue. On this deficient record the trial court clearly did not err in denying the suppression motion.

### 2. *The Judd Street House*

The trial court found Bryant had established a legitimate expectation of privacy in his home on Judd Street. Bryant contends the affidavit supporting the warrant did not establish probable cause. Moreover, any likelihood that evidence would have been found there had grown stale by the time the warrant was served a month after the murders. The court properly rejected these challenges.

The search warrant affiant was the initial murder scene detective. The affidavit encompasses 35 typed pages. It incorporates by reference nine multipage exhibits. Inter alia, the affidavit chronicles observations made at the murder scene, witness statements, and discovery of the victims' bodies. The blood, human tissue, remains, and evidence of gunshots at both Wheeler Avenue and the body recovery scenes are described in detail. The affidavit sets out the relationship between victim Andre Armstrong and the Bryants. It relates the drug interdiction incidents at Wheeler Avenue and the subsequent repairs made there.

Jeff Bryant is the listed owner of Wheeler Avenue. His leadership of the Family and its operations and multiple criminal activities is extensively recounted. The affidavit states that while Jeff was in prison defendant ran the drug business, implementing Jeff's directions. Information from multiple sources recounting people and activity at Wheeler Avenue is provided along with background information about Bryant, the victims, and others identified during the investigation. Largely paralleling the facts adduced at trial, the affidavit recounts details about the shootings of Gentry and Goldman, Armstrong's intention to "squeeze" the Family, the trip from Monterey to Los Angeles, the dispute

23

over the dirty apartment, Armstrong's affair with Tannis, the operations at Wheeler Avenue, and Bryant's activities there.

Particularly with regard to the staleness question, the affidavit recites that guns are valuable and difficult to obtain, particularly by ex-convicts and parolees. Suspects often retain guns along with ammunition, documents, and gun-related equipment after a crime is committed. Blood is difficult to remove from clothing and other fabrics. Forensic analysis of such items is frequently successful in linking suspects to a victim or scene.

The affiant relates his belief that these kinds of items, along with documents, address books, photographs, and clothing could be found at the locations or in the automobiles described. Accordingly, as the request pertained to Bryant, the application was made for authorization to search his home, a car, and the pool hall for a variety of items specifically listed.

"Probable cause sufficient for issuance of a warrant requires a showing that makes it ' "substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." ' [Citations.] That showing must appear in the affidavit offered in support of the warrant. [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 161 (*Carrington*).) "The showing required in order to establish probable cause is less than a preponderance of the evidence or even a prima facie case." (*Id.* at p. 163.) The question of staleness concerns whether facts supporting the warrant application establish it is substantially probable the evidence sought will *still* be at the location at the time of the search. "No bright-line rule defines the point at which information is considered stale. [Citation.] Rather, 'the question of staleness depends on the facts of each case.' [Citation.] 'If circumstances would justify a person of ordinary prudence to conclude that an activity had continued to the present time, then the passage of time will not render the information stale.' " (*Id.* at pp. 163-164.)

24

The affidavit clearly established probable cause to believe Bryant was involved in the murders, and he does not argue otherwise. Contrary to his claim, there is ample support for a finding of probable cause to search the Judd Street house. The affidavit is extensive and detailed. It demonstrates a substantial basis to believe that firearms, blood evidence, and other items of evidentiary value would be found at Bryant's home. Moreover, based on " ' "the nature of the crimes and the items sought, a magistrate [could] reasonably conclude that a suspect's residence is a logical place to look for specific incriminating items." ' " (*Carrington*, *supra*, 47 Cal.4th at p. 163.) The trial court properly found the affidavit provided timely and sufficient probable cause.

Bryant also contends the warrant was unconstitutionally overbroad because it authorized the police officers to seize "[a]ny articles or personal property tending to establish the identity of persons who have dominion and control over the premises." "Whether a warrant's description of property to be seized is sufficiently particular is a question of law subject to independent review by an appellate court. [Citation.] In considering whether a warrant is sufficiently particular, courts consider the purpose of the warrant, the nature of the items sought, and 'the total circumstances surrounding the case.' [Citation.] A warrant that permits a search broad in scope may be appropriate under some circumstances, and the warrant's language must be read in context and with common sense." (*People v. Eubanks* (2011) 53 Cal.4th 110, 133-134.) We recently rejected a similar claim in *Eubanks*. As in that case, the warrant here was sufficiently particularized under the circumstances. At the time the warrant was requested, police could not have realistically described the personal property with any greater particularity, and it was necessary to establish Bryant's control over any evidence seized. (See *id.* at pp. 134-135; *People v. Nicolaus* (1991) 54 Cal.3d 551, 575.)

## B. Denial of Bryant's Motion for Pretrial Hearing Concerning Admission of Other Crimes Evidence

The trial in this case began in late January 1995. In September 1992 Bryant had made a great many pretrial motions, including a request for a hearing on the admissibility of any uncharged crimes evidence to be offered under section 1101, subdivision (b), of the Evidence Code. The trial court held no such hearing. Bryant contends the court's failure to do so violated his statutory rights under Evidence Code sections 402 and 403,[4] and his constitutional right to due process. The argument fails. To the extent Smith and Wheeler intended to join this claim, it is forfeited because they did not join the motion below, and, in any event, it is equally meritless as to them.

Bryant acknowledges the record does not disclose whether the court ever ruled on the request, either when it was initially made, or shortly before the trial actually began. Bryant's failure to secure a ruling on his motion forfeits any appellate claim of error. Here, there is simply no ruling for this court to review. Even if Bryant could demonstrate the motion was denied, there was no error. Bryant points to no authority establishing that the court must conduct a *pretrial* hearing on the admissibility of anticipated evidence, much less do so years before the trial starts. A trial court is not required in all cases to conduct a " 'preliminary inquiry' " regarding the sufficiency of proffered other crimes

---

**4** Evidence Code section 402, subdivision (b), provides in relevant part that "[t]he court *may* hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ." (Italics added.)

Evidence Code section 403, subdivision (a)(1), provides in relevant part that when the "relevance of proffered evidence depends on the existence" of foundational facts, "[t]he proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact." (See also Evid. Code, § 405 [addressing the trial court's duty to evaluate preliminary facts related to evidentiary rules of exclusion]; *People v. Cottone* (2013) 57 Cal.4th 269, 282-287 [discussing the distinction between Evid. Code §§ 403 and 405].)

evidence. (*People v. Clair* (1992) 2 Cal.4th 629, 677-678.) During trial the court ruled on Bryant's numerous objections to specific evidence. We reject the notion that asserted errors in those rulings somehow give rise to a retroactive violation of Bryant's rights based on the absence of an earlier pretrial hearing.[5]

## C. Denial of Defendants' Motions to Recuse the Los Angeles County District Attorney's Office

During pretrial proceedings before severance of the capital offenses and defendants, the court granted a motion to recuse the entire Los Angeles County District Attorney's Office (LADA). The Attorney General sought review and the Court of Appeal reversed for abuse of discretion. Bryant contends that permitting the LADA to prosecute him violated his statutory rights under section 1424 and his rights under the state and federal Constitutions. We assume Smith and Wheeler have properly joined in this claim. Defendants establish no statutory or constitutional error.

### 1. Background

Recusal was sought based on two separate pretrial events. First, during a pretrial writ proceeding, the lead prosecutor asserted that Bryant Family employees had "infiltrated" the district attorney's office. The defense had not been provided with discovery on that subject. Second, the prosecution delayed disclosing unredacted interview notes of a deputy district attorney. The notes expressed the deputy's belief that a police investigator and the lead prosecutor had questioned a witness in a way that affected her recollections and her testimony at a preliminary hearing. This witness ultimately did not testify at trial.

---

[5] We discuss, *post*, defendants' separate challenges to the court's rulings admitting various items of evidence.

In addressing the infiltration issue, the trial court conducted a series of in camera ex parte meetings with LADA personnel and later took testimony in open court. The court found no infiltration by the Family and denied the motion to recuse.

As to the interview notes, the prosecution had provided redacted copies of the notes that omitted the prosecutor's concerns. The fact that the notes had been redacted was not apparent from these copies. The prosecution later requested in camera review of the complete notes. It sought a ruling on whether the previously redacted portions constituted privileged work product. The court declined to undertake that review and the prosecution produced the unredacted copies. In light of this delayed disclosure, defendants renewed their recusal motion.

The trial court heard testimony from a number of LADA supervisors and line deputies. There was a dispute among the prosecutors whether the witness questioning had been improper. The court ultimately granted the recusal motion, finding that there had been "an intentional, deliberate holding back of evidence," and that essentially all the high-level supervisors in the office had been involved. Part of the trial court's concern was that during its review of the infiltration issue the court had asked the prosecutors whether there was any other information that it should know. No one had mentioned the notes or the internal conflict.

The Attorney General appealed. (See § 1424, subd. (a)(1).) The Court of Appeal concluded that the failure to disclose the complete notes did not support recusal of the entire office. We denied defendants' petitions for review.

The LADA removed from the case the lead prosecutor who had made the infiltration assertion. The prosecutor who wrote the notes about the interview had previously been removed and the witness was not called at trial.

28

## 2. *Applicable Law*

Section 1424 provides, in relevant part, that a motion to recuse a prosecutor "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) The statute provides a two-part test: (1) whether there is a conflict of interest, and (2) whether the conflict is so severe as to disqualify the district attorney from acting. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) Recusal under section 1424 requires "a showing of a real, not merely apparent, potential for unfair treatment, and further requires that that potential 'rise to the level of a *likelihood* of unfairness.' [Citation.] Although the statute refers to a 'fair trial,' we have recognized that many of the prosecutor's critical discretionary choices are made before or after trial and have hence interpreted section 1424 as requiring recusal on a showing of a conflict of interest ' "so grave as to render it unlikely that defendant will receive fair treatment *during all portions of the criminal proceedings*." ' [Citation.]" (*People v. Vasquez* (2006) 39 Cal.4th 47, 56 (*Vasquez*).) If a defendant seeks to recuse an entire office, the record must demonstrate "that the conduct of any deputy district attorney assigned to the case, or of the office as a whole, would likely be influenced by the personal interest of the district attorney or an employee." (*Id.* at p. 57.)

As a constitutional matter, we acknowledged in *Vasquez* that "[n]either this court nor the United States Supreme Court has delineated the limitations due process places on prosecutorial conflicts of interest." (*Vasquez, supra*, 39 Cal.4th at p. 60.) Indeed, "[a]s . . . prosecutors [cannot] completely avoid personal influences on their decisions, to constitutionalize the myriad distinctions and judgments involved in identifying those personal connections that require a . . . prosecutor's recusal might be unwise, if not impossible. The high court's approach to *judicial* conflicts generally leaves that line-drawing process to state disqualification and disciplinary law, with 'only the most extreme of cases' being recognized as constitutional violations. [Citation.] [¶] To show

29

a due process violation arising from a *prosecutor's* conflicting interest should be more difficult than from a judge's, for the 'rigid requirements' of adjudicative neutrality . . . do not apply to prosecutors." (*Id.* at p. 64, italics added.) In *Vasquez*, we concluded the defendants had failed to establish a violation of due process when the prosecutors' conflicts did not arise from "a direct, substantial interest in the outcome or conduct of the case separate from their proper interest in seeing justice done," and any prosecutorial conflict that existed was not " 'so severe as to deprive [defendants] of fundamental fairness in a manner "shocking to the universal sense of justice." ' " (*Id.* at pp. 64-65.)

### 3. *Discussion*

The Attorney General initially contends that review of the recusal issue is partially precluded by the law of the case doctrine.**6** Not so. The Court of Appeal determined that the factual basis for the order was the untimely disclosure of the complete interview notes. Thus, it concluded there was "no basis for recusal in the delayed discovery of the one sentence in the [witness interview] notes which was improperly redacted." Defendants' claim here is broader. They urge the LADA should have been recused based on the totality of the evidence before the trial court. Because the factual basis for the claim here is materially different from that considered by the Court of Appeal, the law of the case doctrine is not applicable. (*Boyer*, *supra*, 38 Cal.4th at p. 443; *People v. Mattson* (1990) 50 Cal.3d 826, 850.) The Attorney General's contention that Smith forfeited any

---

**6** "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' " (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893.)

30

appellate claim by initially failing to join in the recusal motion also fails. He joined in the motion resting on the totality of the circumstances.

Arguing for reversal, defendants focus primarily on why the past actions of the prosecutors were improper. That is not the proper inquiry. The prosecutors whose conduct was questioned were removed from the case. The remaining question is whether *any* Los Angeles deputy district attorney could fairly prosecute. Recusal of a prosecutor under section 1424 constitutes a statutorily authorized judicial interference with the executive branch's constitutional role to enforce the law. Accordingly, the decision whether to recuse must be carefully considered. "[R]ecusal of an entire prosecutorial office is a serious step, imposing a substantial burden on the People, and the Legislature and courts may reasonably insist upon a showing that such a step is necessary to assure a fair trial." (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1156 (*Hamilton*).)

Recusal is not a mechanism to punish past prosecutorial misconduct. Instead, it is employed if necessary to ensure that *future* proceedings will be fair. "[S]ection 1424 does not exist as a free-form vehicle through which to express judicial condemnation of distasteful, or even improper, prosecutorial actions." (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 735.) Defendants have failed to demonstrate a likelihood that LADA could not prosecute the case fairly. Nor do they show that, in fact, the ensuing proceedings were unfair.

For the most part defendants rely on accusations of overzealous advocacy by prosecutors who were replaced. Defendants claim those prosecutors made misrepresentations in court documents, tried to taint the jury pool, failed to timely provide discovery, and tampered with a witness. No aspect of these alleged improprieties, however, establishes a conflict of interest that was likely to affect the hundreds of *other* prosecutors in the office. (See *Vasquez*, *supra*, 39 Cal.4th at p. 57, fn. 2; *People v. Gamache* (2010) 48 Cal.4th 347, 366 (*Gamache*).) Even if specific prosecutors had engaged in misconduct, this behavior standing alone would not

necessarily evince a likelihood that other prosecutors would exceed the bounds of proper advocacy. "Our cases upholding recusal have generally identified a structural incentive for the prosecutor to elevate some other interest over the interest in impartial justice, should the two diverge." (*People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 754.) Here, defendants point to nothing in the record establishing that the prosecutors who ultimately tried the case engaged in any improper action due to a conflict of interest.

Defendants also assert that the LADA's failure to criminally prosecute the suspected office infiltrators was unfairly lax compared to the prosecution of defendants, and that its handling of the witness interview and the prosecutor's notes similarly amounted to an improper "cover up." That the office treated accusations of employee improbity differently from charges of a quadruple murder including a child victim is hardly surprising. It certainly does not establish that the LADA suffered from a conflict of interest likely to make defendants' prosecution unfair. Even if the events surrounding the witness interview and the prosecutor's notes could be characterized as a cover up, the LADA did ultimately disclose the matter. Once again, defendants fail to explain how that behavior, remedied by the office's own actions, establishes a likelihood of future misconduct.

Finally, defendants assert that because various supervisors had become involved in the recusal matters, any prosecutor would have been "under the watchful eye of these personally-involved powers within the office." They argue that a prosecutor's objectivity could have been tainted by the impact of the trial on the future of both the trial prosecutors and involved supervisors. As we explained in *Vasquez*, however, "[d]istrict attorneys, as people, inevitably hold individual personal values and allegiances and feel varying emotions relating to their work. As public officeholders, they may also have political ambitions or apprehensions. But that a public prosecutor might feel unusually strongly about a particular prosecution or, inversely, might hesitate to commit to a

32

prosecution for personal or political reasons does not inevitably indicate an actual conflict of interest, much less a constitutional bar to prosecution." (*Vasquez*, *supra*, 39 Cal.4th at p. 63.) "Zealous advocacy in pursuit of convictions forms an essential part of the prosecutor's proper duties and does not show the prosecutor's participation was improper." (*Id.* at p. 65.) Recusal is justified only when the prosecutor has "an interest in the case extraneous to [his or her] official function." (*People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 746.) Defendants fail to establish the existence of such an interest.

### D. Denial of Bryant's Motion to Exclude the Investigating Officer

Before trial, Bryant sought to "recuse" Detective James Vojtecky from any further investigation in the case and to exclude him from the trial except when testifying, notwithstanding the prosecutor's authority to designate him as the officer entitled to be present at trial under Evidence Code section 777, subdivision (c).[7] Bryant asserted that Detective Vojtecky had tampered with a witness, attempted to intimidate a witness during testimony, withheld discovery, and tried to adversely influence Bryant's jail housing. He also pointed out that the Attorney General, in contesting the LADA recusal motions, had suggested that Detective Vojtecky might instead be removed from the case. Bryant argued that Detective Vojtecky would continue to engage in misconduct and his presence at the prosecution's table might unfairly bolster the jury's view of his credibility. The

---

[7] Evidence Code section 777 provides, "(a) Subject to subdivisions (b) and (c), the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses. [¶] (b) A party to the action cannot be excluded under this section. [¶] (c) If a person other than a natural person is a party to the action, an officer or employee designated by its attorney is entitled to be present."

Counsel also unsuccessfully moved that Detective Vojtecky be prohibited from being armed in the courtroom, and directed to submit to a psychiatric evaluation. Defendants do not contest those rulings on appeal.

33

trial court denied the motion. Assuming there was legal authority to grant it, the court found no indication the defense actually had been or would be prejudiced by the detective's continued participation in the investigation or his presence at trial. Bryant challenges that ruling. Smith and Wheeler cannot join in this claim because they did not do so below. The trial court did not err.

Bryant first contends the Attorney General is "judicially estopped" from arguing that the trial court ruled properly, because the deputy attorney general opposing recusal had suggested the removal of Vojtecky as an alternative. In dissuading litigants from taking opposite positions on an issue at different points in a proceeding, the doctrine of judicial estoppel serves to maintain fairness and judicial integrity. (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986.) The fundamental purposes of the doctrine would not be advanced by applying it here.

The Attorney General was seeking to prevent recusal of the entire district attorney's office. The suggestion that recusing the detective would be a less drastic option is not the same as agreeing that such a removal was legally required. Legitimate and practical advocacy does not undermine the integrity of the judicial system. More importantly, Bryant's ability to fully litigate his recusal motion has not been negatively affected, nor have the People obtained some other unfair advantage.

As to the merits, Bryant relies on section 1424, and *People v. Merritt* (1993) 19 Cal.App.4th 1573 (*Merritt*). His argument fails.

Section 1424, subdivision (a)(1) authorizes the filing of a motion "to disqualify a district attorney from performing an authorized duty" that "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." As noted, the statute does not authorize the trial court to order recusal as a punishment for past misdeeds. Yet Bryant urges that "recusal" of Vojtecky would have served as an "appropriate sanction" for his alleged misconduct.

34

More fundamentally, Bryant seeks to expand the scope of the statute. Section 1424 permits a court to disqualify a *prosecutor* from performing an authorized duty. In *Merritt*, the defendant filed a motion to dismiss the charges against him based on alleged misconduct by a district attorney investigator for withholding exculpatory material, suggesting that a witness commit perjury, and making sexual advances toward the witness. After the trial court denied the motion to dismiss, the defendant moved to recuse the entire office. Despite representations regarding the steps prosecutors had taken to exclude the investigator from any aspect of the case, the trial court granted the motion. (*Merritt*, *supra*, 19 Cal.App.4th at pp. 1577-1578.) On appeal the recusal of the entire office was held unjustified. The order was modified "to apply only to preclude participation by [the investigator] in any further investigation or decisionmaking with respect to [the defendant's] case, and to any other investigators or deputy district attorneys who may be shown to have participated in or approved the activities of [the investigator]." (*Id.* at pp. 1581-1582.) In essence the *Merritt* court barred the district attorney from permitting the particular investigator's continued involvement, because any such participation would have resulted in the likelihood of an unfair trial.

In explaining the basis of the *Merritt* ruling, we do not necessarily endorse the modified recusal order as valid under the statute. It is arguable the statute was not intended to apply to nonattorney employees, who do not exercise discretionary authority over the actual prosecution of cases. We need not decide here whether the statute grants courts a role in overseeing the inner workings of a prosecutor's office beyond ensuring that a properly impartial prosecutor handles the case. Detective Vojtecky was an employee of the Los Angeles Police Department. His investigation of the crimes was not pursuant to any delegation of authority from the district attorney. Bryant does not cite, nor are we aware of, any other authority permitting a judge to direct that a particular police officer be barred from participating in the investigation of a specific crime.

35

Bryant's contention that the trial court should have overridden the prosecutor's decision to designate Detective Vojtecky as the investigating officer, and instead excluded him from the trial, fails. By statute, Detective Vojtecky was entitled to be present at the trial. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 950-951 (*Gonzalez*).) Bryant's allegation of potential unfairness arising from his presence at counsel table is too speculative to establish error. (See *id.* at p. 951.) The defense remained free to bring to the court's attention any alleged misconduct that did materialize, and to seek appropriate relief.

## E. Denial of Defendants' Motions for Severance

At numerous points before and during the trial, defendants moved to sever their trials from each other and, in particular, from codefendant Settle, who represented himself. The court, having already severed the noncapital defendants and charges, consistently refused to grant the requests for separate murder trials. Defendants contend the court abused its discretion and their joint trial was grossly unfair. Neither an abuse of discretion nor an unfair trial occurred.

"Section 1098 provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they *must* be tried jointly, unless the court order[s] separate trials.' Our Legislature has thus 'expressed a preference for joint trials.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 574 (*Avila*), italics added.) As the United States Supreme Court explained regarding a similar federal statutory preference, "[j]oint trials 'play a vital role in the criminal justice system.' [Citation.] They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.' [Citation.]" (*Zafiro v. United States* (1993) 506 U.S. 534, 537 (*Zafiro*).)

"[T]he court may, in its discretion, order separate trials 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion

36

resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' [Citations.] [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.] If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " (*Avila*, *supra*, 38 Cal.4th at pp. 574–575.)

In the general sense, this was a classic case for a joint trial. Defendants "were charged with the same crimes arising from the same events." (*Letner*, *supra*, 50 Cal.4th at p. 150.) Defendants' arguments that certain aspects of this case overrode the preference for a joint trial are unpersuasive.

Their arguments overlook three fundamental concepts relating to joint trials. First, there is a difference between when a trial court *may* order a severance and when it *must* do so. Second, a joint trial is not equivalent to simultaneous separate trials of the defendants. Third, severance is not required simply because a joint trial may reduce the likelihood of one or more of the defendants obtaining an acquittal.

Defendants also cite as grounds for severance various asserted errors they have raised as independent claims for relief. As explained below those claims also lack merit.

### 1. Conflicting Defenses

A majority of Bryant's arguments revolve around his assertion that the codefendants, particularly Settle, presented evidence that conflicted with Bryant's own defense or further incriminated him. Therefore, the codefendants supposedly acted as "second prosecutors," bolstering the prosecution's case against him. Smith and Wheeler raise similar contentions. Simply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1297-1298.) Indeed,

37

important concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges.

*Avila* quoted *People v. Massie* (1967) 66 Cal.2d 899 (*Massie*), listing several circumstances in which "the court *may*, in its discretion, order separate trials." (*Avila*, *supra*, 38 Cal.4th at p. 574, italics added.) Among these is the presence of " 'conflicting defenses.' " (*Ibid*.) As we have made clear in subsequent decisions, however, the possible or even actual presentation of antagonistic defenses by codefendants does not necessarily *require* severance. " 'If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case." ' [Citation.] Accordingly, we have concluded that a trial court, in denying severance, abuses its discretion only when the conflict between the defendants *alone* will demonstrate to the jury that they are guilty. If, instead, 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.' [Citations.]" (*Letner*, *supra*, 50 Cal.4th at p. 150; *People v. Hardy* (1992) 2 Cal.4th 86, 168 (*Hardy*).) Nor does the federal Constitution compel severance when codefendants present conflicting defenses. (See *Runningeagle v. Ryan* (9th Cir. 2012) 686 F.3d 758, 776 ["we have explicitly concluded that *Zafiro* and [*United States v.*] *Lane* [(1986) 474 U.S. 438] do *not* 'establish a constitutional standard binding on the states and requiring severance in cases where defendants present mutually antagonistic defenses' "].) Moreover, when there is sufficient independent evidence of the defendants' guilt, the actual presentation of conflicting defenses at trial does not reduce the prosecution's burden or otherwise result in gross unfairness. (*Letner*, *supra*, 50 Cal.4th at p. 153.)

38

Here, sufficient independent evidence of each defendant's guilt was manifest. If credited by the jury, James Williams's testimony alone was sufficient for conviction.[8]

## 2. *Evidence Admitted "Against" a Codefendant*

Defendants, particularly Smith and Wheeler, contend severance was required because evidence presented "against" one defendant negatively affected another defendant's case. This claim implicates the second and third considerations mentioned above. A joint trial is not equivalent to simultaneous separate trials, and the possibility that one defendant's chance of acquittal is reduced does not make a joint trial unfair.

Smith and Wheeler argue that, because they were jointly tried with Bryant, a plethora of evidence about the Bryant Family drug business was admitted "against" Bryant. Had they been tried separately a lesser amount of that evidence might have been admitted. Yet, as the high court stated in similar circumstances, the primary error in such a claim is each defendant's "characterization of the issue presented here as affecting *his* trial, as opposed to the *actual* trial in this case — the joint trial of [all of them]." (*Buchanan v. Kentucky* (1987) 483 U.S. 402, 418 (*Buchanan*).) In other words, the issue is not whether a theoretical separate trial of one defendant would have been different, but whether the joint trial that actually occurred was in some manner prejudicially unfair or unreliable.

Naturally, anyone facing prosecution would rather be tried on a single charge, rather than multiple counts. Likewise, an accused would rather not be associated in the jury's mind with other potentially unsavory characters. Jurors are expected to follow instructions in limiting evidence to its proper function, and the efficiency of trying connected crimes against different defendants "is a valid governmental interest."

---

[8]    As explained *post,* in part III.H.1., the trial court properly declined to instruct the jury that Williams was an accomplice as a matter of law. Thus, corroboration was not required under section 1111.

39

(*Spencer v. Texas* (1967) 385 U.S. 554, 562.) Moreover, a joint trial may actually *enhance* fairness and reliability: "In joint trials, the jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials. From such a perspective, it may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each . . . ." (*Buchanan*, *supra*, 483 U.S. at p. 418.) The high court has also observed: "While '[a]n important element of a fair trial is that a jury consider *only* relevant and competent evidence bearing on the issue of guilt or innocence,' [citation] (emphasis added), a fair trial does not include the right to exclude relevant and competent evidence." (*Zafiro*, *supra*, 506 U.S. at p. 540.) Further, the prosecution's theory regarding Smith and Wheeler's involvement rested on their roles as active Family members who took direction from Bryant. As a result, much evidence about which they complain would have been relevant even at a separate trial. The argument that some evidence admitted at a joint trial might not have been admitted at a separate trial misses the mark.

Similarly unavailing are defendants' assertions that the joint trial made it more difficult for them to obtain acquittals. Defendants are constitutionally entitled to a fair trial, not one that gives them the best possible chance for an acquittal. An essential goal of a trial is that the fact finder determine what happened through a fundamentally fair and reliable process. As we stated in the analogous circumstance of joinder of charges, "the benefits of joinder are not outweighed — and severance is not required — merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried." (*People v. Soper* (2009) 45 Cal.4th 759, 781 (*Soper*).) "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." (*Zafiro*, *supra*, 506 U.S. at p. 540.)

40

Similar considerations apply to the evidence regarding the attacks on Keith Curry, the husband of Bryant's ex-wife. Bryant's comparable jealousy toward Andre Armstrong would establish a motive for directing his minions Smith and Wheeler to kill him. If it could be proven, as it was here, that Smith worked for Bryant and carried out his illegal directives, evidence showing Bryant's state of mind was relevant to establish Smith's guilt. The circumstance that Bryant's jealousy was partially established through his statements as a party opponent (Evid. Code, § 1220) does not render the evidence of his motive inadmissible as to Smith.

In a somewhat related argument, Bryant now contends *he* was unfairly prevented from establishing an alternative reason why Smith might have shot Curry. He asserts that Smith was angry because Curry took Smith's children to drug transactions attempting to deflect law enforcement attention. Other than providing conclusory argument and speculation, Bryant has not explained how he actually could have established this alternative motive had the trials been severed. (See *Massie*, *supra*, 66 Cal.2d at p. 917; *People v. Cummings* (1993) 4 Cal.4th 1233, 1286, fn. 26.) Further, when Smith cross-examined Curry on this subject, he denied taking the children with him to drug sales.

We also reject the conclusory allegations that the amount of evidence presented to the jury was too extensive and complicated, and that the trial court's instructions did not adequately guide the jury's deliberations at either the guilt or penalty phase. "Objection, this is too complicated," has yet to be recognized as a valid statutory ground. Juries frequently evaluate complex cases. There is no indication the jurors were unable to fairly do so here.

### 3. *Guilt by Association and Weak Case Joined to Strong Case*

Defendants contend the joint trial was grossly unfair because of "guilt by association." For instance, Smith argues he was prejudiced by being tried with Bryant, the leader of the criminal organization who had "acted with impunity and terrorized the

41

community." Wheeler argues he was prejudiced by being tried with Bryant and Smith, who, he asserts, were much more important members of a "very bad organization made up of bad guys doing bad things."**9** In related arguments, defendants unpersuasively point to assertedly lesser evidence of their own guilt compared to the guilt of their codefendants to argue severance was required.

Whenever defendants are jointly tried, part of the prosecution's case will naturally attempt to establish that the defendants associated with each other, at least to the extent that they all participated in the crimes at issue. To some degree, as the high court has recognized, "[w]hen many conspire, they invite mass trial by their conduct." (*Kotteakos v. United States* (1946) 328 U.S. 750, 773.) That defendants associated more broadly than their specific involvement in the alleged crimes may also be directly relevant to establishing their guilt. In *Letner*, *supra*, 50 Cal.4th at page 152, we held the prosecution could properly argue the defendants committed the crimes in concert based on their past history of joint activity. In *People v. Champion* (1995) 9 Cal.4th 879, 921, we observed that evidence of the defendants' membership in a gang did not create improper guilt by association, but instead "formed a significant evidentiary link in the chain of proof tying them to the crimes." Moreover, it is also quite likely that different defendants participating together in a crime will have different levels of involvement and different personal backgrounds. These circumstances alone do not compel severance or render a joint trial grossly unfair. Individuals who choose to commit crimes together are not generally entitled to shield the true extent of their association by the expedient of demanding separate trials.

---

**9** Bryant argued at trial that his case should be severed from Wheeler's because witnesses identified Wheeler as the one who killed Loretha Anderson and her young daughter.

To justify severance the characteristics or culpability of one or more defendants must be such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue. (*Letner*, *supra*, 50 Cal.4th at p. 152.) Here, it does not appear the jury would have found one defendant's characteristics or culpability so overwhelming compared to the others that it convicted any defendant simply because of his association, rather than because his individual guilt had been proven. While each had different roles and different places in the Family hierarchy, there was ample evidence that all defendants were well aware of the nature, scope, and brutality of Family operations and willingly took part.

Similarly unconvincing are defendants' contentions that the evidence of another defendant's guilt was especially weak compared to the evidence of his own. All the defendants here contend the evidence against them was, in some aspect, weaker than that incriminating the others. In this context, the strength of the case against oneself is clearly in the eye of the beholder. (See *Letner*, *supra*, 50 Cal.4th at p. 151.) We have recognized the potential for unfairness if one defendant may be swept up in a much more compelling case against codefendants. Such a scenario is not present here, where the strength of the evidence against each defendant was roughly equivalent. Each defendant was incriminated by his ties to the Bryant Family and the Wheeler Avenue house, and each was equally incriminated by the testimony of James Williams. Accordingly, a comparison of the relative strength and weakness of each defendant's guilt does not show an abuse of discretion or gross unfairness in the joint trial. (*Ibid.*)

Bryant makes the novel argument that the penalty phase was grossly unfair because Smith's and Wheeler's mitigation evidence was more compelling. Initially, it is obvious that the jury did not find Smith's and Wheeler's mitigation evidence very compelling. It returned death verdicts as to them as well. In any event, it is not surprising that different defendants presented different mitigating evidence regarding

43

their backgrounds. That circumstance alone clearly cannot establish that the jury failed to give each defendant individualized consideration. Bryant's speculation that the jury impermissibly compared defendants' backgrounds in reaching its verdicts is unpersuasive. We also observe that some comparison between defendants in terms of their relative *culpability* is proper. Section 190.3, factor (j), directs the jury to consider whether a defendant's participation in the crimes was "relatively minor." "Properly understood, intracase proportionality review is 'an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others.' " (*People v. Hill* (1992) 3 Cal.4th 959, 1014.)

### 4. Security Measures

Defendants contend that because the four capital defendants were tried together, the court put in place various security measures that prejudiced the jury against them, and that would not have been required had they been tried separately. This claim is based on pure speculation that the security measures were prejudicial, and that similar measures would not have been put in place in separate trials. Moreover, as we discuss *post*, in part II.F., the court did not abuse its discretion or violate defendants' rights by ordering the security measures at issue.

### 5. Joint Trial with Self-Represented Defendant and Misconduct by Codefendants

Defendants contend the trial court should have granted severance based on the fact that codefendant Settle represented himself and engaged in various asserted improprieties that the trial court failed to prevent or remedy. In a similar vein, Smith characterizes various actions by Bryant, Wheeler, and their attorneys as misconduct that assertedly prejudiced him, giving jurors a negative impression of all criminal defendants and defense attorneys. There were no specific objections at trial to many of the instances of "misconduct" now complained of on appeal. Even assuming these contentions are properly raised, defendants' trial was not grossly unfair.

44

As an initial matter, no authority holds that severance is required simply because self-represented and attorney-represented codefendants have been joined for trial. To the contrary, many courts have held there is no per se bar against joint trials in these circumstances. (See, e.g., *U.S. v. Celestin* (1st Cir. 2010) 612 F.3d 14, 21; *U.S. v. Veteto* (11th Cir. 1983) 701 F.2d 136, 139.) We agree. It is always possible that a codefendant or, for that matter, another attorney might engage in inappropriate behavior. Protection against that possibility is found not in severance, but in the court's duty to control the proceedings and ensure each defendant receives a fair and reliable trial. A court, of course, may take appropriate measures to prevent and sanction misconduct. (See, e.g., *Veteto*, at pp. 138-139 [suggesting various precautionary steps].) Severance is not required simply as a preemptive measure based on an assumption that the court will be unable to control the proceedings.

We also reject defendants' assertions the joint trial was unfair because Settle ultimately did engage in misconduct, which the court failed to prevent or remedy. First, the asserted lack of cooperation between Settle and the other defendants cannot alone render the joint trial unfair. Manifestly, there is no requirement that codefendants cooperate. Each is entitled to fairly pursue his defense as he, and his counsel, see fit. Defendants also allege Settle improperly gave false testimony and argued facts not in evidence.[10] To some degree, this assertion repackages the claim that defendants were prejudiced by the presentation of conflicting defenses, which we have rejected. Even if Settle's actions could additionally be characterized as misconduct, we reject the notion that the trial was unfair as a result. Nothing in the record indicates that Settle's actions

---

[10] Also mentioned is Settle's supposedly improper conduct during a meeting with witness Una Distad, in which he apparently did not follow the trial court's instructions about what he could tell and ask the witness. Defendants do not explain what unfairness resulted. None is apparent.

45

rendered the jury unable to fairly evaluate all the evidence regarding each defendant's guilt or innocence, or that the jury did not follow the court's repeated instructions that the opening statements and closing arguments were not evidence. Even if Settle presented untrue testimony or engaged in inappropriate behavior, the trial was not unfair. The presentation of disputed testimony occurs in almost every trial and accusations of improper conduct are common. "Juries are not so susceptible that they cannot measure intelligently the weight of [evidence] that has some questionable feature." (*Manson v. Brathwaite* (1977) 432 U.S. 98, 116.) The same is true regarding Smith's assertions that Bryant and Wheeler gave false testimony or they and their attorneys acted disrespectfully. Nothing in the record indicates the jury was unable to intelligently weigh the actual evidence. Simply because the jury was unable to reach verdicts as to Settle and he subsequently pleaded guilty to lesser charges, does not in some way render the jury's guilty verdicts as to defendants unfair.

Defendants challenge the trial court's decision to let Settle reopen his case and testify after the other defendants concluded their own cases. They argue Settle falsely told the court he would not testify in order to hear the other defense presentations, then tailor his testimony to incriminate them and exonerate himself. The court, in their view, failed to recognize its authority and discretion to control the order of the presentation of evidence. Their own argument defeats them. "[S]ection 1044, . . . vests the trial court with broad discretion to control the conduct of a criminal trial." (*People v. Calderon* (1994) 9 Cal.4th 69, 74-75.) Defendants did not specifically object on this ground. Even if the lack of an objection were overlooked, defendants cannot identify any error that resulted in cognizable prejudice to them.

Defendants had no statutory or constitutional right to have the defenses presented in a particular order. Although there had been an agreement among the defense teams on that subject, the trial court was not bound by their decision and had ultimate authority over the presentation of evidence. Sections 1093 and 1094 provide the order of

46

procedure to be followed in a criminal trial *unless* the court deems there are good reasons to follow a different order. Wheeler, by defense agreement, went first. He knew that Settle might testify afterward. Although Smith and Bryant had already rested when Settle decided to testify, they have not demonstrated they made any strategic decisions based on the agreed-upon order of the presentations. Nor would we necessarily conclude any such reliance on their part would have been reasonable, given the trial court's controlling discretion in the matter. Furthermore, a defendant who initially decides not to testify may legitimately change his mind before the trial concludes. It would be most unusual, if not improper, for a court to deny a defendant who makes a timely request to testify in his defense the opportunity to do so. There is no indication the trial court would have prevented any defendant from reopening his case to present evidence or testimony to respond to Settle's testimony. In fact, Wheeler did so in his surrebuttal case by calling Settle's brother Frank as a witness.

Even if Settle's testimony undermined defendants' cases, that potential did not result in an unfair trial. The jury could assess the credibility of his testimony in light of its timing and all the other evidence. In addition, defendants were permitted to cross-examine Settle, to present additional evidence in response, and to argue his unreliability.

Finally, defendants contend Settle improperly commented on their having chosen to be represented by counsel, and on Smith's decision not to testify in his defense. In both his opening statement and closing argument to the jury, Settle stated that he was representing himself because he believed that doing so was "the best way to get to the truth." He also mentioned that, although he had the right to refrain from presenting a defense, he had chosen to give up his right to remain silent, so he could testify to establish his innocence.[11] Defendants argue that Settle's comments improperly invited

---

[11]     In his opening statement, Settle said: "My name is Jon Settle, and I would like to tell you why I am representing myself. I am representing myself because this is a truth-

*(footnote continued on next page)*

the jury to draw a negative inference from their having exercised their constitutional rights to be represented by counsel and, as to Smith, the right not to testify.  Not so.

Under *Griffin v. California* (1965) 380 U.S. 609, 615, a prosecutor's comment on a defendant's decision not to testify violates the constitutional right to silence.  This prohibition applies to such comments made by defense attorneys as well.  "Thus, in a joint trial of multiple codefendants, comment by an attorney representing one defendant on the silence of a codefendant violates the codefendant's constitutional right to freedom from adverse comment on his silence at trial." (*Hardy*, *supra*, 2 Cal.4th at p. 157.)  That rule also binds defendants acting as their own counsel.

Defendants also contend Settle's statements commented not only on their silence, but also their decision to rely on counsel to represent them.  Comment on the exercise of the Sixth Amendment right to counsel would be equally inappropriate.  Guilt cannot be inferred from the reliance on a constitutional right.  Imposing a penalty for its exercise undermines that right "by making its assertion costly." (*Griffin v. California*, *supra*, 380 U.S. at p. 614.)

---

*(footnote continued from previous page)*

seeking process, and I feel that the best way to get to the truth is through the defendant. And I believe in the justice system, and you believe in our justice system.  And as you know, ladies and gentlemen, the defendant in a criminal case has an absolute right to remain silent and put on no evidence whatsoever.  But I will give up that right so that I could take the stand and answer any of the questions that any of those attorneys would like to ask regarding my life."

In his closing argument, Settle said:  "In my on [*sic*] statement I made — I'd like to just go over some things that I said in my opening statement.  I said that I'm here representing myself because it is a truth-seeking process, and I feel that the best way to get to the truth is through the defendant.  I believe in the justice system, and — and that I will get up there and answer all the questions of any of these attorneys . . . ."

However, not every statement made before a jury that touches on one defendant's rights to silence and representation amounts to a constitutional violation. For example, a prosecutor is permitted to comment on the state of the evidence and the defendant's failure to call a logical witness, despite the mere possibility that the statement might also be interpreted as a reference to the defendant's failure to testify. (*People v. Thomas* (2012) 54 Cal.4th 908, 945.)[12]

In addition, in a joint trial a defendant's individual right to present a vigorous defense may justify making arguments that could seem to implicate the other defendants' constitutional rights, even though similar comments would be improper had they been made by a prosecutor. For instance, when a particular defendant has chosen to testify and others have not, the testifying defendant is permitted to "emphasize to the jury that *his* credibility is strong because he took the stand and submitted to cross-examination," despite the fact that such comments could be broadly viewed as also hinting at the other defendants' having chosen not to testify. (*Hardy*, *supra*, 2 Cal.4th at p. 158.) A prosecutor may not invite the jury to infer guilt from silence. However, a comment by *the defense* regarding that defendant's *own* choice to testify properly urges that his or her testimony is worthy of belief because it was freely given and subject to adversarial testing. The jury will not necessarily interpret such a statement by one defendant as calling into question, or even referring to, the guilt or innocence of the other defendants. (*Ibid*.; see also *Letner*, *supra*, 50 Cal.4th at p. 153 [rejecting as unsupported the

---

**12**     However, the prosecutor cannot refer to the absence of evidence that only the defendant's testimony could provide. (*People v. Brady* (2010) 50 Cal.4th 547, 565-566.) A defendant may also request that the jury be explicitly instructed not to consider the fact that he has not testified. (See CALJIC No. 2.60; CALCRIM No. 355.) Such instructions are usually given only at the defendant's request, because they draw the jury's attention to the fact the defendant exercised the right to remain silent. (*People v. Roberts* (1992) 2 Cal.4th 271, 314.)

49

defendant's claim the jury held against him his decision not to testify when the codefendant had testified].)

Settle's comments are most reasonably understood as urging the strength of his own defense, not as comments on the codefendants' different constitutional choices. Settle did not directly comment on defendants' representation by counsel, or Smith's decision not to testify. Nor is it likely that the jury considered Settle's statements regarding his self-representation and decision to testify when assessing evidence of the other defendants' guilt or innocence. The remarks here are similar to those made in *Hardy*. Settle did not insinuate his codefendants were guilty because they were represented by counsel and had not testified. Instead he urged that *he* had " 'nothing to hide and that's why he got up on the witness stand and testified.' " (*Hardy*, *supra*, 2 Cal.4th at p. 160.) It is also notable that no defendant specifically objected to Settle's statements at trial or requested an instruction addressing this concern. Defendants have not established that their joint trial was rendered unfair by Settle's actions.

### F. Security Measures

Before trial, the court said it would order several heightened security measures. Defendants were to be restrained by either shackles or a "REACT belt."[13] Extra deputies would be stationed in the courtroom. Prospective and seated jurors would be identified by number only. Jurors would meet at a secret location each morning and be escorted to court by bailiffs. They would be sequestered in a special jury lounge during recesses, and

---

[13] "[T]he remote electronically activated control technology (REACT) belt" is a "battery-operated belt ' "consist[ing] of a four-inch-wide elastic band, which is worn underneath the prisoner's clothing." ' [Citation.] If activated by its remote transmitter, the belt can deliver a brief 50,000-volt electric shock." (*People v. Lomax* (2010) 49 Cal.4th 530, 560, fn. 8. (*Lomax*).)

be escorted back to the meeting site each evening.[14] Defendants, while objecting to the use of any restraints, chose to wear the REACT belts. They also unsuccessfully objected to the jury being kept anonymous. They did not object to the remaining security measures. On appeal, they contend the trial court erred in taking these steps, violating their constitutional rights. Defendants forfeited challenges to the measures other than the use of the belts and jury anonymity by failing to object. The trial court did not abuse its discretion here.

"In general, the 'court has broad power to maintain courtroom security and orderly proceedings' [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest" — such as the interest in courtroom security — specific to the defendant on trial.' [Citation.] We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at pp. 558-559.)

" 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' [Citation.] Although the

---

**14** There also was discussion of placing a metal detector at the entrance to the courtroom to screen spectators. The record, however, does not reflect whether this measure was used.

51

court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' [Citation.] The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 559.) The mere facts that the defendant is an unsavory character and charged with a violent crime are not sufficient to support a finding of manifest need. (*People v. Duran* (1976) 16 Cal.3d 282, 293.)

Defendants have not identified, and we are unaware of, any decision of this court holding that the basis for a finding of manifest need must be a showing of prior conduct of the exact type about which the court is concerned, or that the defendant himself personally had engaged in such conduct. A court's decision about the use of restraints involves a prediction of the likelihood of violence, escape, or disruption weighed against the potential burden on the defendant's right to a fair trial. Given the serious potential consequences on both sides of the scale, the range of factors the court may consider in assessing and weighing the risks should be broad. (See *People v. Cox* (1991) 53 Cal.3d 618, 651 [a manifest need for restraints may be based on " '[e]vidence of any nonconforming conduct . . . which . . . would disrupt the judicial process if unrestrained' "]; see also *State v. Stewart* (Minn. 1979) 276 N.W.2d 51, 62; *State v. Tolley* (N.C. 1976) 226 S.E.2d 353, 368.)

As we have also explained, "the stringent showing required for physical restraints like shackles is the exception, not the rule. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need. [Citations.] In contrast to physical restraints placed on the defendant's person, we have upheld most other security practices when based on proper exercises of discretion. Thus, we concluded the use of a metal detector or magnetometer at the entrance of the courtroom is not inherently prejudicial. [Citations.] And we have consistently upheld the stationing of

security or law enforcement officers in the courtroom. [Citations.]" (*People v. Stevens* (2009) 47 Cal.4th 625, 633-634 (*Stevens*).)

"[W]e will not overturn a trial court's decision to restrain a defendant absent 'a showing of a manifest abuse of discretion.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1050.) To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason." A merely debatable ruling cannot be deemed an abuse of discretion. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226; *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . . .' " (*Carrington*, *supra*, 47 Cal.4th at p. 195.)

The record reflects a manifest need to physically restrain these defendants. The trial court did not abuse its discretion or violate their constitutional rights.

The court here was clearly aware of its obligation to make its own determination on the need for restraints, and not simply defer to the wishes of the prosecutor or courtroom security personnel. There is no indication that the idea to use restraints came from anyone other than the judge himself. The court also clearly based its decision on the particular facts of this case, not a generalized policy that any defendant charged with a violent crime must be restrained. Indeed, Bryant cited the applicable law in his written opposition to the use of restraints. Although the court did not conduct a formal hearing with the presentation of evidence, the matter was discussed over the course of two pretrial proceedings, and the court summarized the case-specific information upon which it based its decision. Accordingly, this case is distinguishable from *People v. Mar* (2002) 28 Cal.4th 1201 and *People v. Hill* (1998) 17 Cal.4th 800, where trial courts had abused their discretion. In addition, as in *Lomax*, the trial court's ruling predated our decision in *Mar*, where we first applied the manifest need standard to the use of the REACT belt. The trial court here cannot be deemed to have abused its discretion because it did not

53

"foresee and discuss" the concerns addressed in *Mar* concerning "the potential psychological consequences of wearing a stun belt and the physical effects from electric shock in subjects with certain medical conditions." (*Lomax*, *supra*, 49 Cal.4th at p. 562.)

Defendants focus on the trial court's assessment of their potential for violence, disruption, or escape. During several years of court proceedings none of the defendants had been disruptive in court, nor had any escape plots been uncovered. There was no indication Bryant and Smith had been violent while in pretrial custody. Defendants assert there had been no suggestion of using restraints before the trial was to begin, and note that accusations of violence for which the defendant is on trial are not alone sufficient to justify restraints. Even in light of those facts and general principles, the trial court's rulings did not exceed the bounds of reason.

The trial court had before it a great deal of credible information from the preliminary hearings, charging documents, trial briefs, other summaries of the intended evidence, and in-court representations of counsel that defendants were part of a large-scale and extremely violent drug organization, with many members remaining at large. The organization had previously taken steps to interfere in court proceedings, attempting to bribe, intimidate, and even kill prosecution witnesses. The stakes for defendants in this capital trial were, obviously, quite high. There was no indication that any of the defendants was physically infirm or otherwise unable to attempt a violent escape. Once trial began, in the presence of the jury and spectators, the courtroom dynamics would change from the less formal pretrial proceedings. The challenge to maintain security if a disruption occurred would increase. The court was justifiably concerned others might undertake disruption, violence, or an escape plot on defendants' behalf. The court was aware of "ill will" between the defendants and codefendant Settle, such that Settle had been placed on "keep away" status at the jail and the only time all the defendants were together was in the courtroom. As to Wheeler specifically, the court knew he had been formally charged and held to answer for an attempted murder of a jail inmate and an

54

assault with a deadly weapon on a guard that had occurred during his pretrial incarceration. As to Bryant, the court was informed that he had been disciplined in the jail for possessing improper amounts of razor blades and food items, suggesting he was still engaged in organized illicit activities while in custody. As was the case in *Lomax*, the trial court considered the REACT belt to be a minimally obtrusive and restrictive device that would lessen the potential for violence or escape. Given the choice between shackles and the REACT belt, defendants chose the latter. In sum, we affirm the exercise of the court's discretion.

After the trial, the court acknowledged that the belts created a lump under defendants' clothes and it was "not impossible" that the jurors may have briefly seen them when defendants walked to the witness stand. Given the particularized finding of need in this case, the possibility that some jurors may have perceived defendants were wearing some type of device does not establish a constitutional violation. (*Deck v. Missouri* (2005) 544 U.S. 622, 629.)

Defendants also challenge the trial court's other security measures as improperly suggesting that their guilt was a foregone conclusion. Again, no objection was lodged beyond the use of restraints and the order for juror anonymity. In any event, "[s]ecurity measures that are not inherently prejudicial need not be justified by compelling evidence of imminent threats to the security of the court." (*People v. Jenkins* (2000) 22 Cal.4th 900, 997 (*Jenkins*).) None of the additional measures should be considered inherently prejudicial. Unlike the use of visible restraints, which a jury might interpret as a judicial comment on the defendant's own character and guilt, there are plausible and entirely likely interpretations of the other measures used in this case that would not lead the jury to draw any inference particular to a defendant. (See *Holbrook v. Flynn* (1986) 475 U.S. 560, 569.) The presence of security personnel in the courtroom is " 'ordinary and expected.' " (*Stevens*, *supra*, 47 Cal.4th at p. 635.) The court told the jurors that the anonymity order and details of their arrival and departure from court were designed to

protect their privacy from members of the press, and to make it easier for them to enter and leave the courthouse. It further instructed the jury before deliberations that "the security measures taken in relation to this, or any, trial are not evidence and cannot be considered or discussed by the jury in determining any issue in this case."

Accordingly, the additional security measures, considered individually and cumulatively, did not create an inherently prejudicial "aura of guilt." As we explained in *Stevens*: " 'Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance,' the high court stressed [in *Holbrook*] that it has 'never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.' [Citation.] That a security practice seems to focus attention on the defendant is not enough, without more, to render the practice inherently prejudicial." (*Stevens*, *supra*, 47 Cal.4th at p. 638.) As with the decision to order the use of restraints, the trial court exercised its discretion based on the circumstances of this particular case. The measures it ordered to minimize the danger of violence or an escape attempt were not beyond the bounds of reason.

### G. Admission of Recording of Police Interview with Andre Armstrong

The court admitted, over defense objection, a tape-recorded statement the deceased Andre Armstrong gave to police detectives. Defendants contend the admission violated their federal and state constitutional confrontation rights and was error under our statutory hearsay rule. (Evid. Code, § 1200.) Any error was harmless beyond a reasonable doubt.

The circumstances are these. A little more than a year after Armstrong shot and killed Kenneth Gentry, and after he had been arrested for that crime, Gentry's father was killed. On July 23, 1983, after Armstrong had been convicted of the Gentry murder and Goldman shooting, detectives investigating the father's death interviewed Armstrong.

56

There is no indication the detectives considered Armstrong a suspect. They did not give him *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436) before the interview. Armstrong told the detectives he did not know anything about the father's death. He did, however, admit his role in the Kenneth Gentry and Goldman shootings, saying he committed those crimes at the behest of the Bryants. They were to pay him approximately $15,000 for his efforts. Armstrong was unhappy because he had rejected an offer to plead guilty to the shootings in exchange for a reduced sentence. Instead, he went to trial expecting the Bryants to pay off the witnesses, but they failed to do so. He believed the Bryants therefore "owed" him, and told the detectives if he were to be released from prison he intended to "squeeze" the Bryants for money and a part of their drug distribution business. Armstrong considered the Bryants to be "lightweights" lacking the fortitude to oppose him. While recounting how he became involved with the Bryants, Armstrong also talked about the drug dealing and related violent crimes he previously had committed in St. Louis that supposedly included several murders. Armstrong also said he would kill a woman if he deemed it necessary, but would not kill a child for any reason.

The prosecution urged Armstrong's statement was admissible to establish three things: (1) the Bryants had hired him to shoot Goldman and Gentry; (2) Armstrong believed the Bryants owed him for having failed to dissuade the witnesses who testified against him; and (3) he intended to "squeeze" the Bryants when he was released from prison. The prosecution asserted that the statement was admissible under the hearsay exceptions for declarations against penal interest (Evid. Code, § 1230), statements of an existing mental state (Evid. Code, § 1250, subd. (a)(1)), and statements of present intent

57

to do a future act (Evid. Code, § 1250, subd. (a)(2); *People v. Alcalde* (1944) 24 Cal.2d 177).[15]

In guilt phase closing arguments the prosecutor explained, "Armstrong was the primary person they wanted to kill here for the reasons you know. . . . It isn't often that a jury hears the voice from the grave of one of the victims explaining the motive and why what happened here happened. . . . He explains exactly what happened at the Ken Gentry murder, why he did it and who he did it for and exactly what he was going to do when he got out, that they owed him. [¶] The Bryants owed him. They owed him for taking this fall for them. And when he got out, which he did, got his case reversed, he gets out and his guys from St. Louis come out and he is going to get a piece of their operation because they owe him. [¶] That is why he was killed here." The prosecutor later reiterated the argument that Armstrong's statement established the "motive and reasons that these crimes occurred."

The prosecutor also argued as follows. "You don't see more of an evil act than you see here. [¶] If you want to see the difference between Andre Armstrong — I'd be the last person to stand here and tell you that Armstrong had a lot of good qualities. He

_____

**15** Evidence Code section 1230 provides, in relevant part, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

Evidence Code section 1250, subdivision (a) provides, "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." "Evidence of a statement is inadmissible under this [provision] if the statement was made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.)

certainly didn't. He is a hit man for the Bryants. He is a cold blooded, ruthless killer. [¶] But there are some standards even against that. And if you want to know the difference between Armstrong and these guys look back at that tape. [¶] What you know about Andre Armstrong, if nothing else, is he liked kids. . . . His response [to the detectives' questions whether he would kill a child for money] is 'I might kill the woman but I'm not killing no kids. . . .' But killing children, folks. Even among hit men and killers there are some standards. And there is nothing lower than what happened in this case. All to protect — to put money in their pockets."

It is evident that Sixth Amendment jurisprudence following the Supreme Court's decision in *Crawford v. Washington* (2005) 541 U.S. 36 (*Crawford*) remains in considerable flux. (See the various opinions in *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221]; *People v. Dungo* (2012) 55 Cal.4th 608, 633-649 (dis. opn. of Corrigan, J.).) We need not venture into that thicket. We assume, but do not decide, the admission of hearsay here ran afoul of defendants' right to confrontation. " ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [*Chapman*]." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*); *Neder v. United States* (1999) 527 U.S. 1, 18.) Because we conclude that any error here was harmless under *Chapman*, we do not separately consider defendants' statutory hearsay arguments, which would be reviewed under the less demanding standard of *People v. Watson* (1956) 46 Cal.2d 818, 836.

The parties primarily dispute whether the admission of Armstrong's statement was harmless because other independent evidence proved the assertions contained in the tape: that he had acted as a "hit man" for the Bryant Family; had "taken the fall" for the Goldman and Gentry shootings; believed the Family owed him; and was later killed to eliminate his threat to Family operations. Defendants contest the admissibility of some of

59

the other evidence, including Armstrong's statements to other people that he had "taken the fall" for the shootings, and his expectation of compensation. They attack the persuasive value of evidence including the Bryant Family payments to Armstrong and his family while he was in prison, and Bryant's allusions to the events at Wheeler Avenue. It is unnecessary to parse these disagreements. Based on this record a rational jury clearly would have reached the same result even if none of the disputed evidence had been admitted.

Ignoring for the moment James Williams's testimony directly incriminating defendants, these murders were clearly not random acts of violence unrelated to the Bryant Family. The physical evidence established that the victims were shot in the entrance to, and while parked in front of, a house used in the Family operations. Armstrong and Brown were ambushed by people *inside* the fortified Wheeler Avenue house. The victims' bodies were removed from the scene. It was undisputed that Armstrong and Brown had ties to the Family through their drug operation in Monterey, and that they came to Los Angeles expecting continued Family assistance. The victims' fateful trip to Wheeler Avenue was not a random excursion; the evidence established they went there planning to pick up money from "Stan."

The primary determination for the jury in this case was not the specific reason the Family wanted Armstrong and the others dead, but rather who had ordered the murders and who had carried them out. Defendants did not dispute at trial that the murders were committed at the behest of the Family. They simply contended they were not involved. The jury was properly instructed that the motive to commit murder is distinct from the required mental state for that crime. Motive is not an element of any of the charged offenses and need not be proved. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504; CALJIC No. 2.51; see also CALCRIM No. 370.) Armstrong's statements aside, there was resounding and uncontroverted evidence that he was connected to the Bryant Family, and that the murders were carried out for the Family's benefit. Moreover, the

60

prosecution's alternate motive for Armstrong's murder, Bryant's jealousy of the affair with Tannis, tied Bryant directly to the crimes. Finally, James Williams's compelling testimony, the testimony of the other eyewitnesses, and the forensic evidence linking defendants to the murders make the statement even less consequential. Any constitutional error in the admission of Armstrong's statement was harmless beyond a reasonable doubt.[16]

### H. Denial of Motion for Sequestered Voir Dire of Prospective Jurors

Defendants contend the trial court's failure to conduct individual sequestered voir dire of the prospective jurors was constitutional error as a matter of law, and an abuse of discretion on the facts of this case.[17] There was no error.

Before trial, Smith requested individual sequestered voir dire, citing pretrial publicity and our decision in *Hovey v. Superior Court* (1980) 28 Cal.3d 1. Bryant and Wheeler joined the motion. The trial court denied the request, finding the procedures unnecessary.

Defendants first urge that sequestered voir dire of prospective jurors is constitutionally required in *all* capital cases to prevent "an unreasonable risk of juror partiality" and a resulting violation of due process. This argument is simply a restatement of arguments made to challenge the voir dire change effected by Proposition 115. Though decided after this trial, our recent decisions have considered and rejected

---

[16] To the extent defendants have adequately raised the issues, we similarly conclude the jury's verdicts could not have been improperly affected by the prosecutor's characterization of Armstrong's statement as a "voice from beyond the grave," and the suggestion that the hit man had scruples because he would not kill children. The strength of the other evidence relegates this attempt to put a good spin on Armstrong's unsavory character far to the background.

[17] The claim is not forfeited because, although defendants acquiesced in the trial court's plans to conduct group voir dire, they did not abandon their motion for individual questioning after the trial court denied it. (*People v. Taylor* (2010) 48 Cal.4th 574, 606.)

61

the arguments offered here. (*People v. Watkins* (2012) 55 Cal.4th 999, 1011 (*Watkins*); *People v. McKinnon* (2011) 52 Cal.4th 610, 633 (*McKinnon*); *People v. Stitely* (2005) 35 Cal.4th 514, 537.) Defendants present no compelling counter argument.

Defendants next contend the court abused its discretion in denying the motion under the circumstances of this case. The controlling statute, section 223 of the Code of Civil Procedure, then provided in relevant part, as it currently does, that "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors . . . ." They argue that the trial court's assertedly summary denial of the motion shows the court did not consider whether group questioning was practicable. They urge that group voir dire was not practicable here because some prospective jurors could be influenced by the questions posed to and answers given by others. Defendants are wrong on both counts.

As to the exercise of discretion, the court gave no explicit reasons for denying the motion. However, it is clear from its discussions about the conduct of voir dire that the court believed no particular circumstance rendered group voir dire impracticable. When one attorney commented that the intended procedures appeared to be complicated, the court explained the process actually would be "[v]ery simple. Pretend this is a regular jury trial. That is what it is. It is, with additional questions being asked on [the] death [penalty]. That is all it is." Moreover, Smith's motion explicitly mentioned the court's authority to order sequestered voir dire if it found that group questioning was impracticable. As a result, the issue was squarely presented to the trial court. As a general rule " 'a trial court is presumed to have been aware of and followed the applicable law.' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114; see also *McKinnon*, *supra*, 52 Cal.4th at p. 634.)

As to the substance of the ruling, we have recognized that conducting group voir dire may be impractical when it results in " ' "actual, rather than merely potential, bias." ' " (*People v. Famalaro* (2011) 52 Cal.4th 1, 34.) Here defendants fail to make

such a showing. Their arguments to the contrary are based on pure speculation that some prospective jurors were affected by the questioning of others. (See *Watkins*, *supra*, 55 Cal.4th at p. 1012.) " 'The possibility that prospective jurors may have been answering questions in a manner they believed the trial court wanted to hear,' however, 'identifies at most potential, rather than actual, bias and is not a basis for reversing a judgment.' [Citation.] Indeed, the purpose and effect of the 'group voir dire' requirement of Code of Civil Procedure section 223 would be obviated if nonsequestered questioning were deemed '[im]practicable' because of the speculative concern that one prospective juror's death penalty responses might influence the responses of others in the venire." (*McKinnon*, *supra*, 52 Cal.4th at p. 634.)

Defendants' claim also relies on the fact that some jurors expressed views during voir dire that differed from those expressed in their questionnaires. Such changes are not uncommon. As we observed in similar circumstances, " '[v]oir dire examination occurs when a prospective juror quite properly has little or no information about the facts of the case and only the most vague idea as to the applicable law.' " (*People v. Riggs* (2008) 44 Cal.4th 248, 287-288 (*Riggs*).) This observation is particularly apt regarding the completion of juror questionnaires following brief introductory remarks from the court. It is not surprising that prospective jurors' views would continue to be refined as they have additional time to consider these weighty philosophical questions and discuss them at some length with the court and counsel. The apparent evolution of views during the course of voir dire does not by itself establish a juror's bias. The change may simply indicate an enhanced understanding of the legal principles at issue and further reflection. The trial court did not abuse its discretion by denying the motion for sequestered voir dire.[18]

---

[18] Within his challenge to the denial of the motion for sequestered voir dire, Bryant also appears to urge that the trial court improperly asked a member of the panel whether

*(footnote continued on next page)*

## I. Dismissal of Three Prospective Jurors Based on Their Views Concerning the Death Penalty

Defendants contend the trial court erroneously excused for cause three prospective jurors, violating their rights to an impartial jury, a fair sentencing hearing, and due process under the state and federal Constitutions.[19]  The claims are unpersuasive.

"Under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*), we consider whether the record fairly supports the trial court's determination that [a prospective juror's] views on the death penalty would have prevented or substantially impaired her performance as a juror." (*People v. Thomas* (2011) 52 Cal.4th 336, 357.)  " 'Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for "appellate courts recognize that a trial judge who observes and speaks with a prospective juror and

---

*(footnote continued from previous page)*

it would be appropriate to give a witness immunity from prosecution "if there was somebody who was so bad and so dangerous that nobody could testify against him unless they got something in return for it?"  He argues that the question could be interpreted as a statement of the court's own belief about Bryant.  As he did at trial, he asserts the entire group of prospective jurors should have been excused for cause.  The court, however, did not suggest that Bryant was such a person.  Instead it was probing whether the prospective juror thought any circumstances would justify a grant of immunity.  Those who heard the question were not irredeemably biased.  The conclusory assertions that the court's question "lightened the prosecution's burden of proof," "improperly bolster[ed] the credibility of witnesses," and constituted the admission of improper and prejudicial criminal propensity "evidence" that denied Bryant of a "state-created liberty interest," are devoid of logic and legal merit.

[19]     Bryant challenges the excusals of Prospective Juror Nos. 52, 56, and 204, while Smith challenges the excusals of only Prospective Juror Nos. 52 and 56.  Wheeler did not raise any challenge in his briefs.  We assume each defendant joins in all three challenges and the two other contentions Bryant raises concerning the legal standards at issue.  Prospective Juror No. 204 was called to serve as a possible alternate juror.  Because alternate jurors were eventually selected at random and seated during the trial, it does not appear that any error in excusing her would have been harmless.  (Cf. *People v. Jones* (2012) 54 Cal.4th 1, 44-45 (*Jones*).)

hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." [Citation.]' [Citation.] [¶] A finding of bias 'may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." [Citation.] Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, is entitled to resolve it in favor of the State." [Citation.]' [Citations.]" (*People v. Bramit* (2009) 46 Cal.4th 1221, 1235.) " ' "The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]" ' [Citations.]" (*People v. Lancaster* (2007) 41 Cal.4th 50, 79.)

Defendants initially contend affording deference to a trial court's resolution of ambiguities and inconsistencies is contrary to the holdings of the United States Supreme Court in *Adams v. Texas* (1980) 448 U.S. 38 and *Gray v. Mississippi* (1987) 481 U.S. 648. "We have previously rejected this contention. [Citations.] Furthermore, the high court has more recently reiterated its view that '[c]ourts reviewing claims of *Witherspoon–Witt* error . . . owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror.' (*Uttecht v. Brown* (2007) 551 U.S. 1, 22.)" (*People v. Thomas* (2012) 53 Cal.4th 771, 790-791, fn. 3 (*Thomas*).)

### 1. Prospective Juror No. 52

Prospective Juror No. 52's (Number 52) responses to the approximately 20 death-penalty-related questionnaire inquiries expressed ambivalence. He answered many

questions by writing a question mark in the space provided, including the question asking for his "general feelings about the death penalty," and answered many others by circling "Don't Know" (as opposed to "Yes" or "No"). He wrote he did not know whether he would automatically vote for either the death penalty or life without parole. He had also indicated, however, that he "Agree[d] Somewhat" with the statement that a person who intentionally and unlawfully kills more than one person "should <u>automatically</u> receive the death penalty." Number 52 also chose "Don't Know" when asked whether he had "any conscientious objections to the death penalty which you believe might impair your ability to be fair and impartial."

During voir dire, after three general introductory questions, the trial court asked Number 52 if he could "think of any reason that you would not be an appropriate juror for this particular case," and he responded, "I'm very opposed to the death penalty." In response to the trial court's question whether his opposition would "substantially affect" his ability to choose between the two possible penalties, he stated he had "been studying that recently," and he "would be lying to you if I said that it didn't bother my conscious [*sic*] about the death penalty." Although in subsequent questions he said he could "follow the law" and he could vote for the death penalty "if [he] had to," he continued to express reservations regarding actually voting for a death verdict. Ultimately, the trial court asked him, "Notwithstanding the fact that you have a conscientious objection for this, could you in fact be a fair judge of the penalty and vote for death if you felt it was appropriate given our facts or could you not?" Number 52 answered, "No. I don't think so." The trial court sought to confirm the answer, asking, "You don't believe you could do that?" He answered, "No." The trial court granted the prosecution's challenge for cause, "based on the total of his answers including the quite clear one he gave about two minutes ago."

Defendants urge that Number 52's answers were equivocal, but he had at times stated he could follow the law. However, the trial court could properly rely on Number

52's own statement, which he confirmed, that he could not be a fair judge of the penalty question. The prospective juror's statement that he thought he could follow the law and vote for death "if [he] had to" would not necessarily have established that, contrary to the trial court's finding, he could perform his duties as a juror. Clearly, a juror is never *required* to vote for the death penalty. (See *People v. Brown* (1988) 46 Cal.3d 432, 475.)

### 2. *Prospective Juror No. 56*

In her questionnaire, Prospective Juror No. 56 (Number 56) stated she did not "believe in the death penalty," or that California should have one. Instead, she "believe[d] in life in prison without parole." Her views were based on her "religious conviction" that "no one has the right to take a life." She would not "be able to vote for the death penalty on another person if [she] believed, after hearing all the evidence, that the penalty was appropriate." She would "automatically, in every case, regardless of the evidence, vote for life in prison without the possibility of parole." Her views on the death penalty had not changed in the last 10 years.

During voir dire Number 56 stated that she did not want to serve on the jury, but now believed that, despite her religious views, she could vote for the death penalty "[i]f it was required under the law." Although she initially stated that she did not think she could be a fair juror because of the child victim, when asked again whether she was biased, she answered, "Okay, I could be fair." When pressed, she stated that although she still did not believe in the death penalty, she could impose it in light of her "civic duty," but would not be "overjoyed" in doing so. She claimed that the change from her answers on the questionnaire were based on the trial court's "little speech this morning about weighing the good and the bad and the evidence that comes in before that."

The trial court rejected Number 56's in-court statements as simply incredible in light of the decisiveness of the opposite views she had expressed in her questionnaire

answers.  In granting the prosecution's challenge for cause, the court stated it did not "believe it is a close credibility call at all."

The trial court properly excused this prospective juror.  In her questionnaire Number 56 clearly stated her long-standing views opposing the death penalty and how they would prevent her from performing the duties of a juror.  She answered other questions in an equivocal or contradictory manner, and qualified her ability to vote for the death penalty if the law required her to do so.  The trial court reasonably credited her answers demonstrating her impairment.   The fact that the prospective juror at times claimed she believed she could perform her duties as a juror "did not prevent the trial court from finding, on the entire record, that [she] nevertheless held views . . . that substantially impaired her ability to serve."  (*People v. Griffin* (2004) 33 Cal.4th 536, 561.)

### 3.  *Prospective Juror No. 204*

In her questionnaire responses, Prospective Juror No. 204 (Number 204) stated she was "against [the death penalty] because I wasn't put here so another person dies."  She did not believe California should have the death penalty, because it "seems to have little impact on [the] person doing the crime."  Her other answers did indicate, however, that she believed should could vote for death in a given case, and that she would not automatically vote against it.

During voir dire, she reiterated that she was against the death penalty based on her "personal philosophy."  At times she said she would be able to vote for death but it would be "very difficult" for her to do so.  She would essentially equate rendering a death verdict with "pulling the trigger [of a gun] on somebody," and she could not "imagine [herself] doing that under any circumstance."  Ultimately, the court asked her whether she thought she "could actually in this particular case come out here and look somebody in the eye, a defendant, [and] say . . . evidence to the death sentence here, that's what the

68

evidence and the law came up with." She answered that there was "no doubt" in her mind that she would not be able to do so. This record amply supports the grant of a for-cause challenge.

### 4. Inconsistent Standards

Defendants also contend the trial court applied inconsistent criteria in ruling on challenges. They assert the court was more willing to grant the prosecutor's challenges while applying a more stringent test in evaluating defense challenges. They contrast the excusals of Numbers 52, 56, and 204, who had expressed qualms about the death penalty, with the decisions to retain Prospective Juror Nos. 80 and 82 (Number 80 and Number 82), who strongly favored the death penalty.[20] The attempt fails.

Defendants point out that as to Numbers 80 and 82 the trial court credited their in-court answers over the questionnaire responses, unlike with Number 56, whom the court excused. But this circumstance cannot establish by itself that the court's rulings were inconsistent or unfair. Making such credibility determinations fell squarely within the trial court's province. The court properly and explicitly recognized that "it is not a matter of what answers are to be accepted, the questionnaire answer or the answers given verbally. The issue is at the conclusion of the voir dire of that particular juror do grounds for cause exist or not exist." The court's decisions were properly based on "the sum total of the responses of the juror and not what was written in the questionnaire or said in open court but the sum total of responses, demeanor, appearance, et cetera, of the juror while answering questions, and the court tries to make a judgment as to whether a juror could or could not . . . be fair to the defense and prosecution in a guilt and penalty phase."

---

[20] The defense used peremptory challenges to excuse Numbers 80 and 82 after the trial court denied the challenges for cause. Defendants did not exhaust their peremptory challenges.

The court said it believed Number 80's answers did not indicate she would "automatically proceed in a particular way." Defendants also seize upon this comment as showing the court applied a different standard than it applied in granting the prosecution's challenges for cause. Other than noting the linguistic difference between the phrases "a juror will automatically proceed in a particular way" and "a juror's views on the death penalty prevent or substantially impair the performance of the juror's duties," defendants do not elaborate on the asserted substantive difference between the two. Indeed, we have recognized that jurors who will automatically vote either for or against the death penalty without properly considering the evidence must be excused. (See, e.g., *People v. Salcido* (2008) 44 Cal.4th 93, 132.) The trial court's view that Number 80 would not automatically vote in a particular way does not establish that the court applied an improper or even a different standard than with other prospective jurors. The same is true of defendants' attempts to parse the trial court's comments regarding its decision to excuse Number 56 — because the court did not think there was "really a reasonable likelihood she could choose conscientiously between the penalties based on the evidence and so forth." As we stated in similar circumstances, "*Witt* has long been the law and it is clear the court was aware of the appropriate standard to apply. In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas*, *supra*, 52 Cal.4th at p. 361.)

## J. Seating a Hearing-impaired Juror

Smith contends the trial court erred and deprived him of his constitutional rights to due process and trial by jury by allowing a hearing-impaired juror to sit without providing an effective listening device to assist him. He also claims the juror may have improperly learned of the sidebar discussions between the court and counsel by reading their lips. Assuming Bryant and Wheeler have joined in this claim, we conclude it is

forfeited as to all of them. None of them raised these concerns at trial. Moreover, the record does not support defendants' claim.

After the jury was sworn, Juror No. 435 asked the court whether the court and witnesses would use a microphone.[21] The court asked whether he had "any hearing difficulty," and the juror responded, "Slightly. I have a little trouble understanding." The court said microphones would be used and that an audio headset could be provided. The court then told all the jurors, "if you do not hear something during the trial, if you don't hear a question or answer that somebody has said, don't sit and try to figure it out. Raise your hand just like you did now, and we will have it read back or repeat it. It is better to nip it in the bud than trying to figure it out at the end of the case." Without any objection from defendants, the proceedings continued.

The headset arrived during the second witness's testimony. The court explained how to use it, and mentioned that if someone stepped between the transmitter and the headset there would be " a little bit of static," and a brief absence of audio. The court later told Juror No. 435 to remove the headset during any sidebar discussion.

Two subsequent and minor problems with the headset were promptly fixed. Juror No. 435 also mentioned he had picked up some of the witness testimony by reading lips. Later, the juror mentioned that the headset's battery had been recharged. The headset had been making "funny noises" when the battery was low.

Defendants now contend that Juror No. 435 *might* not have heard proceedings when he did not have the headset or it was malfunctioning, or that he *might* have learned information from the side bar conferences by reading lips. Had they raised these issues

---

[21] The reporter's transcript initially misidentified the juror at issue as Juror No. 412. It was later confirmed on the record that he was actually Juror No. 435. Juror No. 435 was an alternate, but later replaced a seated juror and participated in both the guilt and penalty phase deliberations.

71

during the trial, the court could have made a more complete record and remedied any problems. It was reasonable for the court to expect the juror would follow the instructions and tell the court if he could not hear something. He did so on occasion. The juror was also admonished not to try and deduce what was said at sidebar. Finally, there is no indication that he was actually in a position to see anyone's lips during these conferences. Defendants' claims are purely speculative.

### III. GUILT PHASE ISSUES

### A. Admission of "Other Crimes" Evidence

Bryant and Smith contend the trial court erred in admitting evidence of various crimes committed by them and other Family members. They generally assert that the evidence was inadmissible character evidence,[22] irrelevant,[23] and/or unduly prejudicial.[24] We assume that Wheeler has joined in the claims, although, as noted below, not all claims were preserved as to each defendant. We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1256 (*Gonzales*); *Scott*, *supra*, 52 Cal.4th at p. 491.) There was none.[25]

The general framework for the admission of evidence as it relates to defendants' challenges is as follows. Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is broadly defined as that having a "tendency in reason to prove or disprove any disputed fact that is of consequence" to resolving the case. (Evid. Code, § 210.) Inferences drawn from the evidence must be logical and reasonable, not merely

---

[22]  Evidence Code section 1101, subdivision (a).

[23]  Evidence Code sections 210 and 350.

[24]  Evidence Code section 352.

[25]  Hereinafter in parts III A, B, and C, we refer to Evidence Code section 1101, subdivision (a), as section 1101(a), Evidence Code section 1101, subdivision (b), as section 1101(b), and Evidence Code section 352 as section 352.

72

speculative. (*People v. Morrison* (2004) 34 Cal.4th 698, 711; *People v. Babbitt* (1988) 45 Cal.3d 660, 681.) All relevant evidence is admissible, unless a specific statutory or constitutional provision bars its admission. (Evid. Code, § 351; Cal. Const., art. I, § 24.) If evidence is relevant and admissible for one purpose, but inadmissible if considered for another purpose, the trial court must admit it but, upon request, limit its proper scope and so instruct the jury. (Evid. Code, § 355.)

Section 1101(a) prohibits the admission of character evidence if offered to prove conduct in conformity with that character trait, sometimes described as a propensity to act in a certain way.[26] (See also Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1101, p. 221.) Defendants appear to argue that evidence of uncharged acts by, or connected to, a defendant is presumptively inadmissible under section 1101(a). As a result, they urge the evidence must be found to fall within an "exception" to that provision in order to be admitted at trial. That interpretation has been rejected. Section 1101(a) "expressly prohibits the use of an uncharged offense if the *only* theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense." (*People v. Thompson* (1980) 27 Cal.3d 303, 316, italics added.) Section 1101(b) provides that "[n]othing in this section" prohibits the admission of uncharged acts to prove a fact "other than [a person's] disposition to commit such an act."[27] Section 1101(b) is not an exception to section

---

[26]    Section 1101(a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[27]    Section 1101(b) provides in full, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to

*(footnote continued on next page)*

73

1101(a). Section 1101(a) prohibits the use of character to prove conduct. Section 1101(b) provides for the admission of uncharged acts when relevant to prove some other disputed fact. The true exceptions to section 1101(a) are set out in Evidence Code sections 1102, 1103, 1108, and 1109, and are not implicated here.

If an uncharged act is relevant to prove some fact other than propensity, the evidence is admissible, subject to a limiting instruction upon request. Here, the court instructed the jury several times, including in its final charge in the guilt phase, that evidence of other criminal acts had not been admitted and could not be considered to establish any defendant's character, disposition, or propensity. At no time during the guilt phase did the court instruct the jury that any evidence *could* be considered as character evidence. Section 1101(a) was not violated.

Even if uncharged acts evidence is otherwise admissible, an accused may still urge that section 352 should bar it from consideration.[28] In the face of a timely objection (Evid. Code, § 353, subd. (a)), relevant evidence may still be excluded if its probative value is substantially outweighed by the probability that its admission will require undue time consumption, will confuse or mislead the jury, or poses a substantial risk of undue prejudice.

---

*(footnote continued from previous page)*

prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[28]     Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Defendants claim they did not dispute that the murders were committed by someone who acted with premeditation and intent to kill. Thus, they argue, evidence relating to those elements was irrelevant or unduly prejudicial. We rejected this argument in *Scott*, *supra*, 52 Cal.4th 452, and do so here. Defendants pleaded not guilty, placing in issue all the elements of murder. The court explicitly recognized this fact in response to an initial suggestion that premeditation would not be an issue in the trial. The court did not err. (*Id.* at pp. 470-471.)

With these principles in mind, we now turn to defendants' specific challenges.

### 1. *Rhonda Miller Bribe*

Rhonda Miller testified that she recanted her statement that Andre Armstrong killed Kenneth Gentry because she was offered a bribe by the girlfriends of Jeff and Stanley Bryant. Defendants contended that the testimony was irrelevant without other evidence connecting the bribery attempt to the Bryants, and, further, that her testimony would be "more prejudicial than probative." The court found her testimony relevant. The jury could reasonably infer that, contrary to defendants' positions, Armstrong did not act on his own but instead killed Gentry on behalf of the Bryant Family. It also held that sufficient evidence connected the bribe to the Family. The court did not explicitly weigh the risk of undue prejudice against the probative value, but we may conclude it implicitly did so in overruling defendants' objections. (*People v. Padilla* (1995) 11 Cal.4th 891, 924.)

Defendants appear to concede that Miller's testimony was relevant to undermine the assertion that Armstrong killed Gentry on his own initiative. Indeed, the testimony was relevant for that purpose and properly admissible.[29] The jury could logically and

---

[29]     The court also found Miller's testimony relevant to "further buttress the credibility" of Armstrong's statements made to detectives, the admission of which we presumed erroneous. (See *ante*, pt. II.G.) Miller's testimony was relevant on its own to

*(footnote continued on next page)*

75

reasonably infer that *someone* in charge of the Bryant Family ordered the bribery, and that these efforts showed the Family was involved in the Gentry murder.

Defendants' argument that the evidence was unduly prejudicial also fails. This jury heard evidence, inter alia, that all three defendants murdered several people, including a young child. Evidence of bribery and witness dissuasion was not likely to evoke improper bias or an emotional response on the part of the jurors. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) As we recently explained in *Scott*, *supra*, 52 Cal.4th at pages 490 to 491: " ' " 'Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' [Citation.] [¶] The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.]"

---

*(footnote continued from previous page)*

establish the connection between Armstrong and the Bryant Family. We need not discuss the court's alternate theory.

76

## 2. *Francine Smith Assault*

Bryant challenges admission of Francine Smith's testimony that she was beaten after trying to cheat a Bryant Family employee selling her drugs. Bryant later told her she was lucky he knew her so well, otherwise she would have been killed. In his opening brief, Bryant characterizes the testimony as improper character evidence. (§ 1101(a).) The Attorney General correctly points out, however, that Bryant did not raise this objection at trial, nor did he request a limiting instruction. The contention is forfeited. In his reply brief, Bryant recasts his claim as based on section 352. That argument, too, is forfeited by the failure to raise it in the opening brief. (*People v. Tully* (2012) 54 Cal.4th 952, 1075 (*Tully*) ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."].) The challenges to this evidence are forfeited as to Smith and Wheeler because they did not object to the testimony at trial. In any event, the trial court did not abuse its discretion under either provision.

The court found the testimony showed Bryant's level of involvement in the Family operations, and the Family's willingness to use violence to protect its interests, a similar motive for the murders of Armstrong and his associates. The jury could also infer that if Armstrong had tried to take advantage of the Bryant Family, but was less well known to its leaders, he would have been subjected to harsher retaliation than a mere beating. Because the testimony was relevant to prove facts other than Bryant's propensity, its admission was not an abuse of discretion under section 1101(a).

Nor did the trial court abuse its discretion under section 352. In Bryant's opening statement he contested the very existence of the Bryant Family organization, let alone his own role in it. Evidence establishing the nature of the Family, its operations, and Bryant's role was important evidence tying him and the Family to the murders. Again, in light of the accusations and extensive evidence regarding the charges, testimony by Ms.

77

Smith that she was beaten in a drug dispute does not raise a substantial likelihood of undue prejudice.

### 3. Drug Business Operations

Bryant contends the court erroneously admitted evidence about the Family drug operations, including the police actions that led to Bryant's prior drug conspiracy conviction.[30] Bryant uses several pages of his brief to set out the evidence at issue, then asserts in a general manner that the evidence was irrelevant, prejudicial, and improper character evidence. Assuming Bryant has presented his appellate claims in a manner that sufficiently identifies the specific factual and legal bases supporting them, they are forfeited. He did not object to this evidence at trial on the grounds he now raises. This is equally true as to Smith and Wheeler, to the extent they intended to join Bryant's appellate claims.

In arguing that the claims are not forfeited, Bryant points to a brief remark Smith's counsel made (in which Bryant's and Wheeler's counsel joined), before the prosecution began presenting the evidence. Counsel said there *might come a point* in the trial at which the otherwise relevant evidence should be limited under section 352 based on the undue consumption of time.[31] To the extent this statement could be deemed an objection

---

[30]    We address Bryant's challenges to the admission of the testimony and statements of specific individuals, including William Johnson, Lawrence Walton, and Ladell Player, *post*, in part III.B.

[31]    Counsel stated, "On the drug stuff[,] there is a point at which we believe there is a relevancy on 352 problems [*sic*] in terms of the consumption of time. [¶] I believe [the officers] are going to talk about incidents in '84 or '85, certain rock houses and so on and so forth that may have some relevance. [¶] I don't know how long [the prosecutor] will go into that but it is going away from the motive to kill Armstrong into maybe matters relating to a drug conspiracy or something of that nature which has been severed out. [¶] I understand that it may have some relevance, but I want the court to be cognizant. [¶] Maybe we can go through it."

at all, it obviously was not specific enough to have alerted the trial court to the asserted errors Bryant now claims. Defendants' failure to object with specificity prevented the prosecution and the court from addressing the relevance, probative value, and risk of undue prejudice or time consumption. Accordingly, we decline, except as discussed below, to entertain Bryant's appellate claims on this subject.

In the factual recitation in his brief, Bryant mentions the introduction of his drug conspiracy conviction. Bryant argued at trial that his conviction would only be relevant for impeachment should he elect to testify. The trial court disagreed. It admitted the evidence to show the existence and scope of the organization and Bryant's role in it. It also found the evidence related to the credibility of a Bryant Family employee who testified about Bryant's role in the organization. On appeal, Bryant does not explain how the admission was error. To the extent he suggests that all the drug business evidence was irrelevant because it did not establish the motive for the murders, or because Bryant later admitted he was part of the business, the arguments are forfeited because they were not raised at trial. Moreover, they are meritless. The evidence was legitimate circumstantial evidence that Bryant knew Armstrong planned to "squeeze" the Family, posing a threat that motivated the murders. Bryant's limited admission to lesser Family involvement did not retroactively render irrelevant the prosecution's evidence.

### 4. Keith Curry Attacks

Bryant and Smith challenge admission of the attacks on Keith Curry while he was romantically involved with Bryant's ex-wife. The trial court heard Curry's testimony in limine, considered extensive arguments, and provided a comprehensive ruling. It admitted the testimony about two attacks, but excluded proffered evidence of a third in which Curry was shot by an unknown assailant. The trial court explained its ruling as follows: "The evidence is highly relevant in the court's opinion, as I indicated today. It does tend to show that Mr. Smith, not as a person of bad character, although the other

evidence may suggest that, but the manner in which the evidence can be utilized by the jury is to show that there is a relationship between Mr. Smith and Mr. Bryant of the type that would allow Mr. Smith — cause Mr. Smith at Mr. Bryant's behest to commit violent acts either out of loyalty for Mr. Bryant or because that's his job in this organization. The jury will have to determine those issues. But there is sufficient evidence to allow the jury to do so. The evidence is quite probative." The court acknowledged that in weighing the potential prejudicial effect, "the conduct is similar; homicidal, violent, and the jury will have that in mind," but "on balance, the court feels that with a limiting instruction . . . explaining to the jury the use to which they may put this evidence that the potential for prejudice . . . is outweighed by the clear and concrete relevance." The court noted that before the evidence would be admitted the prosecution would have to establish that Bryant was aware of and angered by the affair.

Before Curry testified the court instructed, "the evidence that you will hear has to do with some — an act of violence alleged to have been committed by one of the defendants in this case. [¶] That evidence may not be considered by you as tending to show that any defendant in this case has a propensity to commit violent acts or a propensity to commit crimes of the type alleged in this case or of any type for that matter. [¶] However, the evidence may be considered by you on the following limited issues: . . . on the issue of the existence of any intent which is a necessary element of the crime charged, the identity of the person who committed any crime with which the defendant is accused, any motive for the commission of the charged offenses[,] and as it may tend to prove the relationship between Mr. Bryant and Mr. Smith in this case. [¶] You are not to consider this evidence for any other purpose. [¶] The court is not suggesting that the

evidence is probative on any of the points that I listed, but only [that] you may consider it on those particular issues and no other."[32]

Defendants first label the evidence irrelevant because the prosecution failed to show Bryant was so angered by the affair that he would want to kill Curry. That argument fails. A witness testified Tannis said Bryant admitted he had put the bomb in Curry's car, and would continue to try to kill Curry until he succeeded.[33] Bryant argues the testimony was privileged as a marital communication under Evidence Code section 980. As we discuss *post*, in part III.B.6, the trial court properly rejected that assertion.

Smith similarly contends the trial court should have instructed the jury not to consider the Curry bombing evidence "against" him. Smith was not entitled to such an instruction. The jury could infer that a jealous Bryant wanted to kill Armstrong and that the others participated in the shootings on Bryant's orders. The parties at times have referred to Bryant's jealousy as an alternative motive separate from a desire to protect Family operations. These motives are not necessarily unconnected. The jury could reasonably infer that Bryant acted on both.

Defendants also contend the trial court erroneously instructed that the Curry attacks could be used to establish the identities of the Wheeler Avenue murderers. As mentioned above, the court somewhat vaguely told the jury the evidence could be

---

[32]    The instruction also told the jury to consider the Curry evidence "only as to" Bryant and Smith, and not as to Settle and Wheeler. As we explained *ante*, in part II.E.2., however, evidence of Bryant's motive to kill Armstrong was relevant as to all defendants in the sense the jury could reasonably infer that their motives derived from Bryant's. Wheeler's counsel objected to the admission of the Curry evidence. We assume Wheeler may join in Bryant's and Smith's appellate claims, despite the trial court's instruction.

[33]    When questioned by the prosecution, Tannis denied having heard Bryant make the statements at issue or speaking to anyone about them. The witness's testimony that she heard Tannis talking about Bryant's statements was admissible as a prior inconsistent statement under Evidence Code section 1235.

81

considered "on the issue of . . . the identity of the person who committed any crime with which the defendant is accused."

Assuming arguendo that the court's instruction was wrong, or at least potentially confusing, any error was harmless. The Curry evidence itself was properly admitted to support inferences other than identity. The section 352 determination was properly made. There is little chance the jury would have drawn an *impermissible* "identity" inference that the crimes were so similar and distinctive that the same person committed them. (See *Scott*, *supra*, 52 Cal.4th at p. 472.) No instruction from the court or argument from the parties relied on the evidence for that purpose. To the extent we assume the evidence was insufficient to support an inference of identity under section 1101(b), we can presume that any rational juror would have followed the trial court's instruction and found that the facts of the crimes simply did not support the particular inference that the same persons committed all of them. (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 49 (*Nunez*).)

### 5. *Smith's Flight After the Curry Shooting*

The court admitted evidence that after shooting Curry, Smith tried to evade apprehension, leading police on a high-speed chase and throwing items from his car. Cocaine and a handgun ultimately were found in his possession. Smith now argues the evidence of the cocaine and the chase were irrelevant or unduly prejudicial. The arguments fails.

Smith's counsel acknowledged that the drug possession was relevant to prove his connection to the Bryant Family. He urged however that proof of connection to the Family had a "prohibited 1101(a) purpose . . . that someone who is a member of the . . . 'Family,' . . . might have a greater propensity to have committed these particular homicides." The prosecution never made such an argument and Smith requested no limiting instruction. Smith later moved to strike the drug possession testimony because

82

the witnesses had not testified that the drugs were in a unique cookie shape common to the Bryant Family rock cocaine. Therefore, his arrest became like "any other drug bust."

On appeal, Smith renews his contention that the cocaine evidence was irrelevant because the prosecution failed to establish the distinctive shape. The evidence was relevant. While there was no testimony about the cocaine's shape, a witness did testify that the drugs were packaged in a manner similar to that used by the Family. To the extent Smith continues to rely on section 1101(a) as a basis for exclusion, the cocaine clearly was not admitted to establish conduct in conformity with a character trait. Smith made no section 352 objection below. Any appellate claim on that ground is forfeited.

Smith also contends the evidence of the car chase should have been excluded. Again, the challenge is forfeited for failure to object. Furthermore, the evidence was clearly relevant. Smith's efforts to evade the police and his apparent attempt to discard items during the chase had a tendency in reason to show that he knowingly possessed the drugs later found in the car, helping to show his connection to the Bryant Family.

## B. Challenges to the Admission of Witness Testimony and Out-of-Court Statements

Bryant and Smith contend the trial court improperly admitted various hearsay statements. We assume Wheeler has joined in these claims. Many challenges are forfeited for failure to object below. (Evid. Code, § 353, subd. (a), *People v. Partida* (2005) 37 Cal.4th 428, 433-434.)[34] Defendants occasionally contend the admission of

---

[34]     Defendants often contend that the trial court's asserted evidentiary errors deprived them of due process under the federal Constitution. As noted, when no specific federal constitutional challenge to the evidence was raised below, such appellate claims are preserved only to the extent that the federal aspect is a gloss on the claim of error actually raised. (*Scott*, *supra*, 52 Cal.4th at p. 487, fn. 29.) Nonetheless, contrary to defendants' apparent argument, every state law error does not automatically result in a violation of the federal Constitution under *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 ["for the most part . . . the mere erroneous exercise of discretion under such 'normal' rules [of evidence] does not implicate the federal

*(footnote continued on next page)*

hearsay violated their federal right to confrontation under the Sixth Amendment, along with *Crawford*, *supra*, 541 U.S. 36, and its progeny. As the high court has made clear, however, the focus of the confrontation clause is on the admission of *testimonial* hearsay as that term is understood. The admission of *nontestimonial* hearsay does not implicate the federal safeguard. (*Michigan v. Bryant* (2011) 562 U.S. ___, ___ [131 S.Ct. 1143, 1155].) Further, the *Crawford* rule does not apply when the declarant testifies and is thus subject to cross-examination. (*People v. Redd* (2010) 48 Cal.4th 691, 731.)

Defendants also raise a general confrontation clause challenge to the practice they refer to as "Greening" a witness under *California v. Green* (1970) 399 U.S. 149. *Green*, in conjunction with Evidence Code section 1235, permits the introduction of a witness's prior statements when he or she testifies inconsistently with or denies having made them.[35] We recently rejected an identical challenge and do not reconsider that decision. (*People v. Dement* (2011) 53 Cal.4th 1, 23-24; see also *People v. Clark* (2011) 52 Cal.4th 856, 927 (*Clark*).)

We now turn to defendants' specific challenges.

---

*(footnote continued from previous page)*

Constitution"]; *Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21 ["We have long recognized that a 'mere error of state law' is not a denial of due process. [Citation.] If the contrary were true, then 'every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question.' "].)

[35]    Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 requires that before an inconsistent statement is admitted, the witness must be given "an opportunity to explain or deny the statement," or must be subject to being recalled as a witness.

### 1. *Winifred Fisher*

Defendants challenge admission of Winifred Fisher's hearsay statements. Any error was harmless.

The detective investigating Kenneth Gentry's murder interviewed Winifred Fisher. The prosecutor asked the detective to "describe for the members of the jury what it was that Mr. Fisher related to you in conjunction with Mr. Gentry's death." Smith's attorney objected on the grounds of hearsay and lack of foundation. In response, the prosecutor elicited that Fisher had died. The court asked Smith's attorney, "Does that massage [*sic*] your doubts or do you wish more?" Counsel replied, "No," and the court instructed the prosecutor to continue. The detective related Fisher's statement that he, Gentry, and Michael Flowers bought substandard "dope" from a person named Bryant. When they challenged the quality of the drugs, "Bryant" refused a refund. In retaliation, the three vandalized a van belonging to Roscoe Bryant. The Bryant who sold the drugs learned they had done so and was angered.

Bryant and Wheeler never made or joined in any objection. Smith withdrew his hearsay and foundation objections to the testimony. Nonetheless, rather than become enmeshed in the forfeiture issue, in a case tried before *Crawford* was decided, we treat the confrontation claim as preserved. (See *People v. Pearson* (2013) 56 Cal.4th 393, 461-462.)

Any assumed error was harmless. Defendants offer no argument on that point. As *Livingston*, *supra*, 53 Cal.4th at page 1159, points out, the harmless beyond a reasonable doubt standard of *Chapman*, *supra*, 386 U.S. 18, applies to confrontation clause violations. Although Fisher was absent, Michael Flowers did testify and was cross-examined. His out-of-court statements inconsistent with that testimony were properly

admitted. Flower's statements conveyed the same information on this collateral issue. Fisher's statements to the detective were merely duplicative.**36**

### 2. *Benny Ward*

Benny Ward told police, essentially, that 45 minutes before Gentry's murder, Gentry said he had just seen Stanley Bryant driving by. Gentry said if he had been armed he would have confronted Bryant. Called as a prosecution witness, Ward denied being with Gentry and did not recall hearing Gentry say he saw Bryant. Over defendants' objections, the detectives testified as to what Ward had told them.

Defendants contend that Ward's statements were improperly admitted as prior inconsistent statements (Evid. Code, § 1235) and Gentry's statements to Ward were double hearsay improperly admitted as spontaneous statements (Evid. Code, § 1240).**37** The arguments fail.

Defendants first argue that Ward's testimony was not *inconsistent* with his prior statements, because he only testified that he did not *remember* the conversation with Gentry. The trial court, however, reasonably found that Ward's claimed failure of recollection was actually a deliberate evasion tantamount to a denial. This ruling is supported by the fact that Ward had been able to recall Gentry's statements during a police interview conducted 10 years after the murder, but claimed memory loss when he

---

**36** For this reason, to the extent defendants raise claims of ineffective assistance of counsel regarding the failure to preserve the confrontation clause issue, any alleged deficient performance was not prejudicial.

**37** Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

testified two and a half years later. (See *People v. Collins* (2010) 49 Cal.4th 175, 215 (*Collins*); *People v. Ervin* (2000) 22 Cal.4th 48, 84-85.)[38]

Defendants next contend Gentry's statement to Ward was not a spontaneous statement. (Evid. Code, § 1240.) There is no dispute that Gentry's statements spontaneously narrated an event he was perceiving. Defendants argue, however, that the event itself was not sufficiently startling or emotion-provoking to induce the excitement required as foundation for the hearsay exception.

" '[I]f the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) " 'To render [such statements] admissible it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*Ibid.*) "The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 811.)

---

[38]     The court also instructed the jury on this point as follows. "If you disbelieve a witness' testimony that he or she no longer remembers a certain event, such testimony is inconsistent with a prior statement or statements by him or her describing that event." (See CALJIC No. 2.13.)

There was evidence that Gentry, Fisher, and Flowers had bought drugs from a man named Bryant. A dispute arose over the drugs' quality. Dissatisfied with the resolution, the three vandalized a van belonging to another member of the Bryant Family. Substantial evidence supported the reasonable inferences that the Bryant Family was a violent drug gang whose members would take a jaundiced view of vandalizing their property and that one should not engage in further interaction with them unless armed. Thus, the trial court could reasonably find that Gentry, having engaged in some ill-advised vandalism, was startled by seeing one of the Bryants driving by. His reference to the need for weaponry was consistent with this interpretation. The events, taken in context, produced a nervous reaction sufficient to satisfy the spontaneous statement exception. The court's conclusion was well within the realm of reason.

### 3. *Sofinia Newsome*

Defendants contend the court improperly allowed Sofinia Newsome to testify that Kenneth Gentry told her about the fractious drug deal and vandalism. They argue Gentry's statement did not qualify as a declaration against his interest under Evidence Code section 1230. This challenge is forfeited; the sole objection made at trial, by Bryant only, was that the statement was "not a declaration against penal interest as to anybody *except* Ken Gentry." Thus, counsel acknowledged that the statement was, in fact, contrary to Gentry's interest in avoiding criminal liability.

### 4. *William Johnson*

Defendants challenge the admission of statements by William Johnson as inadmissible hearsay and unduly prejudicial. Their claims lack merit.

Johnson was arrested during a police raid on a Bryant Family drug house. At trial he claimed to be a freelance drug dealer, and generally denied knowing about the Family's operations. He also denied he was afraid to testify. The prosecutor then asked Johnson about inconsistent statements he had made during a police interview. In those

88

statements he recounted details of the Family's operations and his role. He spoke of his fear to cooperate with authorities. Wheeler objected that Johnson's statements that witnesses might be killed were unduly prejudicial and should be excluded under section 352. The court overruled the objection, observing that the statements related to Johnson's demeanor and credibility.

On cross-examination, Bryant questioned Johnson about an interview statement he made seeming to suggest police had arrested and then released the "real" Wheeler Avenue murderer.[39] On redirect, Johnson testified that the statement concerned a different murder.

The prosecution subsequently sought to introduce an edited recording of Johnson's police interview. Johnson was asked, "The quadruple homicides — the wrong people are in custody?" He replied, "It's not the wrong people in custody, but there's more people out there . . . that's putting more pressure down."

Defendants first objected that the entire statement was "vague" and "rambling" and therefore substantially more prejudicial than probative. The court overruled the objection.

Smith and Wheeler also objected that Johnson's statement about the "right people" being in custody for the Wheeler Avenue murders was based on speculation or hearsay, and unduly prejudicial. Bryant objected on a different ground — that the "right people" statement was not inconsistent with the statement asked about in cross-examination because they each concerned different subjects. The court overruled the objections, but

---

[39] Counsel asked Johnson if he told the police "they had arrested the right people but let them go after a few months." Counsel later revisited the subject and asked if Johnson remembered saying, specifically, "I'm talking about when the murder first hit, ya all picked his ass up and had him locked up for about four or five months and let him go." Johnson initially denied having made such statements.

offered to instruct the jury that it could not consider the "right people" statement for its truth, but only as it reflected on Johnson's state of mind and credibility. Defendants chose not to request such an instruction so that the matter would not be highlighted to the jury. The court told the jury that to the extent it found Johnson's testimony inconsistent with his statement to police, it could consider the prior statement as both credibility evidence and for the truth of the matters stated. (CALJIC No. 2.13.) No defendant objected to the instruction.

The trial court properly overruled defendants' section 352 objections. Evidence of Johnson's fear of retaliation and the basis of that fear was relevant to his credibility, which was aggressively challenged on cross-examination. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084; *People v. Harris* (2008) 43 Cal.4th 1269, 1288 (*Harris*); *Gonzalez*, *supra*, 38 Cal.4th at p. 946.) His statements about the Family organization were probative of the circumstances of and motivations for the Wheeler Avenue murders. Nothing in Johnson's statements was unduly prejudicial as that term is properly understood. (*Scott*, *supra*, 52 Cal.4th at p. 491.) Defendants forfeited the claim that the reasons for Johnson's fear should not have been admitted for the truth. They did not object to the instruction.

The court also properly admitted the "right people" statement. It was relevant to the jury's evaluation of the statement Bryant introduced regarding the police having released some murderer. Defendants waived the claim that the court erred by admitting this statement for its truth because they agreed to forgo a limiting instruction.

### 5. *Lawrence Walton and Ladell Player*

Defendants raise conclusory claims that the trial court improperly admitted testimony and out-of-court statements by Lawrence Walton and Ladell Player. They admit that some statements were relevant and probative. They assert that other largely unspecified aspects of the statements were "irrelevant and/or cumulative to the issues in

90

the present case and highly prejudicial." To the extent they do not specify the evidence they contest, they fail to properly present the issue. Defendants do mention testimony and statements concerning the witnesses' reluctance to testify and concern that defendants would learn that they had spoken with the authorities. As with defendants' challenge to William Johnson's statements, such issues were relevant to the jury's assessment of credibility.

In his reply brief, Bryant asserts that the court erroneously refused to accept a stipulation from defendants that they "were selling drugs," which assertedly would have made the testimony and evidence regarding the Bryant Family operations cumulative and unduly prejudicial. That contention is forfeited because it was not raised in the opening brief. Further, it is meritless. Wheeler's counsel asserted that the testimony would be cumulative because the court had already admitted a great deal of evidence about the drug business. Counsel stated, "there is not one count that we are currently dealing with that deals with the drug organization or selling drugs. If that is the case, we will stipulate that they were selling drugs. The issue is the murder case." The trial court, however, pointed out that the other defendants had disputed the nature of the Bryant Family organization. There was no further discussion of a stipulation. Bryant's claim is unfounded.

### 6. *Tannis Curry*

Bryant contends the trial court erred in permitting testimony that he told Tannis he had put the bomb in Keith Curry's car and would continue to try and kill him. Gwendolyn Derby testified that she overheard Tannis repeating Bryant's statements to a hairdresser. He argues his statements were protected by the confidential marital

91

communications privilege. (Evid. Code, § 980.)[40] The trial court properly found the statements were not "made in confidence" as required by the statute.

As an initial matter, Bryant was statutorily authorized to assert the confidential marital communications privilege even though a third party testified about the contents that Tannis disclosed to someone else.[41] Evidence Code section 980 provides that one spouse may prevent both the other spouse and another person from testifying about the communication. Evidence Code section 912, subdivision (b), provides that a waiver of the privilege by one spouse does not prevent the other from claiming the privilege. (See *North v. Superior Court* (1972) 8 Cal.3d 301, 310.)

On appeal, Bryant attempts to recast the trial court's ruling as based on erroneous legal conclusions that (1) the privilege was inapplicable because Bryant and Tannis were not living together when the statement was made, or (2) that exceptions to the privilege applied because Bryant's statements "criminally victimized" Tannis,[42] or were made in furtherance of a crime.[43] The attempts fail. The court's comments reveal that it did not base its rulings on the exceptions. Nor did the court fail to recognize the privilege outlives the marriage. Instead, the court properly found Bryant's statement was not "made in confidence," as the statute requires. The court repeatedly stated this view in

---

[40] Evidence Code section 980 provides: "Subject to Section 912 [concerning waiver of a privilege] and except as otherwise provided in this article, a spouse (or his guardian or conservator when he has a guardian or conservator), whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

[41] Tannis denied both that Bryant made the statement and that she repeated it to others.

[42] Evidence Code section 985.

[43] Evidence Code section 981.

92

various ways: (1) "So it sort of stretches the imagination that a statement, if one was made to Tannis Curry indicating [Bryant's] continued desire to kill Keith Curry, was something that he hoped for her to keep a secret or expected would remain confidential"; (2) "assuming that [there was] a valid marriage, the court will rule that there was no . . . reasonable expectation by either party that this would be a privileged [communication]"; (3) "I don't think that one could reasonably expect to keep that information private, a direct threat evidencing a plan by Mr. Bryant to kill somebody. [¶] I am all for marital bliss. But one would not be able to expect any spouse in any marriage to keep that secret, a plan to kill somebody. That would . . . enable her boyfriend to then be killed"; (4) "It is not a confession but a confession coupled with a statement of present intention to do harm to that person or in fact kill him. [¶] That is not the kind of statement that anybody would expect to remain private. If they did, especially when given to the estranged wife, that would not be a reasonable inference to draw — that you would expect that she would not warn this guy at least." The other circumstances mentioned were factors the court considered in assessing whether the statement was made in confidence, not, as Bryant argues, independent, and legally erroneous, reasons to reject assertion of the privilege.

As to the merits of the ruling, there was no error. "To make a communication 'in confidence,' one must intend nondisclosure [citations], and have a reasonable expectation of privacy [citation]." (*People v. Mickey* (1991) 54 Cal.3d 612, 654.) "As a general matter, the claimant of the confidential marital communication privilege has the burden to prove, by a preponderance of the evidence, the facts necessary to sustain the claim. [Citation.] He is aided by a presumption that a marital communication was made in confidence. (Evid. Code, § 917.) The opponent has the burden to prove otherwise [citation] by a preponderance of the evidence [citation]." (*Id.* at p. 655.) Here, the presumption was adequately rebutted. Bryant presented no evidence that he actually intended nondisclosure. Given that the statement was a threat to murder the current lover of his estranged wife, any expectation of confidentiality would have been unreasonable.

93

Moreover, the circumstances give rise to a reasonable inference that Bryant affirmatively intended Tannis to convey the threat to Curry to extinguish the relationship. (See *People v. Gomez* (1982) 134 Cal.App.3d 874, 879 [concluding in similar circumstances that the defendant "had no desire that the threats be kept secret[;] [t]he purpose of the threats to [the spouse] was to terrorize her into curtailing her relationship with [the victim]"].)

### 7. *Francine Smith and Mona Scott*

Defendants briefly contend error when Francine Smith and Mona Scott were allowed to relate statements by victim Armstrong that he was "owed" for having "taken the fall" for someone. They now attack the statements as hearsay. Defendants acknowledge they did not object to the testimony on this (or any) ground at trial, but argue an objection would have been futile in light of the court's decision to admit the tape of Armstrong's police interview. "The overruling of an objection to one item of evidence does not necessarily mean an objection to different evidence would have been futile," even when the items at issue concern the same subject. (*Livingston*, *supra*, 53 Cal.4th at p. 1160.) In any event, as we explained regarding defendants' challenge to Armstrong's interview statements, any error in admission was harmless even under the beyond a reasonable doubt standard.

### 8. *Karen Flowers*

Karen Flowers testified that she had been romantically involved with Armstrong. The prosecution wanted to show she called him using a telephone number belonging to defendant Smith. The prosecution's theory was that Smith was friendly with Armstrong, and part of Smith's role in the Wheeler Avenue murders was to lull the victims into a false sense of security. Flowers testified that she could not remember the telephone number she used but she had previously given the number to the police. After the court overruled Smith's objection, the parties stipulated that Flowers had given the police that particular number.

94

Smith now contends the court wrongly overruled his objection that the number in the report was "double hearsay." Bryant and Wheeler did not object or join in Smith's objection. Thus, they have forfeited the claim. As to one level of hearsay, Smith conceded that the report notation was admissible under the past recollection recorded exception. (Evid. Code, § 1237.)[44] The foundational requirements of the exception were not more fully developed because Smith conceded the point.

Smith additionally contends, as he did at trial, that Flowers's statement was double hearsay because Armstrong, or someone else, had told her this was his telephone number. Smith has mischaracterized Flowers's testimony. When asked if she had "a phone number for [Armstrong] where you could contact [him]," she answered, "yes," but she could not recall the number. The question and testimony concerned Flowers's personal knowledge of the telephone number she had used to contact Armstrong. Flowers was not asked and did not testify about a telephone number that someone gave her to contact Armstrong. The ruling was proper.

### 9. *James Williams*

Smith contends the trial court erred by admitting part of a recording in which James Williams told police Smith and Settle drove the bodies away from the murder

---

[44] Evidence Code section 1237 provides: "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement. [¶] (b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party."

scene.  Bryant and Wheeler did not object at trial.  In fact, they sought to introduce the entire tape with only one unrelated redaction.  The claim is forfeited.  At trial Smith objected only that the statements reflected inadmissible speculation.  The trial court overruled Smith's objection finding Williams had sufficient personal knowledge on the point.  Nothing in the record showed that this statement was based on information gleaned from someone else.  The court's ruling that other statements in the recording could be admitted for the nonhearsay purpose of showing Williams's credibility did not change the court's ruling on the statement at issue here.  Accordingly, the hearsay claim is both forfeited and meritless.

### 10.  Documentary Evidence

Defendants contend the trial court improperly admitted various documents including Western Union receipts detailing money transfers to people connected to Andre Armstrong and assorted records seized from the Bryant Family drug houses.  No defendant objected to this evidence at trial.  The claims are forfeited.

## C.  Admission of Photographs of the Victims

 Defendants contend the court violated their constitutional rights by admitting various photographs taken where the bodies were found and during the autopsies.  The evidence was admissible.  " ' "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory.  [Citations.]  The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.  [Citations.]" [Citation.]' [Citations.]  . . . Autopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy, even if other evidence may serve the same purposes.  [Citation.]"  (*People v. Howard* (2010) 51 Cal.4th 15, 33.)  The court properly ruled the challenged items were relevant.

96

As to undue prejudice, we have reviewed the photographs at issue. As is usually the case in a murder, they are unpleasant. The trial court did not exceed the bounds of reason in finding that the probative value of the photographs was not substantially outweighed by the risk of undue prejudice.[45] Moreover, the court rejected some photographs proffered by the prosecution, and admonished the jurors, in essence, to avoid letting any emotional reaction affect their consideration of the evidence.[46]

## D. Admission of Opinion Evidence Regarding Drug Business Operations

Detective James Dumelle testified about the police raids and arrests during the 1984-1985 investigation of the Bryant Family. During Bryant's cross-examination, Dumelle testified that in his opinion, at the time of the Wheeler Avenue murders, Jeff Bryant was in charge even though he was in prison. During redirect examination, the prosecutor asked the detective, "based on your understanding of the people running the organization, what's your opinion as to who [Jeff Bryant] would leave in charge of" the "people on the outside of the prison?" Bryant objected to the question on the grounds of lack of foundation and improper opinion. The trial court overruled the objection, and Dumelle answered that defendant Bryant would be in charge. On appeal, Bryant renews his contention that the detective's answer was improper, because it constituted

---

[45] Defendants challenged the admission of X-ray images taken during the autopsy of Chemise only on relevance grounds, not as unduly prejudicial. Their section 352 challenge to these items is forfeited. (*People v. Valdez* (2012) 55 Cal.4th 82, 138-139 (*Valdez*).)

[46] The court instructed the jury as follows: "You are going to be allowed during the testimony of [the pathologist] to view some photographs that he is going to describe for you, photographs of the four decedents in this case. The photographs are not given to you with the idea of inflaming you or trying to affect you emotionally, but because the court feels there is some relevance to the photographs that is not outweighed by any potential damaging effect by your seeing the photographs. I want you to keep in mind that they are simply evidence like every other piece of evidence in this case."

unsupported opinion testimony. Smith and Wheeler forfeited the claim for failure to object. The evidence was also admissible. Bryant relied on Dumelle as an expert on the structure of the organization by eliciting the opinion that Jeff was in charge despite his imprisonment. The trial court properly admitted his opinion about an additional aspect of organization structure and operations. (See Evid. Code, § 720, subd. (a) ["A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates."]; *People v. Fuiava* (2012) 53 Cal.4th 622, 672 (*Fuiava*).) Moreover, Bryant was free to challenge the persuasive value of Dumelle's opinion on recross-examination.

### E. Questioning of Bryant by the Trial Court

Defendants contend that during the prosecutor's cross-examination of Bryant, the court posed a series of hostile questions demonstrating a failure to remain impartial, and violating their rights to due process. No defendant objected at trial; the claim is forfeited. (*People v. Harris* (2005) 37 Cal.4th 310, 350.) The failure to object is particularly significant here because the claim may rest on an error in the reporter's transcript in attributing the questions to the court, rather than the prosecutor.[47]

---

[47] In response to the first question supposedly asked by the court — whether Bryant was "selectively answering questions you choose to answer because you figure they're safe questions to answer" — Bryant answered, "I'm answering the questions to the best of my ability when you ask me and the *other attorneys*," implying that it was an attorney, i.e., the prosecutor, asking this question and those that followed, not the trial judge.

During a remand from this court to allow the trial court to make other specified record augmentations and corrections, the trial court found that the reporter's transcript was, indeed, erroneous in the attribution of the questions at issue. Bryant contends the trial court's finding was outside the scope of its authority granted by the remand order. We need not resolve the propriety of the trial court's finding here because defendants' appellate claim is forfeited.

## F. The Trial Court's Comments on Costs of Trial

Defendants contend the trial court improperly mentioned to the jury the expense of the trial. They point to a few instances over the course of several months in which the court referred to trial costs. They assert that these references may have prejudicially coerced the jury when it deliberated. Assuming the challenges are not forfeited (see § 1259),[48] they lack merit.

The first references came early in the trial. The court told the jurors about arrangements made to protect their privacy, such as having them escorted to court and keeping them together in a jury room during the day. The court explained, "we simply cannot afford to have trials blow up because the jury cannot follow the court's instructions. . . . It costs a lot of money to run this courtroom. I won't bore you with the details, only to say it is astronomical. That means we must have everybody on the same wavelength, not speaking about the case, not doing anything for no good reason that would result in a mistrial." After several days of testimony, the court asked jurors whether the arrangements were causing any problems. The court stated that "the arrangements that we have to get you to court in the morning and to keep you in the building during the day and to provide lunches and so forth, those are being done for your benefit and at considerable expense. [¶] I won't bore you with the details about those bills I sign every single day and you would be very surprised. So I will not get into that with you." Later in the discussion, the court reminded the jury that it was not "do[ing] this lightly at all. We certainly do not need to get into any more expense than we have to, but it is appropriate for the reasons I stated earlier."

---

[48] Section 1259 provides, in relevant part, "The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

99

We addressed similar comments in *People v. Andrews* (1989) 49 Cal.3d 200. There, the trial court mentioned the cost of running the courtroom and the expense of a retrial to stress the importance of the jurors following the admonition not to discuss or investigate the case outside of the court proceedings. We concluded there was no reasonable likelihood of any improper effect on the jury because "[t]he comments merely constituted an attempt by the trial court to stress the importance of obeying the court's admonitions." (*Id.* at p. 221.) The same considerations apply here. The comments were made in the context of explaining the necessity for the special arrangements regarding the jury's coming and goings and the importance of the court's instructions. Moreover, the court explicitly admonished the jurors that the special arrangements and costs should not bear on their deliberations.[49]

The other two references defendants point to were even more oblique. In light of trial testimony that in the past the Bryant Family had hired attorneys to represent employees who were being prosecuted, defendants requested that the trial court instruct that the attorneys representing defendants in this case had been appointed. The court invited defendants to formulate the language of the instruction. It is unclear whether they did so. The court ultimately instructed that the defense attorneys had been appointed, and repeated that instruction in a slightly expanded form the next day when a juror asked for clarification. The court first said, "You heard some testimony in this case about Family

---

[49] During the first discussion, the court stated, "Let me explain what you cannot do with this information I have given you. First of all, you are not to allow any arrangements that I have made for my reasons to affect your verdict in this case, whatever that verdict is, at any phase, guilt phase, or if we have a penalty phase." In the second discussion, the court stated, "This is being done because the court thinks it is appropriate. That is about all I will say at this point in time. [¶] And whether you think we are going overboard with the accommodations or being too accommodating, you are entitled to your opinion. But I don't want those opinions to in any way influence the manner in which this case is decided . . . ."

attorneys, things of that nature, two or three times. I don't remember what witness but let me assure you as follows: That none of the defense attorneys in this case have been retained by the defendants in this case. These attorneys are on our approved, very elite death penalty list and they are the ones that the court calls upon and appoints to handle cases wherein a potential penalty is death. These people, whether there are or are not Family attorneys, these lawyers are not among that group." In response to the juror's question the following day, the court explained that the defense attorneys were not Family attorneys, but had been appointed and paid by the court. The court then stated, "I'll tell you this, too. Nobody can hire a lawyer for a death penalty case. I don't care who you are, it costs too much money. I've not yet seen a retained counsel on a death penalty case, so these are appointed and paid by the State of California, all the lawyers in this case." The court told the jury that the fact that defense counsel were being paid by the state was "not an issue that is of any interest to you right now, shouldn't be," nor was it "evidence of anybody's indigency or lack thereof," the court was only trying to inform the jury of the status of the attorneys, and that this information should not "detract or add to any other evidence in the case." The court then asked the attorneys if what it had told the jurors was "agreeable to all counsel." No counsel expressed any dissatisfaction.

Again, the court's comments in no way suggested that the expense of the attorneys representing defendants should play a role in the jury's deliberations. The indirect references came in the context of instructing the jury on a proper subject and at defendants' request. The court admonished the jury not to take from the court's instructions more than a clarification that the attorneys had not been hired by the Family. There is no possibility that the court's comments regarding the cost of representation for defendants had any prejudicial effect on the jury's deliberations.

101

## G. Asserted Prosecutorial Misconduct

Defendants contend the prosecution committed misconduct during the guilt phase in both the presentation of evidence and argument. They forfeited nearly all of their claims by failing to object and to request admonitions. (*Gonzales*, *supra*, 54 Cal.4th at p. 1275.) Defendants' blanket assertion that admonitions could not have cured the prejudice from the asserted misconduct is unpersuasive, as is their assertion that we should apply a "plain error" standard to review otherwise forfeited claims. (*Fuiava*, *supra,* 53 Cal.4th at p. 727; *Collins*, *supra*, 49 Cal.4th at p. 204.) Defendants' failure to object prevented the prosecution from developing the record to refute these claims and prevented the trial court from taking steps to avoid or remedy any prejudice. We therefore decline to address them. The only two claims of misconduct preserved for appeal involve one statement of law and one concerning the facts. Both claims are meritless.

" 'The standards governing review of misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." [Citation.] . . . When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " [Citation.]' [Citation.]" (*Gonzales*, *supra*, 54 Cal.4th at p. 1275.)

Defendants contend the prosecutor misstated the appropriate legal definition of what constitutes an accomplice. The prosecutor argued, "Jay Williams is not an accomplice in this case, and the reason he is not an accomplice is he has to be subject to prosecution for exactly the same crimes, meaning he has to be guilty of these crimes."

102

Following a defense objection that the prosecutor had misstated the law, the trial court stated to the jury, "Well, he has to be shown to be an accomplice by the evidence, I think, within the confines of the court."

Defendants contend the prosecutor's statement was improper because "[n]ot everyone who is 'subject to prosecution' is guilty." They appear to base this contention on the notion that the term "guilty" means only a formal adjudication of guilt in a court proceeding. The trial court's admonition and the prosecutor's subsequent argument adequately conveyed, however, that it was up to this jury to decide for itself whether Williams was an accomplice in that he had aided and abetted the murders. There is no reasonable likelihood the jury interpreted the prosecutor's isolated comment to mean Williams could not be an accomplice because he had not been convicted.

Wheeler contends the prosecutor engaged in misconduct by arguing against facts he knew to be true.[50] A prosecution witness had testified that Wheeler sold drugs for the Family as far back as 1986. Wheeler denied that was so, testifying he had been confined in county juvenile and California Youth Authority facilities from 1985 through late 1987. He testified that he did not join the Family until February 1988, only six months before the murders. In closing argument, Wheeler's counsel contrasted Wheeler's brief connection to the Family with the lengthy relationships of the other defendants, and suggested that Williams framed Wheeler because he was the "odd man out."

The prosecutor addressed Wheeler's "alibi" in argument to the jury as follows: "Now, he admits yeah, I am a dope dealer, but they could not have met me then because I was in custody. Well, that is a fine defense, but nonetheless, he went to juvenile camp, and the juvenile camp had him in and out of custody." Wheeler objected that the

---

**50** Bryant and Smith did not object to this asserted misconduct or raise it as a claim on appeal; the issue does not appear to relate to them at all.

prosecutor had misstated the evidence, and the trial court agreed, stating, "There is no evidence. Jury is admonished to disregard." The prosecutor went on, "There is no evidence, no records to show when Wheeler was in custody and when he was not. And if it was true he was in custody that entire time, how easy to show that. If there is any truth at all to that, how easy to show that. Oh, just take Leroy Wheeler's word for it. Leroy Wheeler, the man lied to the police with every word he said, and lied to you a number of times. But take my word for that. Yeah right." Wheeler later raised an objection that the prosecutor had, in effect, argued that Wheeler's testimony was false when records the prosecution had provided confirmed that he was in custody during the relevant period. Wheeler also raised this issue in his motion for a new trial and provided confirming records. The trial court overruled the objection and denied the motion for a new trial.

On appeal, Wheeler renews his claim that the prosecutor's statements were improper. The Attorney General responds that the prosecutor permissibly commented on the state of the evidence, urging that Wheeler's own testimony was not credible, and that he had failed to present other available evidence to support his testimony. (See *People v. Chatman* (2006) 38 Cal.4th 344, 407; *People v. Wash* (1993) 6 Cal.4th 215, 263.) We agree with Wheeler, however, that this assertion misses the point. It is misconduct for a prosecutor to urge a failure of proof and argue the contrary is true, when the prosecutor knows or should know the assertion is, in fact, false. Further, " '[u]nder well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents . . . .' " (*People v. Harrison* (2005) 35 Cal.4th 208, 242.)

Wheeler's juvenile records reflect that Wheeler was arrested in 1985, committed to the county juvenile hall, then a California Youth Authority facility, and ultimately paroled in November 1987. There is no indication that Wheeler was ever released from custody, even temporarily, during that time. It was improper to suggest that a failure to produce the records could be relied upon to show that Wheeler's testimony was not true

104

when the prosecutor knew or should have known the records appeared to corroborate Wheeler.

We nonetheless conclude any misconduct was not reversible. It clearly fell within the jury's province and capability to weigh the credibility of the conflicting testimony on this tangential subject. It was undisputed that Wheeler sold drugs for the Family and processed money at Wheeler Avenue. The jury was instructed that the parties were not *required* to present all available evidence concerning an issue.[51] Moreover, Wheeler's credibility had already been substantially undermined. By his own admission he had lied extensively to police officers investigating the murders. The trial was not fundamentally unfair, nor is there a reasonable probability the outcome would have been more favorable to Wheeler in the absence of the prosecutor's brief and sarcastic argument suggesting yet another reason to disbelieve his testimony on a collateral issue.

## H. Accomplice Determinations and Jury Instructions

Defendants raise several challenges relating to accomplice testimony. The trial court did not err.

### 1. *Accomplices as a Matter of Law*

Defendants' primary claim that Williams was an accomplice as a matter of law relies on section 1111. The statute provides, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

---

[51] The trial court instructed the jury with CALJIC No. 2.11: "Neither side is required to call as witnesses all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events. Neither side is required to produce all objects or documents mentioned or suggested by the evidence."

[¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*) " '[A]n accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose *and* an intent to assist in the commission of the target crime . . . .' [Citation.] 'In order to be an accomplice, the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33).' [Citation.]" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1353.)

"Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law." (*Valdez*, *supra*, 55 Cal.4th at pp. 145-146.) "[A] court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' " (*People v. Williams* (1997) 16 Cal.4th 635, 679.) The trial court here instructed the jury that defendants bore the burden of proving that Williams was an accomplice. If it found he was an accomplice, it was required to find corroboration for his testimony, and it should view his testimony with caution. (See CALJIC Nos. 3.11, 3.12, 3.13, 3.18, and 3.19; see also CALCRIM No. 334.)

Defendants claim a number of facts establish that Williams assisted in the murders as an accomplice. That is a jury question. The *court's* task was not to determine whether the jury *could* reasonably find Williams was an accomplice, but rather whether it could *only* reasonably find that he was an accomplice.[52] Williams testified that he followed

---

[52]    Similarly, defendants at times mischaracterize the trial court's ruling as its having found that Williams was not an accomplice, e.g., that the court treated Williams's "self-

*(footnote continued on next page)*

Bryant's orders. He suspected the possibility of an armed conflict at Wheeler Avenue between the Family employees and unknown people who were to arrive there. However, he did not actually know what was going to happen and did not intend to assist in murdering the visitors. If the jury credited this testimony, it would have properly found he was not an accomplice to murder because he lacked the required knowledge and intent. "Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice." (*Carrington*, *supra*, 47 Cal.4th at p. 191; see also *People v. Sully* (1991) 53 Cal.3d 1195, 1227 [an accessory after the fact under §§ 32 and 33 is not an accomplice].) An accomplice must "*share*[] *the perpetrator's criminal purpose*"; even providing "assistance with *knowledge* of the perpetrator's criminal purpose" is insufficient. (*People v. Balderas* (1985) 41 Cal.3d 144, 194 (*Balderas*).) The trial court correctly declined to find Williams was an accomplice as a matter of law. (*Valdez*, *supra*, 55 Cal.4th at pp. 146-147; *People v. Stankewitz* (1990) 51 Cal.3d 72, 91.)

The trial court, contrary to defendants' arguments, did not apply an incorrect standard in resolving this issue, nor did defendants raise the assertion below, forfeiting this challenge. The court did not state or imply that Williams was not an accomplice because he had not been convicted of the murders. It did not substitute a generic sufficiency of the evidence standard for the "liable to prosecution" standard in section 1111. The court made clear that the basis for its ruling was the disputed evidence regarding Williams's status.

---

*(footnote continued from previous page)*

serving exculpatory statements as dispositive of his accomplice status." To the contrary, the court clearly, and properly, left that question to the jury, and instructed it accordingly.

Defendants also raise two related arguments. First, they observe that Williams was initially charged with the same crimes as defendants, including participating in the illegal drug distribution conspiracy. Accordingly, they urge he was "not only 'liable' to prosecution for the murders, he *was actually prosecuted*." The trial court properly ruled the filing of charges did not establish as a matter of law that he was an accomplice. *Riggs*, *supra*, 44 Cal.4th 248, is instructive. There, the trial court properly declined to find the witness was an accomplice as a matter of law even though she had already been *convicted and sentenced* for the same murder at issue. (*Id.* at pp. 312-313.) Similarly, we held in *People v. Garrison* (1989) 47 Cal.3d 746, 772, "[t]he fact that a witness has been held to answer for the same crimes as the defendant and then granted immunity does not necessarily establish that he or she is an accomplice." Defendants' argument that Williams was an accomplice because he was still "liable to prosecution" for the drug conspiracy offense, which had been severed from the murder charges, is unsupported by the language of the statute. Under section 1111, an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant *on trial in the cause in which the testimony of the accomplice is given*." (Italics added.) In determining whether Williams was an accomplice to murder, the jury was not called on to decide whether defendants were guilty of drug conspiracy.

Next, defendants contend Williams was an accomplice as a matter of law under the natural and probable consequences theory of aider and abettor liability. They urge that because Williams admittedly participated in the Bryant Family drug conspiracy, he was liable for these murders as the natural and probable consequences of the drug operation. This theory fails. "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." (*People v. Mendoza*

108

(1998) 18 Cal.4th 1114, 1133.) There is no doubt that drug dealing and violence commonly go hand in hand, and that the Bryant Family organization historically used violence against those who crossed them. However, those facts standing alone do not establish as a matter of law that one of the reasonably foreseeable results of the drug dealing conspiracy was this particular set of murders. (See *People v. Hinton* (2006) 37 Cal.4th 839, 880 [murder is not "a natural and probable consequence of any drug deal 'involving a large sum of money' "]; *People v. Ward* (2005) 36 Cal.4th 186, 213 [murder is not a natural and probable consequence of any drug sale]; *People v. Garceau* (1993) 6 Cal.4th 140, 183 (*Garceau*) [the record failed to establish as a matter of law that the murders at issue were a natural and probable consequence of an illegal drug manufacturing conspiracy, despite prior threats by members of the organization to "kill 'snitches' "].)

Defendants also contend Bryant's ex-wife Tannis was an accomplice as a matter of law. Again the claim lacks merit. As with Williams, the fact that Tannis was initially charged in the case is not dispositive. Defendants further suppose that she had planned to lure Armstrong to Wheeler Avenue "as a guarantee that he would be safe because of her presence." There is scant and conflicting evidence on this point, including the fact that she ultimately did not accompany the victims. Even if the jury could have found that Tannis planned to act as a lure to the victims, there is no evidence she knew a murder was planned or that she acted with the requisite intent.

The trial court properly declined to instruct that Williams and Tannis were accomplices as a matter of law. Because the jurors reasonably could have found Williams was *not* an accomplice, we need not, and do not, decide whether there was sufficient corroborating evidence as to each defendant.

## 2. *"Equally Guilty" Instruction*

Defendants contend the trial court's instructions to the jury were erroneous because the definition of principals in a criminal offense — those who commit and aid and abet the offense — provided that each principal is "equally guilty." The court instructed the jury, pursuant to CALJIC No. 3.00 (5th ed. 1988), that "[t]he persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include [those who commit and aid and abet the crime]." Defendants claim the instruction prevented the jury finding that Williams was an accomplice to the murders because he had not been convicted of the murders. They also argue that the jury might have determined he was guilty of a lesser degree of homicide and thus was not "equally guilty" with defendants of first degree murder. Even assuming that this point is not forfeited by the failure to object below (§ 1259), the instructions were proper.

As given CALJIC No. 3.10 defined an accomplice as "a person who is or was subject to prosecution for the identical offense charged against the defendant on trial by reason of aiding and abetting." CALJIC No. 3.01 as given defined an aider and abettor as a person who, "with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice, aids, promotes, encourages or instigates the commission of the crime." Essentially, defendants claim the CALJIC No. 3.00 instruction led the jury to infer that, in addition to the requirements set out in the court's other instructions, Williams could not be an aider or abettor, and therefore an accomplice, unless the jury found him to be "equally guilty" of the murders as defendants.

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the

110

jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 822 (*Solomon*).)

Since defendants' 1995 trial, CALJIC No. 3.00 has been revised to address the circumstance that aiders and abettors are not always guilty of *the same crime* as the actual perpetrators. (See Use Note to CALJIC No. 3.00 (Spring 2010 rev..) (Fall 2010 ed.)); *People v. McCoy* (2001) 25 Cal.4th 1111, 1122.) Currently, if an aider and abettor might be guilty of a different crime than the actual perpetrator, the court should modify the instruction to state, "Each principal, regardless of the extent or manner of participation is *guilty of a crime*." (CALJIC No. 3.00, italics added; see also CALCRIM No. 400 ["A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] [Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.]"].) This revision, however, addresses quite different circumstances from the present case.

The instruction given generally stated a correct rule of law. All principals, including aiders and abettors, are "equally guilty" in the sense that they are all criminally liable. (§ 31.) The instruction could be misleading if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding. However, defendants' challenge to the instruction is not based on that potential problem. Instead, they posit that the jury would interpret from this instruction an additional requirement regarding the accomplice finding: that before finding Williams was an aider and abettor, they must find he was guilty of the same crimes as the actual perpetrators. There is no reasonable likelihood the jury would have parsed the instructions in this tortuous manner, particularly in light of the court's other instructions

111

correctly defining accomplices, and the absence of any argument by the parties suggesting this interpretation.

### 3. "Slight Evidence" Instruction

The trial court instructed, without objection, that the evidence of corroboration "is sufficient if it tends to connect the defendant with the crime even though it is slight and entitled, when standing alone, to little consideration." Defendants now contend the instruction violated their constitutional right to due process by nullifying the prosecution's burden to prove their guilt beyond a reasonable doubt. Assuming the claim is not forfeited, the instruction correctly stated the law of corroboration. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 969.) Section 1111 reflects a legislative determination of how accomplice testimony must be treated. It does not create a new element of any criminal offense, nor does it involve "an issue bearing on the substantive guilt or innocence of the defendant." (*People v. Frye* (1998) 18 Cal.4th 894, 968 (*Frye*).) Defendants' reliance on the decisions of the federal courts of appeals concerning proof of a defendant's participation in a conspiracy is inapt. Contrary to defendants' arguments, the instruction did not convey to the jury that it "could convict if there was slight corroboration." Instead, the instruction properly explained the corroboration requirement as it related to the jury's consideration of accomplice testimony. The challenged instruction in no way lowered the prosecution's burden of proof.

### 4. Instruction Regarding Lack of Prosecution

The trial court told the jury, "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he or she has been or will be prosecuted. Your duty is to decide whether the People have proved the guilt of the defendants on trial. The

112

second paragraph of this instruction does not apply to the testimony or prior statements of James Williams." (See CALJIC No. 2.11.5; see also CALCRIM No. 373.) Defendants contend Tannis should have been included in the final sentence.

We assume this claim was not forfeited by defendants' failure to raise it at trial. We also assume, arguendo, that there was some evidence supporting an inference that Tannis might have been an accomplice in the murders. Nonetheless, any error was manifestly harmless. Other than making general assertions of prejudice, defendants do not explain how including Tannis in the instruction could have helped them. In fact, her in-court testimony was *favorable* to defendants. She denied that Bryant told her he had put the bomb in Keith Curry's car and would continue to try and kill him. Her contradictory out-of-court statement was made at a beauty parlor long before the Wheeler Avenue murders. Furthermore, it was not made to anyone with a possible interest in inducing her to lie at trial. The jurors were properly instructed on witness credibility with CALJIC No. 2.20, which told them they could consider "the terms of any arrangement or agreement utilized to obtain the testimony of the witness, including any immunity from prosecution." Including Tannis in the instruction at issue would have made no difference in the trial, nor did the failure to do so lessen the prosecution's burden of proof or render defendants' trial fundamentally unfair.

### I. Other Asserted Instructional Errors

Defendants mount numerous challenges to the trial court's guilt phase instructions. Assuming arguendo that all claims are cognizable (§ 1259), they are without merit.

#### 1. *Other Crimes Instructions*

Defendants challenge several instructions concerning evidence that defendants committed "other crimes" besides the Wheeler Avenue murders. They first contend that the relevance of that evidence hinged on preliminary facts. Thus, under Evidence Code section 403, the court was obligated, on request, to instruct the jury to determine whether

113

the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist.  Defendants' proposed instruction listed the other crimes and told the jury it was required to find that each defendant committed or "request[ed], instigate[d] or hir[ed]" someone else to commit them.  This challenge fails for two reasons.  First, as the trial court pointed out, not all of the other crimes evidence depended for its relevance on the direct participation of a defendant.  For example, the Gentry and Goldman shootings were relevant to establish Andre Armstrong's connection to the Bryant Family organization and his reasons for "squeezing" the Family.  Second, the trial court gave an instruction pursuant to CALJIC No. 2.50.1 (5th ed. 1988), which explained that the other crimes "purportedly committed by a defendant or defendants must be proved by a preponderance of the evidence.  You must not consider such evidence for any purpose unless you are satisfied that a particular defendant committed such other crime or crimes.  [¶]  The prosecution has the burden of proving these facts by a preponderance of the evidence."  (See also *People v. Medina* (1995) 11 Cal.4th 694, 763 (*Medina*).)  Defendants have not demonstrated that more specific instructions about other preliminary facts involved in particular crimes were proper or necessary. Additional instructions on other crimes evidence are not required when the foundational requirement is "obvious" and the significance of the evidence, if any, is evident from "simple logic."  (*People v. Carpenter* (1997) 15 Cal.4th 312, 383 (*Carpenter*).)

Next, defendants challenge the giving of an instruction pursuant to CALJIC No. 2.50 (1994 rev.) (5th ed. 1988), explaining how the jury could use the other crimes evidence.  The trial court instructed:  "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.  [¶] Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. [¶]  Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:  [¶]  A characteristic method, plan or scheme

114

in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged or the identity of the person who committed the crime, if any, of which the defendant is accused; [¶] The existence of the intent which is a necessary element of the crime charged; [¶] The identity of the person who committed the crime, if any, of which the defendant is accused; [¶] A motive for the commission of the crime charged; [¶] The defendant had knowledge of the nature of things found in his possession; [¶] The defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged; [¶] That the crime charged is part of a larger, continuing plan or scheme. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose. [¶] However, prior criminal conduct resulting in a felony conviction may also be considered on the issue of the credibility of the person suffering the conviction."

Defendants complain that the court did not specifically identify which other crimes evidence could be considered for which purpose and against which defendant. The instruction was, in general, a correct statement of the law. (*People v. Wilson* (2005) 36 Cal.4th 309, 328.)[53] Defendants' claim of error is essentially that, in the absence of greater specificity, the jury might have considered some other crimes evidence for purposes that were not justified. A jury is generally permitted to consider all relevant evidence (Evid. Code, § 351), and to give that evidence the weight it deems appropriate (Evid. Code, § 312, subd. (b)). Evidence Code section 1101, subdivision (a) and the

---

[53]    We previously found harmless, *ante*, in part III.A.4., any error in the trial court's having included establishing the "identity" of the murderers as a permissible purpose for the other crimes evidence.

115

related jury instruction make clear that a jury may not consider other crimes evidence as proof of bad character. There is no reasonable likelihood the jury would have misused the evidence in that manner. If some of the other crimes evidence failed, logically, to establish a particular question as to any specific defendant, the jury would simply and properly conclude that evidence was not convincing and disregard it. (*Nunez*, *supra*, 57 Cal.4th at p. 49; see also *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1615 [in some circumstances an instruction matching specific other crimes evidence to the issue to be proven would be improperly "argumentative and repetitious of instructions already given"].) In addition, the parties were free to argue whether specific other crimes evidence was probative of issues relating to the charges. Defendants fail to persuade that the court was required to augment the instruction as defendants now suggest.

Finally, defendants contend CALJIC Nos. 2.50 and 2.50.1 as given unconstitutionally lessened the prosecution's burden of proof because the jury was told the other crimes need only be proven by a preponderance of the evidence. We have previously rejected the same contention, particularly in light of the complete charge to the jury, which, as here, included instructions specifically explaining the prosecution's burden to prove the elements of the crime beyond a reasonable doubt. (*Carpenter*, *supra*, 15 Cal.4th at pp. 382-383; *Medina*, *supra*, 11 Cal.4th at pp. 763-764.)

### 2. *Instructions Assertedly Undermining the Burden of Proof*

Defendants also contend that a number of other standard instructions undermined the requirement of proof beyond a reasonable doubt.[54] These challenges have been rejected and are again. (*Gonzales*, *supra*, 54 Cal.4th at pp. 1278-1279; *Solomon*, *supra*,

---

[54] They challenge CALJIC Nos. 1.00, 2.01, 2.02, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 2.90, and 8.20.

116

49 Cal.4th at p. 827; *People v. Hartsch* (2010) 49 Cal.4th 472, 506 (*Hartsch*); *Harris*, *supra*, 43 Cal.4th at p. 1294; *People v. Howard* (2008) 42 Cal.4th 1000, 1026.)

### 3. Motive Instruction

Defendants raise an oft-repeated challenge to a standard jury instruction: that CALJIC No. 2.51 improperly instructed the jury that it could find sufficient proof of their guilt from evidence of motive alone, and shifted the burden of proof to the defense.[55] This challenge has been repeatedly and properly rejected. (*Watkins*, *supra*, 55 Cal.4th at p. 1029; *Solomon*, *supra*, 49 Cal.4th at p. 827.)

### 4. Consciousness of Guilt Instructions

Similarly, defendants' claims that the consciousness of guilt instructions were unnecessary, improperly argumentative, and invited the jury to draw irrational inferences, are defeated by settled precedent.[56]  (*People v. Alexander* (2010) 49 Cal.4th 846, 921-922 [CALJIC Nos. 2.04 and 2.05]; *Hartsch*, *supra*, 49 Cal.4th at p. 505 [CALJIC Nos. 2.03 and 2.06]; *Rundle*, *supra*, 43 Cal.4th at pp. 152-154 [CALJIC No. 2.52].)

---

[55]     The trial court instructed the jury that "[m]otive is not an element of the crimes charged and need not be shown.  However, you may consider motive or lack of motive as a circumstance in this case.  Presence of motive may tend to establish guilt.  Absence of motive may tend to establish innocence.  You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled."

[56]     Defendants challenge the giving of CALJIC Nos. 2.03 (Falsehoods), 2.04 (Efforts to Fabricate Evidence), 2.05 (Efforts of Others to Fabricate Evidence), 2.06 (Efforts to Suppress Evidence), 2.52 (Flight After Crime), and a special instruction (submitted by Bryant) regarding defendants' refusals to provide handwriting samples:  "If you find that before this trial any defendant willfully failed and refused to provide handwriting exemplars, then as to that defendant you may consider such failure as a circumstance tending to prove his consciousness of guilt as to the fact that his handwriting appears on some or all of the documents admitted into evidence."

117

### 5. Prior Consistent and Inconsistent Statements Instructions

Defendants challenge the giving of CALJIC No. 2.13 covering prior consistent and inconsistent statements, arguing that the instruction "unfairly skewed the jury's credibility determination in favor of the prosecution," because it referred to the truth but not also the falsity of the facts at issue.[57]  This claim, too, lacks merit.  (*People v. Friend* (2009) 47 Cal.4th 1, 41; *Harris*, *supra*, 43 Cal.4th at p. 1293.)

### J.  Refusal to Limit the Jury's Consideration of Evidence Against Smith

Smith presented no defense.  He argued that, because he planned to rely on the presumption of innocence and the prosecution's burden of proof, the jury should be limited to considering only the evidence presented up to the point he rested and not any evidence presented by the other defendants or by the prosecution in rebuttal.  The court refused to so limit the jury's consideration of the evidence.  The ruling was correct.

As with defendants' challenge to the court's denials of their motions for separate trials, Smith's claim is based on the same fundamental misperception:  that this trial should be viewed as the simultaneous separate trials of the four defendants, rather than a joint trial of all of them.  As explained in part II.E., *ante*, when the charges and defendants in a case have been properly joined for trial, the circumstance that the evidence presented to the jury in the joint trial is different from the evidence that might have been presented in a separate trial does not make the joint trial fundamentally unfair, even when a particular defendant's chance of obtaining an acquittal might be reduced.  (*Zafiro*, *supra*, 506 U.S. at p. 540; *Soper*, *supra*, 45 Cal.4th at p. 781.)

---

[57]  The court instructed the jury, "Evidence that on some former occasion, a witness made a statement or statements that were inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasion."

The paramount purpose of a trial is to provide a reliable process for determining the truth of the charges, not to provide the best possible opportunity for one party to obtain a particular result. The reliability of that truth-seeking process and the jury's ultimate verdict of guilt or acquittal cannot be enhanced by requiring that the jury ignore relevant evidence, whenever it is presented in the trial. (Cf. Cal. Const., art. I, § 28, subd. (f)(2) [establishing a Right to Truth-in-Evidence, which generally prohibits the exclusion of relevant evidence from a criminal proceeding]; Evid. Code, § 351.) The jury's consideration of *all* the evidence in a joint trial, even if one defendant strategically elects to present none, does not relieve the prosecution of its burden to prove each defendant's guilt beyond a reasonable doubt, or otherwise result in fundamental unfairness. Indeed, if Smith's contention were supportable, there would be no logical reason to draw the line at the conclusion of the prosecution's case-in-chief: Each codefendant's cross-examination of the prosecution's witnesses (and the prosecutor's redirect examination) also creates an opportunity to introduce evidence that might not have been presented in a separate trial or that could benefit one defendant, but bolster the prosecution's case against another. Joint trials would cease to exist, except in a theoretical case in which each defendant promises to remain mute throughout. Moreover, there are recognized mechanisms for ensuring that the prosecution is not *unfairly* assisted by the defendants' efforts. These include the trial court's discretion to sever the trials of codefendants (see *Avila*, *supra*, 38 Cal.4th at p. 574), and to dismiss the charges based on insufficiency of the evidence under section 1118.1.[58] Finally, as the trial court

---

[58] Contrary to Smith's arguments, there is a clear difference between a court's determination that the prosecution has presented insufficient evidence warranting a judgment of acquittal under section 1118.1, and the jury's determination if a defendant's guilt has been proven beyond a reasonable doubt. Each decision is based on the state of the evidence when made. The existence of the remedy provided by section 1181.1 says nothing about the fundamental fairness of permitting the jury to consider all the evidence when it makes the ultimate finding whether the prosecution carried its burden of proof.

119

recognized, Smith would not be (and was not) precluded from later choosing to counter evidence he perceived as harmful, or to rely on helpful evidence, despite his decision not to present a defense on his own behalf.

### K. Discharge of Juror During Deliberations and Taking Partial Verdicts as to Bryant

Bryant contends the trial court erred by accepting verdicts on two of the charges against him before excusing one juror and replacing him with an alternate. He raises three related challenges: (1) the verdicts were not final; (2) the excused Juror No. 77 (Number 77) was incapable of deliberating when the verdicts were reached; and (3) the reconstituted jury could not have truly deliberated anew on the remaining charges. To the extent Smith and Wheeler intended to join in this claim, the first two of the grounds Bryant asserts are inapplicable as to them because the challenged verdicts did not address their guilt. The trial court did not err.

#### 1. Background

The jury began guilt phase deliberations on May 11, 1995. It had deliberated for four court days when, on the morning of Wednesday, May 17, 1995, Number 77 sent the court a note, which read, "Your Honor, on yesterday, I kept my appointment to see my doctor. She advised me to take a couple days off and stay off my feet. She says I have two things wrong: First, my blood pressure was very high, 184 over 120. And I have a very severe case of arthritis. She says if my knees don't respond to the medication, I will have to go to have knee replacement. She wants me to keep my feet elevated the whole time." Bryant's counsel agreed with the court's suggestion that the juror should be questioned about the note, and expressed concern that the juror could be engaging in "a subterfuge to bail out because of animosity that may have developed, and [counsel] would like to be assured that it's a genuine and legitimate medical problem."

The court questioned the juror in open court with the other jurors absent. Number 77 briefly recounted his chronic knee problems and high blood pressure. In response to

the court's questions, he explained that his knees would be "hurting [him] pretty bad" "after a full day," and the pain "seem[ed] to be progressively getting worse." His blood pressure was also especially high. He agreed with the trial court's assessment that he was asking to be "excused starting now for the rest of the week," but that there was no "guarantee that [he would] be back" thereafter. He also confirmed that the only reason for the request was his physical ailments, and not "problems with the deliberation or what have you that causes you to want to be excused." The attorneys declined the court's offer to ask any additional questions, and the juror returned to the jury room to continue deliberations.

The prosecutor suggested it was problematic to hope the juror would return after only a short recess, and that, if the juror were to be excused, the court ought to inquire whether the jury had reached any verdicts "so we can seal those before the juror is replaced." Bryant's counsel "strenuously" objected to taking partial verdicts.[59] He argued that if the court was inclined to accept partial verdicts, the juror should not be excused. If there would be no receipt of partial verdicts, the juror could be excused. The other defense counsel joined in the objection. The court found good cause to excuse the juror based on his medical problems and the uncertainty as to his ability to return. It would ask whether the jury had reached any verdicts, and, if so, would entertain additional argument before going forward. Bryant's counsel continued to object, arguing that the inquiry would be improper, any verdicts should not be considered final in light of the upcoming participation of an alternate, and accepting the verdicts would conflict with the requirement that the newly constituted jury begin deliberating anew. The arguments were rejected.

---

[59] The defendants (other than codefendant Settle) had made a general waiver of their right to be present for proceedings during the jury's deliberations.

121

All jurors were brought to the courtroom. The court said it would be excusing Number 77, and asked the foreman, "Have there been final verdicts reached?" The foreman answered that the jury had reached verdicts as to "one or more counts, [as to] one defendant," but then added, "as far as the degree, we haven't reached that yet." In apparent conflict with that qualification, however, the foreman responded to the court's question whether "these [are] tentative decisions or final verdicts filled out," by saying the verdicts "were filled out." The court informed Number 77 that he was not yet excused, and directed the entire jury to return to the jury room.

The court then expressed its view that the jury apparently had not reached a final guilty verdict as to any defendant, but there was a "remote" possibility that, through a misunderstanding of the court's instructions, the jury might have acquitted a defendant of one or more charges. Over Bryant's counsel's continuing objections, the court decided it would review the verdict forms to determine if there was "anything that might inure to the benefit of [a] defendant."

The jury then returned to the courtroom, and the court privately reviewed the verdict forms. Two of the forms were completely filled out, including the degree of the murder. The court then had the following exchange with the foreman:

"The Court: I have looked at the various forms that were given. There were a lot. Now, two of these forms are completely filled out, all the pages filled out.

"The Foreman: That's correct.

"The Court: And dated today's date, signed by a foreperson, et cetera. Just listen carefully to me now. Were these filled out before we had our discussion?

"The Foreman: Yes, they were.

"The Court: Completely as they are now?

"The Foreman: Yes, they are [*sic*]. I had forgotten about that because we were in deliberation on the next one.

"The Court: Okay. Are these, in fact, verdicts that have been arrived at?

122

"The Foreman:  Yes, they are.

"The Court:  Tentative, or final?

"The Foreman:  They are final.

"The Court:  Any doubt about that?

"The Foreman:  None.

"The Court:  I don't want to, you know, push you or sway you one way or the other.  But what I see is two forms.

"The Foreman:  That's correct.

"The Court:  If they reflect verdicts, I need to —

"The Foreman:  That's correct.

"The Court:  — discuss that with counsel.

"The Foreman:  Sorry.

"The Court:  That's okay.  So when you were talking about whatever it was that you mentioned 10 minutes or so ago, that had to do with forms that had not yet been filled out at all?

"The Foreman:  That's correct.  When you asked the question, all I remembered was that we were deliberating on another charge as far as the degree, and I had forgotten about that.

"The Court:  And previously, as to that charge[,] that had not been written on at all, since all the [other] ones are blank?

"The Foreman:  That's correct.

"The Court:  All right.  Folks, again, if you would just go back to the jury room and stand by a couple minutes, okay?  Stand by."

The trial court solicited views on how to proceed.  The prosecution suggested the court accept the verdicts, poll the jury, and then replace Number 77 and instruct the jury to begin deliberating anew on the remaining counts.  Bryant's counsel argued the court should excuse Number 77, seat an alternate, and direct the jury to begin deliberations

123

anew on all counts. The other defense attorneys concurred. The trial court postponed its decision until defendants could be brought to court and consult with counsel. The court told the parties that the jury had found Bryant guilty of the first degree murders of Armstrong and Brown. The court directed that readback of testimony previously requested take place while defendants were being brought to court.

At subsequent proceedings outside the jury's presence, all defendants continued to object to acceptance of the verdicts, on the grounds that having different juries rendering verdicts would "disrupt[] the continuity of the process." The trial court acknowledged that it apparently had the authority to allow the soon-to-be newly constituted jury to deliberate anew on all the charges,[60] but decided not to do so. The court believed there was no requirement that the same 12 jurors render verdicts as to all defendants and charges, and therefore the court did not want to "waste for no good reason . . . four days of jury deliberation, when they have arrived at verdicts on two counts and have dated and signed those verdicts including the finding as to degree before we ever spoke to them."

Bryant objected that the verdicts should not be accepted because Number 77 had been aware of his medical concerns since the previous evening, and therefore the verdicts that morning had been reached without "the full attention of this juror who wants to be excused." The court overruled the objection, noting that the juror actually had not asked to be excused from serving, but only for a recess, and there was no indication the jury "came up with a couple of verdicts to get out of here."

_____

[60] Smith's counsel had pointed to *People v. Hernandez* (1985) 163 Cal.App.3d 645 as supporting that position. (See *id.* at p. 658 [stating that when a jury has reported it has reached verdicts on some counts but is *deadlocked* on others, an "acceptable option available to the trial court is not to receive any verdicts on decided counts from the jury until they have finished deliberations on all counts," which would permit the jury to reconsider the verdicts it had already reached].) *Hernandez* is distinguishable. There is no indication that the jury was deadlocked at this point. We need express no view on the reasoning of *Hernandez*.

124

After the jury returned, the court again questioned the foreman regarding the two verdicts:

"The Court: I am looking at forms again. There are two, as I indicated this morning, two verdict forms filled out as to one defendant, and my question is, once again, are these tentative, or are these final verdicts of this jury?

"The Foreman: They were final verdicts of this jury.

"The Court: Are they still final verdicts of this jury?

"The Foreman: Yes, they are.

"The Court: And they were filled out prior to our meetings this morning, I take it, is that what you're saying?

"The Foreman: That is correct."

The court then explained that it would be accepting the verdicts and polling the jurors, meaning they would be "asked in turn for the record . . . if these are, in fact, your verdicts." The clerk then read the verdicts and the jury was asked collectively if these were the jury's verdicts. There was group assent. Each juror was then individually asked whether the verdicts were "your verdicts." Each juror confirmed that they were. The trial court thereafter directed the clerk to record the verdicts, excused Number 77, and seated an alternate juror. Finally, the court instructed the jury with a modified version of CALJIC No. 17.51: "Ladies and gentlemen of the jury, one of your numbers has been excused for legal cause and replaced with an alternate juror. You must not consider that fact for any purpose. The People and the defendants have the right to a verdict reached only after full participation of the 12 jurors who returned the verdicts. This right may be assured only if you begin your deliberations again from the beginning. You must, therefore, set aside and disregard all past deliberations and tentative conclusions and begin deliberating anew as to the remaining charges. This means that each remaining original juror must set aside and disregard the earlier deliberations as if they had not taken place. You will now retire to begin anew your deliberations in accordance with all

125

the instructions previously given." After the court confirmed that the jurors understood the instruction, it directed them to resume deliberating.

One week later, another juror was replaced by an alternate due to a family medical emergency. In response to the court's inquiry, the foreman reported the jury had not as yet reached any other verdicts. The court again instructed the jury to begin anew their deliberations on the remaining counts.

### 2. *Discussion*

The record repudiates Bryant's claim that the jury's verdicts were not final. He emphasizes that the trial court initially asked whether the jury had reached any verdicts, rather than the jury giving such notification. From this, he argues, it is possible that the jurors might not have intended to render final verdicts, and they did not comprehend the irrevocability of the verdicts once the court accepted them.

Bryant cites no authority for the proposition that the court's questions improperly interfered with deliberations. The applicable statutes, sections 1147 and 1149, do not explicitly preclude the court's action.[61] We stated in analogous circumstances that a court may inquire whether a deadlocked jury has reached any verdict eliminating a charged offense. (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 519-520.)

---

[61] Section 1147 provides: "When the jury have agreed upon their verdict, they must be conducted into court by the officer having them in charge. Their names must then be called, and if all do not appear, the rest must be discharged without giving a verdict. In that case the action may be again tried."

Section 1149 provides: "When the jury appear they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same."

Neither provision delineates how, in the first instance, the court is to determine that the jury has "agreed upon their verdict," i.e., by waiting for the jury to say so, or by appropriate inquiry.

Bryant merely speculates that a juror might not have intended and appreciated the finality of the verdicts. The record demonstrates otherwise. The verdict forms for these two charges had been completely filled out, signed by the foreman and dated, and the jury had moved on to other charges involving a separate set of victims. In open court with all jurors present, the foreman unequivocally and repeatedly described these verdicts as final. He confirmed they had been reached before the court's initial inquiry. After the formal reading of the verdicts the jurors collectively and individually affirmed the verdicts. Nothing supports the notion that these verdicts did not constitute the jury's conclusive decisions as to those counts.

Bryant's claim that the verdicts should not have been accepted because Number 77's medical problems rendered him unable to participate in the deliberations equally lacks support in the record. Contrary to Bryant's position, the trial court's finding of good cause to excuse Number 77 was not a determination that the juror *had been* or *at that time was* unable to perform his duties, but rather an acknowledgement that his *continued* service would have been an unacceptable hardship. Section 1089 provides in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." In *Lomax*, *supra*, 49 Cal.4th at page 590, we repeated the rule that excusal of a juror during deliberations must be " 'manifestly supported by evidence on which the court actually relied.' " These standards were satisfied. As to Number 77's ability to deliberate, his discussion with the court that morning clearly showed he was coherent and able to communicate. Although he told the court his knees would become painful "after a full day," and his blood pressure was elevated, there simply is no indication that these

127

problems precluded his meaningful participation in deliberations during the previous four days or that morning. During polling, Number 77 confirmed the verdicts as read were his own.

Finally, defendants point to our statements in *People v. Collins* (1976) 17 Cal.3d 687, 693-694 that because a defendant's constitutional right to a unanimous jury verdict "is not met unless [the 12 jurors] reach their consensus through deliberations which are the common experience of all of them," "a proper construction of section 1089 requires that deliberations begin anew when a substitution is made after final submission to the jury." They contend that accepting some guilty verdicts by one jury and others by a jury reconstituted with an alternate denied them unanimous verdicts on the later verdicts.[62] This is so, they assert, because the existence of the prior guilty verdicts would preclude truly new and independent deliberations on the remaining charges. To the contrary, the requirements of section 1089 and *Collins* were satisfied. The procedures followed did not preclude new deliberations and unanimous verdicts by the reconstituted jury.

Section 1089 explicitly permits the substitution of jurors after deliberations have begun: the substitution can be made "any time, whether before or after the final submission of the case to the jury." Long ago in *People v. Rigney* (1961) 55 Cal.2d 236, we approved the taking of partial verdicts in the general sense. "There is no reason why the court should not have the jury's verdicts on each count returned separately." (*Id.* at p. 246.) We have not directly resolved whether a court may accept partial verdicts, then excuse an original juror for good cause and permit a reconstituted jury to continue deliberations.[63]

---

[62] Defendants present no argument that the record demonstrates the two reconstituted juries actually did not begin the deliberations anew on the remaining counts.

[63] In *People v. Fudge* (1994) 7 Cal.4th 1075, 1100-1101, we declined to address the merits of this issue because the defendant in that case had forfeited the claim. In *People*

*(footnote continued on next page)*

Defendants note that other courts have expressed doubt regarding the ability of a reconstituted jury to set aside the deliberations and findings underlying already-recorded verdicts. For instance, in *State v. Corsaro* (N.J. 1987) 526 A.2d 1046, 1054, the court stated its view that "where the deliberative process has progressed for such a length of time or to such a degree that it is strongly inferable that the jury has made actual fact-findings or reached determinations of guilt or innocence, the new juror is likely to be confronted with closed or closing minds. In such a situation, it is unlikely that the new juror will have a fair opportunity to express his or her views and to persuade others. Similarly, the new juror may not have a realistic opportunity to understand and share completely in the deliberations that brought the other jurors to particular determinations, and may be forced to accept findings of fact upon which he or she has not fully deliberated." Defendants also rely on the dissenting opinion in *People v. Aikens* (1988) 207 Cal.App.3d 209, which articulated a perceived distinction between the circumstances of a reconstituted jury asked to set aside prior unfinished deliberations as opposed to completed determinations. (*Id.* at p. 220 (dis. opn. of Johnson, J.).) Some states, by statute or rule, prohibit *any* substitution of jurors after the case has been submitted to them. (See, e.g., *Cantrell v. State* (Ark. 1979) 577 S.W.2d 605, 266; *Claudio v. State* (Del. 1991) 585 A.2d 1278, 1301; *People v. Roberts* (Ill. 2005) 824 N.E.2d 250, 258; *Crossland v. Com.* (Ky. 2009) 291 S.W.3d 223, 230.)

We do not share the *Corsaro* court's pessimism regarding the capabilities of jurors. As we have consistently stated in numerous contexts we generally presume that

*(footnote continued from previous page)*

*v. Fields* (1983) 35 Cal.3d 329, 351, we rejected a suggested routine procedure of substituting jurors at the conclusion of the guilt phase of capital trials, based on a concern that the penalty phase verdict might not result from deliberations that are the " 'common experience' " of all the jurors.

jurors are capable of following, and do follow, the trial court's instructions. We have specifically applied this presumption to an instruction for a reconstituted jury to begin its deliberations anew. (*Fuiava*, *supra*, 53 Cal.4th at p. 716.) For decades we have presumed that jurors follow a court's general instructions to consider each offense and defendant separately, "as if it were the only accusation before them." (*People v. Kemp* (1961) 55 Cal.2d 458, 477; *People v. Dabb* (1948) 32 Cal.2d 491, 499; see also CALJIC No. 17.00 and CALCRIM No. 203, CALJIC No. 17.02 and CALCRIM No. 3515.) The circumstances of a reconstituted jury's consideration of the remaining charges after the rendering of partial verdicts are not so different that the usual presumption should not apply.

Several jurisdictions, including the federal courts, that had historically prohibited all substitutions of jurors after the start of deliberations, have now revised their statutes or rules to permit this practice. (See, e.g., Fed. Rules Crim. Proc., rule 24(c)(3), as amended Apr. 29, 1999, 28 U.S.C.; Conn. Gen. Stats. § 54-82h, subd. (c), as amended May 26, 2000; N.H. Rev. Stat. § 500-A:13, subd. V, as amended Aug. 14, 1993.) These changes reflect a developing confidence in the ability of jurors to follow a court's instructions to begin deliberations anew.

Furthermore, this record reflects the jury did, indeed, deliberate anew. After Number 77 was excused, the jury met for more than three court days without reaching any other verdicts. Then there was another substitution. Immediately after the second substitution, a juror asked the court whether beginning deliberations anew required that the jury also rehear all previous readback, stating that he did not know "whether that should be a consideration or not. Everything else, usually a new juror comes in we start

130

from scratch."[64]  The record shows the taking of partial verdicts in this case did not violate defendants' right to have the jury reach unanimous verdicts.

## L. Denial of Motion to Direct the Jury to Reopen Deliberations

Defendants contend the court should have instructed the jury to reopen its deliberations after the verdicts against them had already been recorded.  We will assume the issue is preserved as to Bryant and Wheeler despite their failure to explicitly join in Smith's motion.  The court did not err.

After the court had accepted and recorded verdicts as to all the counts against defendants here, the jury continued deliberating on the charges against codefendant Settle.  The jury reported after a week of deliberations and several ballots that it was deadlocked 11 to one and could not reach any verdicts.  The trial court asked the foreman whether there was "anything that you personally can think of that . . . would assist the jury in ending the deadlock as to any count or counts," such as "further clarification of the law, [or] further [readback] of the testimony of any witness?"  The foreman did not believe so, because in his view it was "a matter of conviction on the part of the juror."  Another juror suggested clarification of the difference between proof beyond a reasonable doubt and beyond all possible doubt.  The foreman then suggested clarification of "the definition of an accomplice."  A third juror suggested further instruction on "the full aspect of the corroboration of an accomplice and what that entails."  The court asked the jurors to return to the jury room and write out any questions so the court would not be explaining to the jurors "things that you may not need."

---

[64]    The court explained that it was up to the jury whether to request a readback, directing the jurors to "go forward and begin new deliberations on those remaining counts."  Before reaching any subsequent verdicts, the jury received requested readback of several witnesses' testimony.

The jury sent the court several written questions, three of which concerned aiding and abetting and accomplices.[65] One question asked, "If one is charged with the same crime, but not brought to trial, is he automatically an accomplice?" Another asked whether there can be "aiding and abetting after the crime was committed?" The final question asked whether, as to the corroboration requirement for accomplice testimony, "Doesn't this constitute reasonable doubt if there is no corroboration of same in your mind?" Smith expressed concern about the jury's "apparent failure to understand the law of accomplice and corroboration." The court recessed for the evening to consider how to respond to the questions.

The next morning outside the presence of the jury, Smith asked the court to "resubmit counts 1 to 5 to the jury for reconsideration in light of . . . the tenor of [the] questions [suggesting] a misunderstanding of the law by the jury." The court denied the motion. The court then answered the jury's questions. It explained that a person who does not aid and abet a principal before the crime is committed is not an accomplice. A juror asked whether the court "would . . . be interested in suggesting what [a person who assisted a principal only after the crime was completed] would be guilty of?" The court declined to give an answer, explaining that this "would not be of any assistance to this jury." A juror asked whether the jury "has the final decision as to whether or not they consider someone to be an accomplice or an accessory?" The court explained that none of its instructions had referred to the term "accessory," and that was not an issue that the jury needed to decide. The court reiterated that it was up to the jurors to determine whether a witness was an accomplice. Another juror sought to clarify again that the corroboration requirement "goes beyond reasonable doubt." The court reiterated that this

---

[65] The other questions were about the jury's consideration of inconsistent witness statements, its assessment of witness credibility, and the concept of reasonable doubt.

132

was a distinct rule of law.  Finally, a third juror asked whether the accomplice determination required unanimity.  The court explained that the jurors need not agree on whether a witness was an accomplice, but must be unanimous in the ultimate finding of whether the defendant's guilt had been proved beyond a reasonable doubt.[66]

Outside the presence of the jury, Smith asserted that the jurors' in-court questions made it "painfully clear" that the jury did not understand the law regarding accomplices, and "perhaps did not understand it previously" when it rendered the verdicts as to defendants.  He renewed his section 1161 motion to have the jury reconsider its verdicts "based on misunderstanding of — apparent misunderstanding of that law."  The court denied the motion because it "did not see a misunderstanding."  In the court's view, the questions indicated one juror was having difficulty determining whether there was sufficient corroboration of Williams's testimony incriminating Settle.  The court stated, "that in no way exists with any verdict [in Smith's] case, and does not evidence a confusion as to the law regarding accomplices whatsoever [so] as to render a verdict against your client mildly suspect."

Defendants' reliance on section 1161 is misplaced.  The statute provides:  "When there is a verdict of conviction, in which it appears to the Court that the jury have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict, and if, after the reconsideration, they return the same verdict, it must be entered; but when there is a verdict of acquittal, the Court cannot require the jury to reconsider it.  If the jury render a verdict which is neither general nor special, the Court may direct them to reconsider it, and it cannot be recorded until it is rendered in some form from which it can be clearly understood that the intent of the jury is either to render

---

[66]  As mentioned above, the jury ultimately was unable to reach verdicts as to codefendant Settle.

a general verdict or to find the facts specially and to leave the judgment to the Court." (§ 1161.) Notably, this provision for reconsideration precedes the statutes regulating jury polling (§ 1163) and verdict recordation (§ 1164). By its own terms, section 1161 reflects an expectation that the trial court's actions would occur before the verdict is "entered" or "recorded." As we recently stated in *People v. Carbajal* (2013) 56 Cal.4th 521, 531, the statutes create a "mechanical, prescriptive . . . process for eliciting and receiving a jury verdict." Section 1161 simply does not speak to a situation where verdicts have been formally entered and recorded, as in this case.

Defendants cite no case in which a court has invoked section 1161 to direct reconsideration of recorded verdicts. The cases addressing section 1161, in fact, point to a second related flaw in the theory that the trial court had authority to direct reconsideration. It appears the relevant portion of section 1161 was meant to address errors made manifest by the verdict itself. Specifically, the statute refers to a verdict of conviction "in which" there appears to have been a mistake of law on the jury's part. (§ 1161.) In *People v. Bonillas* (1989) 48 Cal.3d 757, at pages 769-770, we listed a number of instances when section 1161 had been properly applied. Each involved incomplete or inconsistent verdicts that rendered the jury's findings unintelligible. The problems were evident from examining the verdicts themselves. Here, defendants assert not that the verdicts were ambiguous because they were unfinished or conflicting, but that later events supposedly undermined confidence that the jury properly understood the law in rendering them. There is no authority reflecting that section 1161 was intended to reach such circumstances. To the contrary, Evidence Code section 1150 prohibits challenging the validity of a jury's verdict based on evidence "concerning the mental processes by which it was determined."

134

## IV. PENALTY PHASE AND SENTENCING ISSUES

### A. Admission of Evidence of and Jury Instructions Regarding Unadjudicated Offenses

Defendants raise a number of challenges to evidence that they committed violent "unadjudicated offenses" as aggravating factors under section 190.3, factor (b) (factor (b)). Most of these claims are common objections, previously rejected. The more case-specific claims are equally without merit.

We will assume that all defendants have properly joined in the general claims challenging factor (b) and the relevant jury instruction, and that we may consider all the claims even to the extent they have been raised for the first time on appeal. (*People v. Hines* (1997) 15 Cal.4th 997, 1061; § 1259.)

Generally, admission of unadjudicated offenses in aggravation is neither fundamentally unfair nor a denial of due process. (*People v. Anderson* (2001) 25 Cal.4th 543, 584; *Balderas*, *supra*, 41 Cal.3d at p. 205.) There is no constitutional infirmity in permitting the same jury to determine both the defendant's guilt of the charged offenses and whether he or she also committed the unadjudicated offenses. (*Harris*, *supra*, 43 Cal.4th at p. 1315, *Balderas*, at pp. 204-205.) Any differences in the operation of factor (b) compared to noncapital sentencing procedures do not violate a capital defendant's constitutional right to equal protection. (*Harris*, at p. 1315.) Instructions referring to the factor (b) evidence as "criminal activity" and "criminal acts . . . which involved the express or implied use of force or violence or the threat of force or violence" (see CALJIC No. 8.87) did not improperly remove from the jury any issue it was required to resolve. (*People v. Burney* (2009) 47 Cal.4th 203, 259 (*Burney*).) The Constitution does not require juror unanimity regarding unadjudicated criminal conduct. (*Harris*, at p. 1316.)

Smith also contends the trial court's instruction did not properly define the scope of the statute. The instruction, he asserts, improperly escalated the seriousness of some

factor (b) evidence, keeping the jury from considering whether the offenses were merely implied, rather than express, threats of violence. We assume this contention is reviewable as to all defendants under section 1259.

An identical claim was made in *Thomas*, *supra*, 53 Cal.4th 771. There, we declined to resolve the merits because any error was harmless. The unadjudicated battery involved the actual use of force, so the jury's verdict could not have been affected by any instructional error about the nature of the threats. (*Id.* at p. 834.) Here, however, Smith's and Wheeler's bare possession of weapons in jail did not involve actual violence. Even so, there is no reasonable likelihood the jury misunderstood the instruction to defendants' detriment.

The challenged portion of the instruction given pursuant to CALJIC No. 8.87 (1989 rev.) (5th ed. 1988) reads: "Evidence has been introduced for the purpose of showing that the defendant . . . had committed the following criminal acts . . . which involved the express or implied use of force or violence or the threat of force or violence." The instruction did not precisely track the language of the statute, which defines factor (b) evidence as "criminal activity by the defendant which involved the *use or attempted use* of force or violence or the *express or implied threat* to use force or violence." (§ 190.3, factor (b), italics added.)[67] Defendants argue the variation creates ambiguity, because the phrase "express or implied" modifies only the phrase "use of force or violence," rather than the phrase "threat of force or violence," which would parallel the statute. But theirs is neither the only nor most reasonable understanding of the instruction. The jury likely interpreted the phrase "express or implied" to apply to *both* the use of force or violence *and* the threat to use force or violence. However, even if

---

**67** CALCRIM No. 764 omits the statutory language. The violent nature of the offense is a legal matter for the court to decide. (See *Burney*, *supra*, 47 Cal.4th at p. 259.)

the instruction did not clearly define the types of possible threats, it did not explicitly tell the jury that a threat to use force or violence necessarily was an actual threat, rather than an implied one. Defendants were not precluded from arguing that their offenses involved only implied threats and that the jury should give less aggravating weight to that evidence.

Smith also challenges evidence that he possessed two prisoner-made weapons while incarcerated and awaiting trial. He contends that, although we have previously held an inmate's possession of a weapon is properly considered under factor (b), the factual context of his possession is distinguishable from other cases. He claims that, because the evidence did not establish he possessed the weapons "on his person or carried [them] in situations involving contact with other prisoners or prison staff," the evidence should have been excluded. Smith forfeited this claim by failing to raise it below. In any event, the asserted nature of his possession of the weapons is a distinction without a difference. As explained in *People v. Lewis* (2008) 43 Cal.4th 415 at pages 529-530, the possession of a weapon by a prisoner implies a threat to use force or violence.

Finally, Bryant claims the evidence admitted against him involved the uncorroborated testimony of accomplices to the criminal activities. Thus, he argues as he did at trial that any uncorroborated evidence should have been stricken under section 1111. The jurors must find adequate corroboration of accomplice testimony about unadjudicated offenses presented in aggravation. (*People v. Miranda* (1987) 44 Cal.3d 57, 100.) As we explain, however, insufficiency of corroboration is not a basis for excluding evidence. The jury was properly instructed on the need to find corroboration before it could consider the evidence in aggravation. No error occurred.

We need not delve into whether it was ever the case that a lack of corroboration was a ground for excluding factor (b) evidence. The passage of Proposition 8 in 1982 abrogated a great many exclusionary rules in enacting the California Constitution's Right to Truth-in-Evidence provision (Cal. Const. art. 1, § 28, subd. (f)(2) (former subd. (d))

(hereinafter section 28(f)(2)).  Section 28(f)(2) states, "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court.  Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103.  Nothing in this section shall affect any existing statutory or constitutional right of the press."  As will be discussed, we have previously held that this provision abrogated an exclusionary rule based on the corpus delicti rule.  The same analysis and conclusion applies here to the accomplice corroboration rule.

Similar in operation to section 1111, the corpus delicti rule " 'generally requires the prosecution to prove "the body of the crime itself" independent of a defendant's extrajudicial statements.'  [Citation.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 296.)  "The corpus delicti 'rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened.' " (*Ibid.*)

As we explained in *People v. Alvarez* (2002) 27 Cal.4th 1161, "The literal language of [section 28(f)(2)] abolishes, with specified exceptions, all state law restrictions on the *admissibility* of relevant evidence, necessarily including the prong of the corpus delicti rule that bars *introduction* of an accused's out-of-court statements absent independent proof a crime was committed.  But [section 28(f)(2)] does not address, expressly or implicitly, any substantive rule that a *conviction* requires some proof, aside from the accused's statements, of the corpus delicti, and that the jury must be so instructed.  Such issues are beyond the scope of [section 28(f)(2)], both by its literal words and as it reasonably must have been understood by the electors.  Insofar as the corpus delicti rule includes this latter requirement, it was not abrogated by Proposition 8." (*Id.* at pp. 1179-1180.)  Thus, "although the corpus delicti rule no longer

138

limits the admissibility of a defendant's extrajudicial confessions, Proposition 8 did not abrogate the requirements that the trial court instruct the jury on the rule, even on its own motion, and that the proof adduced at trial in support of a conviction must include sufficient independent corroboration of the defendant's confessions." (*Fuiava*, *supra*, 53 Cal.4th at p. 718.)

A straightforward application of section 28(f)(2) to the accomplice corroboration requirement yields the same result. Section 28(f)(2) does not except section 1111 from its operation. Therefore, its language precludes exclusion of an accomplice's testimony based on insufficient corroboration. As has been noted, section 1111 and the corpus delicti rule present "a close analogy." (*Hamilton*, *supra*, 48 Cal.3d at p. 1176.) *People v. Boyd* (1985) 38 Cal.3d 762, on which Bryant relies, is not to the contrary. There we determined the trial court should have struck the factor (b) evidence at issue because the prosecution failed to present sufficient evidence from which a " ' "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*Boyd*, at p. 778.) Even assuming that holding comports with section 28(f)(2), which was not addressed in the opinion, the circumstances here are distinguishable. Despite insufficient corroboration of an accomplice's testimony, a rational trier of fact could still find the *essential elements of the crime* proven beyond a reasonable doubt. The accomplice corroboration requirement is not "an issue bearing on the substantive guilt or innocence of the defendant or otherwise constitutes an element of a criminal offense." (*Frye*, *supra*, 18 Cal.4th at p. 968.) Accordingly, the trial court properly declined to strike the testimony at issue.

Under factor (b) accomplice testimony is *admissible* without regard to corroboration. The trial court must, however, instruct the jury that it cannot conclude a defendant committed an unadjudicated offense based *solely* on the uncorroborated testimony of an accomplice. (See *Fuiava*, *supra*, 53 Cal.4th at p. 718.) Bryant points out that the trial court's oral instruction apparently failed to inform the jury of the

139

circumstances in which accomplice testimony has *not* been corroborated.**68** That error is of no moment. The court gave the jury a written instruction that properly and fully stated the law. (*People v. Mills* (2010) 48 Cal.4th 158, 200-201 (*Mills*); *Garceau, supra*, 6 Cal.4th at p. 189.) Because ultimately the jury was properly instructed, we cannot conclude any error occurred regarding the corroboration of accomplices who testified about Bryant's unadjudicated offenses. Even if we were to conclude that their testimony was not corroborated, we would presume the jury followed the trial court's instruction not to consider that incident as an aggravating factor in reaching its verdict. (*Nunez, supra*, 57 Cal.4th at p. 49.)

## B. Asserted Prosecutorial Misconduct

Smith contends the prosecutor committed misconduct when arguing that Smith's expert witness came "up with some convoluted cockamamie theory that is a bunch of psychobabble as to why Donald Smith committed these acts and don't ask him about that." Smith contends the prosecutor improperly "disparaged" his mitigating evidence,

---

**68** According to the reporter's transcript, the court stated, in relevant part, "You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime, the testimony of the accomplice is not corroborated." The written instruction provided, "You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime alleged. If there is not such independent evidence tending to connect defendant with the commission of the crime, the testimony of the accomplice is not corroborated." The oral instruction apparently skipped from the first word "crime" to the second "crime." We note, however, that the sentence in the transcript is nonsensical, perhaps indicating a transcription error, rather than a reading error. Neither the court nor the half dozen attorneys present mentioned the omission. We also observe that the oral instruction as a whole still informed the jury that it should remove the accomplice's testimony from consideration and determine if there remains evidence connecting the defendant to the crime, and if there *is* credible independent evidence, "then the testimony of the accomplice is corroborated." Even with the omission, the jury would reasonably have inferred that if there was *not* credible independent evidence, then the testimony was not corroborated.

thereby unconstitutionally undermining the reliability of the penalty determination. He forfeited this claim by failing to object to the prosecutor's comment on this basis. (*People v. Enraca* (2012) 53 Cal.4th 735, 765 (*Enraca*).) At trial, Smith only objected that the expert "offered no opinion as counsel just stated." Further, the prosecutor's statement, though colorful, was a permissible comment on the expert's testimony. (*Gamache*, *supra*, 48 Cal.4th at p. 390; *People v. Parson* (2008) 44 Cal.4th 332, 362.) It is legitimate advocacy to disparage the credibility and weight of opposing evidence based on reasonable inferences.

## C. Asserted Instructional Errors

Defendants raise more than two dozen challenges to the penalty phase instructions. We assume each defendant has properly joined in all the claims. We also assume that, for the most part (except as stated *post*), the claims are reviewable under section 1259, even when defendants failed to raise the issue below. No claim is meritorious; most have been previously rejected. In general, we have consistently held that the standard jury instructions, CALJIC Nos. 8.85, 8.86, 8.87, and 8.88, adequately and properly instruct on the jury's determination of sentence. Proposed supplemental instructions purporting to clarify or pinpoint various concepts are often held duplicative and/or argumentative. (*Jones*, *supra*, 54 Cal.4th at p. 74; *People v. Barnett* (1998) 17 Cal.4th 1044, 1176-1177.)

Defendants point out that the trial court apparently misread the instruction defining aggravating evidence under section 190.3, factor (c) involving prior felony convictions.[69] The court's written instruction, however, correctly stated the law and controls. (*Mills*, *supra*, 48 Cal.4th at pp. 200-201; *Garceau*, *supra*, 6 Cal.4th at p. 189.)

---

[69] According to the reporter's transcript, the court instructed the jury that factor (c) consisted of "the presence or absence of *criminal activity* by the defendant, other than the crimes for which the defendant has been tried in the present proceedings." Factor (c) actually permits the jury to consider "[t]he presence or absence of any *prior felony conviction*." (§ 190.3, factor (c), italics added.)

The court was not required to instruct on the concept of "lingering doubt." (*Gonzales*, *supra*, 54 Cal.4th at p. 1298.)

The court was not required to instruct that sympathy alone could support a verdict of life without parole (*People v. Virgil* (2011) 51 Cal.4th 1210, 1279 (*Virgil*)), or that the jury was permitted to use sympathy, mercy, or sentiment in deciding what weight to give a mitigating factor (*People v. Souza* (2012) 54 Cal.4th 90, 140). The court properly rejected an instruction that the jury could consider sympathy for defendants' families and friends as a mitigating factor, and correctly instructed to the contrary. Sympathy for others is not a proper mitigating factor. (*Thomas*, *supra*, 53 Cal.4th at p. 828.)

The court properly declined to tell the jury that it could consider the sentence, or lack of punishment, of a coparticipant in the offenses as a mitigating factor. (*People v. Moore* (2011) 51 Cal.4th 1104, 1141-1142 (*Moore*).)

The court was not required to instruct that life without parole is presumed to be the appropriate sentence. (*Gonzales*, *supra*, 54 Cal.4th at p. 1299.) Likewise, the jury need not be told it must return that verdict if the mitigating factors outweigh the aggravating factors (*People v. McDowell* (2012) 54 Cal.4th 395, 444 (*McDowell*)), or it could return a life verdict even if no mitigating factors had been established (*People v. Moon* (2005) 37 Cal.4th 1, 43). No additional instruction regarding the "meaning" of life without the possibility of parole is required (*Letner*, *supra*, 50 Cal.4th at p. 203), nor should the jury be told that it should presume that its verdict would be carried out (*id.* at p. 206).

The court's instruction was not erroneous because it described the jury's task as determining whether the death penalty was "warranted," or used the phrase "so substantial" in explaining the process of weighing the aggravating and mitigating factors. (*McKinnon*, *supra*, 52 Cal.4th at p. 693.)

The court was not required to instruct that the aggravating factors were limited to those specifically mentioned in the court's instructions. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1180.)

142

The jury was properly told that before any juror votes for death that juror must find "the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The court fairly instructed that the jury need not unanimously agree on which aggravating factors were proved. A similar nonunanimity instruction as to the mitigating factors is not required. (*Moore*, *supra*, 51 Cal.4th at p. 1140.) Even so, the court so instructed the jury at defendants' request.

The trial court specifically described which section 190.3, factor (b) and (c) evidence could be considered as to each defendant. In the absence of a specific request from a party, the court was not required to do the same for section 190.3, factor (a) evidence pertaining to the circumstances of the instant offenses. (*Boyer*, *supra*, 38 Cal.4th at p. 465.) Moreover, in light of the court's specific instructions regarding "other crime" aggravating evidence, there is no reasonable likelihood that the jury somehow improperly considered evidence of "other" criminal activity introduced at the guilt phase. (See *Tully*, *supra*, 54 Cal.4th at p. 1042 [factor (a) evidence includes "guilt phase evidence relevant to 'the immediate temporal and spatial circumstances of the crime,' as well as such additional evidence . . . that ' "surrounds materially, morally, or logically" ' the crime."]; *Scott*, *supra*, 52 Cal.4th at p. 496 ["in directing the jury during the penalty phase to determine what the facts are from the evidence received during the entire trial, [the standard instructions do] not unconstitutionally allow the consideration of nonstatutory aggravating circumstances in the determination of penalty"].)

The trial court was not required to instruct that: The absence of a mitigating factor cannot be considered in aggravation (*Enraca*, *supra*, 53 Cal.4th at p. 770); mitigating factors, including a defendant's "background," can be considered only in mitigation (*Gonzales*, *supra*, 54 Cal.4th at p. 1297); mitigating factors are not limited to those specifically mentioned in the instruction (*Jones*, *supra*, 54 Cal.4th at p. 82); or one mitigating factor could outweigh all the aggravating factors (*Gonzales*, at p. 1298). The

143

court was not required to delete from the instruction assertedly inapplicable mitigating factors. (*McDowell*, *supra*, 54 Cal.4th at p. 444.) The use of "restrictive adjectives" in the definition of some mitigating factors was not erroneous. (*Enraca*, at p. 769.)

"Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty." (*Enraca*, *supra*, 53 Cal.4th at p. 769.) The trial court is not required to instruct that mitigating factors need not be proven beyond a reasonable doubt (*Virgil*, *supra*, 51 Cal.4th at p. 1289), that generally the defendant has no burden of proof at the penalty phase (*ibid*.), or that the defendant is entitled to the "benefit of the doubt" regarding the appropriate sentence (*People v. Lee* (2011) 51 Cal.4th 620, 655).

## D. Assertedly Improper Interference with Jury Deliberations

The jury first returned death verdicts as to Wheeler. Before it returned verdicts as to Smith and Bryant, the jury reported itself deadlocked as to the sentence for Smith. Smith contends the trial court's actions and instructions in response to the reported deadlock improperly coerced a verdict. A related challenge is also discussed below. We assume Bryant has joined these claims, and that the challenges are preserved for appeal. The claims do not apply to Wheeler because the trial court's challenged actions occurred after his verdicts were received and recorded.

### 1. *Background*

After returning verdicts on Wheeler the jury deliberated another day and a half then sent a note reporting a deadlock on Smith. The clerk confirmed that the impasse concerned Smith's sentence. The court agreed with the parties' suggestions to question

144

the jury about the nature of the problem and whether there was anything the court could do to help the deliberations.  It declined to declare a mistrial at that point.

The court questioned the foreman about the impasse.  He stated that the jury had taken "at least eight" votes on Smith's sentence, and the results had "gone from six [to] six through just about every number to eleven to one."  The jury had deliberated as to Smith first, but turned to Wheeler when it had "reached a point of exasperation."  It then resumed deliberations regarding Smith.  The jury had voted four times that morning.  The first votes were eight to two, with two undecided.  The last two votes were 11 to one.  Asked if there was anything the court could do to assist, the foreman stated, "Nothing."  Another juror, however, requested a "clear definition of the sympathy factor."  (See § 190.3, factor (k).)[70]  The court told the jurors to return to the jury room and consider whether it needed clarification of factor (k) or any other issue of law.  The jury subsequently reported it needed no further clarifications, but remained unable to agree on a verdict for Smith.  The court then told the jury the following.  "I want you to continue your deliberations on the remaining matters including Mr. Smith.  [¶]  You may be quite right and it may be that you do not arrive at a verdict as to Mr. Smith as you seem to feel in your note.  [¶]  The court is not convinced that this is the case given the fact that there has been a verdict rendered as to one defendant, given the fact that there has been a change from six to six right up to eleven to one.  [¶]  That may be where it ends or it may go back.  That tells me there is a potential that the jury may resolve this matter regardless of what you feel now.  [¶]  I may be wrong.  I may be right.  [¶]  I will ask you to continue your deliberations in any order that you want.  [¶]  Again, I am not suggesting who you deliberate on or what count or anything like that.  You will have to do that for

---

[70]    Section 190.3, factor (k) provides that the jury can consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

145

yourselves. But the court is not going to at this point declare a mistrial as to the penalty phase as to any defendant based on what we have talked about right here. So you will need to continue your deliberations." The court also noted that one of the jurors was due to be excused at the end of the following day because of prearranged travel plans. It stated it was "not suggesting that you rush. I am suggesting that you don't rush. If there are verdicts that you arrive at as to any counts or any defendant or anything, we will accept those tomorrow afternoon even if they are not complete verdicts."

A juror asked whether the court could provide clarification about the weighing process and section 190.3, factor (k), in light of the "possibility" a juror might not have fully understood the instruction. The court told the jury as a whole to discuss the issue and reduce any question to writing so that the court would not be "shoot[ing] from the hip." The court explained it was not requiring that the jury continue deliberating as to Smith now because "[t]he order in which you deliberate [on] these counts, defendants and issues is up to you." The court was not, however, declaring a mistrial at this point, so the jury would have to continue to deliberate as to his sentence at some point. In response to a juror's question about the effect of a mistrial, the court explained that the verdicts already recorded would not be affected by a mistrial, but the court did not want the jury "to take that as a signal by the court that work is done on this case because your work is not done on this case until the court concludes that the work is done." Outside the presence of the jury, the court denied Smith's renewed request for a mistrial. It cited the length of the trial and the jury's movement toward unanimity.

The jury deliberated the following day without reaching a verdict. Before the departing juror was replaced with an alternate, the court asked about progress. The foreman reported that deliberations had resumed as to Smith and "there has been some change, some dialogue has opened up." At that point there had been no additional votes. An alternate juror was seated and the jury told to begin deliberations anew. The court extended the hours of deliberations by adding a half-hour to the beginning and end of

146

each day and reducing the lunch break by a half-hour.  The new schedule was 8:30 a.m. to 4:30 p.m. with an hour lunch break.  The court explained:  "[W]e have a lot of jurors who obviously need to get on with their business.  This case will take as long as it takes for it either to be resolved or for the court to feel that it cannot be resolved. . . .  But within those parameters, we need to make use of our time wisely.  [The longer hours are] not to punish you, but so we can get as much time in as we can on this case while we have you folks here during the day. . . .  I know it is tough, but we're going to do it that way, and I believe that it may assist in one way or another getting this thing concluded.  At some point in this case, your service will end . . . either with verdicts or with the court declaring there will not be verdicts as to various matters.  However that works its way out, it works its way out; but that end will come sooner, whichever way it is, if we stick to these hours."  The next day produced no verdict.  After a weekend recess, the jury returned death verdicts for Bryant and Smith.

### 2. Discussion

Defendants' claim of jury coercion is misplaced.  *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), explained that "coercive" actions are those involving "a judicial attempt to inject illegitimate considerations into the jury debates and . . . appeal to dissenting jurors to abandon their own independent judgment of the case against the accused," by placing "excessive pressure on the dissenting jurors to acquiesce in a verdict." (*Id.* at pp. 849-850.)  In assessing the effect of the trial court's actions, the question is "whether the instructions tend[ed] to impose such pressure on jurors to reach a verdict that we are uncertain of the accuracy and integrity of the jury's stated conclusion. This determination of whether the instructions 'operate[d] to displace the independent judgment of the jury in favor of considerations of compromise and expediency' [citation] is perhaps best characterized as requiring a generalized assessment of the potential effect

147

of a given instruction on the fact finding process, rather than as an attempted inquiry into the actual volitional quality of a particular jury verdict." (*Id.* at p. 850.)

In *Gainer*, the court gave a lengthy instruction encouraging a unanimous verdict. It advised the jurors to " 'consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other.' " (*Gainer*, *supra*, 19 Cal.3d at p. 841.)  Further, the instruction told the minority jurors to evaluate the reasonableness of their position in light of the fact that the majority had not been convinced by it.[71]

---

[71]    The instruction, in full, was as follows:  " 'Ladies and Gentlemen of the Jury:

" 'In a large proportion of cases and perhaps strictly speaking, in all cases, absolute certainty cannot be attained or expected.  Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other.  You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other.  And, with this view, it is your duty to decide the case, if you can conscientiously do so.

" 'In order to make a decision more practicable, the law imposes the burden of proof on one party or the other in all cases.  In the present case, the burden of proof is on the People of the State of California to establish every part of it beyond a reasonable doubt.  And, if in any part of it you are left in doubt, the defendant is entitled to the benefit of the doubt and must be acquitted.  But in conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments.

*(footnote continued on next page)*

148

Here the court did not violate the *Gainer* principles. It merely told the jurors to deliberate further. It was careful to present a balanced approach and explicitly left open the possibility that agreement might not be reached. It told jurors not to rush the process. In essence, it did not accept the jury's position that it truly was deadlocked at that time. It did not give a "dynamite charge" designed to end a stalemate by suggesting that the jurors reevaluate their positions, or that the case had to be decided. (See *Gainer*, *supra*, 19 Cal.3d at pp. 843-844, 851-852.) The court's statements conveyed that it was not prepared to declare the jury permanently deadlocked at that point. Defendants point out that the court knew of the numerical division, mentioned the jury's apparent progress toward unanimity, and did not specifically instruct the jurors not to give up their position

---

*(footnote continued from previous page)*

" 'And, on the other hand, if much the larger of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself, and [who] have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

" 'And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

" 'That is given to you as a suggestion of the theory and rationale behind jurors coming to a decision one way or the other.

" 'So, Ladies and Gentlemen of the Jury, I'm going to ask you — after lunch — to retire and continue with your deliberations and see if it is at all possible to resolve the matter.

" 'I understand that, of course, on occasions it is impossible to do so, but — based upon the instruction I have just given to you — I would appreciate that after lunch — if you would go back and resume your deliberations and see if you can arrive at a verdict and that the deadlock can be broken.' " (*Gainer*, *supra*, 19 Cal.3d at pp. 840-842.)

simply for the sake of reaching a verdict. In context these factors do not demonstrate that the court displaced the independent judgment of any juror. (See *Virgil*, *supra*, 51 Cal.4th at pp. 1282-1283.)

We are not persuaded by the court's view in *Jiminez v. Myers* (9th Cir. 1993) 40 F.3d 976, 980, upon which defendants rely, that similar circumstances "amounted to giving the jury a de facto *Allen* charge [*Allen v. United States* (1896) 164 U.S. 492]," improperly coercing a verdict. (*Jiminez*, at pp. 980-981.) A trial court faced with a reportedly deadlocked jury is permitted to declare a mistrial if, "at the expiration of such time as the court may deem proper, it *satisfactorily appears* that there is *no reasonable probability* that the jury can agree." (§ 1140, italics added.) A court must be permitted to undertake some inquiry about the state of deliberations to determine if, despite the report of a stalemate, there is a reasonable probability of future agreement. We have consistently rejected the federal rule that inquiries into the numerical division of the jurors are inherently coercive. (*People v. Homick* (2012) 55 Cal.4th 816, 901 (*Homick*); see *Brasfield v. United States* (1926) 272 U.S. 448, 450.) The trial court's mention of the jury's progress explained the court's direction to continue deliberations. It did not encourage any juror to reevaluate a position or push for any verdict.

Subsequent events further undermine defendants' challenge. The next day, the jury reported that deliberations on Smith's sentence had resumed, and that "some change, some dialogue has opened up." The jury continued to consider verdicts as to Smith and Bryant for the balance of the day. The logical reading of this record is that the court's actions had the proper effect of facilitating the jury's continued deliberations, rather than improperly coercing a verdict. Moreover, during that process a seated juror was replaced by an alternate, and the jury was instructed to begin its deliberations anew. Defendants fail to logically argue how any assertedly coercive effect from earlier actions could have persisted once the newly constituted jury started fresh deliberations. (See *Homick*, *supra*, 55 Cal.4th at p. 901.)

150

Defendants also argue their constitutional rights to a unanimous jury were violated when the reconstituted jury began deliberations after the previous jury had rendered death verdicts as to Wheeler. The claim fails for the same reasons we rejected *ante*, in part III.K.

**E. Denial of Application to Modify the Jury's Verdicts as to Smith**

Smith contends the trial court improperly denied his automatic motion to modify the jury's death verdict. (§ 190.4.) He asserts that the trial court considered facts unsupported by the evidence and cursorily dismissed legitimate factors in mitigation.[72] He forfeited these claims by failing to raise them below. (*Hartsch*, *supra*, 49 Cal.4th at p. 514.) They are also meritless.

Section 190.4, subdivision (e) provides in relevant part: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section [1181]. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." The trial court here explicitly acknowledged its duty to review the evidence and to weigh for itself the mitigating and aggravating factors to determine if a sentence of death was justified.

Smith takes issue with the trial court's view that the evidence established he was a "long-standing and respected member" of the Bryant Family organization. Smith now urges his "role in the Bryant organization seems to be rather limited." First, he did not

---

[72] This claim is inapplicable as to Bryant and Wheeler.

151

make that argument at the post-verdict hearing.  Second, his characterization was disputed and substantial evidence points to the contrary.  Finally, the court's ruling was based in large measure on its view that the murders at issue were "horrible," "heinous," and "abhorrent," and Smith's participation in them was not "out of character" in light of his other criminal conduct.  Any misunderstanding about Smith's status in the Family " 'had no impact on the court's decision to deny the motion.' " (*People v. Cooper* (1991) 53 Cal.3d 771, 848.)

Smith also contends the trial court improperly disregarded his mitigating evidence.  To the contrary, the record demonstrates the court considered the evidence, which it specifically recounted.  It simply found it unpersuasive.  (See *People v. Thomas*, *supra*, 54 Cal.4th at p. 948.)  The court explained:  "[t]he manner of these crimes, heinous nature of these crimes, and the other crimes committed by [Smith] outweigh hugely — not just substantially, but hugely — any attempt that [he] has made to explain or mitigate his actions or to even [garner] sympathy in the fact finder or the court.  [¶]  And the jury was correct, I believe, absolutely in their verdict, legally, morally and in any other way, and I adopt it without hesitation."

## V. OTHER ISSUES

### A. Defense Absences from Various Proceedings

Bryant contends the court erroneously conducted a number of ex parte meetings with members of the district attorney's office regarding the first defense recusal motion.  (See *ante*, pt. II.C.)  He also challenges two in camera meetings with jurors concerning security measures (see *ante*, pt. III.F.), and the permission granted Bryant to waive his personal presence at various proceedings.  We assume Smith and Wheeler have joined these claims.  There was no reversible error.

## 1. District Attorney Meetings

The first defense motion to recuse the LADA arose from a statement the lead prosecutor filed that trial evidence would show the Bryant Family had "people inside" the office, as well as other public agencies. Defendants argued the LADA's failure to provide discovery on the subject and, apparently, to prosecute the infiltrators showed there was a conflict of interest that would prevent defendants from receiving a fair trial. The LADA argued that the statement had been misinterpreted, no discoverable information had been withheld, and no conflict of interest existed. To facilitate the court's resolution of the motion, the LADA agreed to disclose to the court the basis for the prosecutor's statement. It asserted that this information concerned completed and ongoing internal investigations and was confidential under the "official information" privilege, section 1040 of the Evidence Code.[73] The trial court observed that it would need to conduct in camera hearings to determine whether the privilege applied. It promised to provide the defense with any material it deemed discoverable. No defendant objected.

The court then conducted a series of ex parte in camera meetings with LADA attorneys and investigators. The court also directed the LADA to conduct further investigation and report back. In the midst of these hearings, Bryant asserted in a written filing that the privilege did not apply because the LADA had publicly disclosed the allegations of infiltration, and, in any event, the defendants' need for the information outweighed any confidentiality interest. The court ultimately ruled: (1) there was no evidence of infiltration or of undisclosed exculpatory material; (2) the information

---

[73] In relevant part, this provision establishes a public entity's privilege to withhold confidential information when "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice[.]" (Evid. Code, § 1040, subd. (b)(2).)

provided to the court in the ex parte meetings was privileged; and (3) no conflict of interest required recusal of the LADA.  Defendants now claim the trial court erred by conducting the ex parte meetings.  The court did not err.

A criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial.  For purposes of the right to be present, a critical stage is "one in which a defendant's ' "absence might frustrate the fairness of the proceedings" [citation], or "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." ' " (*Rundle*, *supra*, 43 Cal.4th at p. 133.)  As to the right to counsel, a critical stage is one "in which the substantial rights of a defendant are at stake" (*People v. Crayton* (2002) 28 Cal.4th 346, 362), and "the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial" (*United States v. Wade* (1967) 388 U.S. 218, 227).

Defendants did not specifically object to the court's decision to conduct in camera proceedings.  After the meetings began, they argued that the court should not apply the official information privilege.  They later pointed out that their absence from the meetings made it difficult for them to address the merits of the issue.  They did not directly challenge the court's decision to hold the ex parte meetings as a denial of their constitutional rights to presence and counsel.  The appellate claim is forfeited.

Even if not forfeited, the claim fails.  In general, a court "has inherent discretion to conduct in camera hearings to determine objections to disclosure based on asserted privileges." (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 383, fn. 21.)  We have acknowledged that, as to an assertion of the official information privilege, a trial court may properly conduct in camera proceedings to "weigh the People's claim of privilege against defendant's asserted need for the information." (*Jenkins*, *supra*, 22 Cal.4th at p. 955.)  As in *People v. Roberts*, *supra*, 2 Cal.4th at page 302, defendants fail "to

154

persuade that [they have] a constitutional right to be present at an in camera hearing at which the prosecution will reveal sensitive and possibly privileged information."

### 2. *Juror Meetings*

As previously mentioned, the court ruled that the potential threat of juror harm called for various security measures. These included juror anonymity, escort to and from a confidential location and sequestration in a special jury room during recesses. Early in the trial proceedings, over defense objection, the court conducted two in camera meetings with the jurors from which all parties were excluded. The court discussed the arrangements and asked if they were causing the jurors any problems. The parties were provided transcripts of the meetings after the trial concluded.

Defendants assert on appeal that they "plainly . . . had a right to be present at proceedings where the court spoke with the jurors who would decide appellant's fate." To the contrary, "a trial court properly may engage in ex parte communications [with jurors] for ' ". . . administrative purposes . . . that do not deal with substantive matters." ' " (*Clark*, *supra*, 52 Cal.4th at p. 987.) The discussions at issue concerned the administrative matter of the jury's travels as well as other arrangements like the provision of lunch. Moreover, the court was reasonably concerned that the discussions remain confidential so security would not be compromised. As revealed by the transcripts, there was no discussion of any substantive matter related to the charges. In fact, the court cut off a juror who began to comment on the parties' use of exhibits. The court then had the juror express that concern in open court. The parties were provided a record of the proceedings after the trial, when the need for confidentiality had ended. Defendants' assertion that the "cold record" does not "reflect whether the court was successful in being neutral in tone and manner," is not persuasive. That rationale would prohibit all ex parte communications between the court and the jury, contrary to law. Defendants have not established that the meetings were critical stages of the trial in the sense that the

155

absences could have frustrated the fairness of the trial or denied a full opportunity for defense.

### 3. Other Absences

In addition to the hearings discussed above, defendants were absent from a number of other proceedings. Defendants personally or through counsel orally waived their right to be present at most of these.[74] Defendants claim that as a general matter, the federal Constitution mandates that a capital defendant be personally present at all trial proceedings, even if the defendant purports to waive that right. They also point out that state law prohibits a capital defendant from voluntarily waiving his presence during the taking of trial evidence, and requires written waivers of the right to be present. (See §§ 977, 1043; *People v. Weaver* (2001) 26 Cal.4th 876,967-968.) Defendants assert that any violation of the statutes comprises the "arbitrary deprivation" of a right secured by state law under *Hicks v. Oklahoma*, *supra*, 447 U.S. at page 346, and thus constitutes federal constitutional error as well. They urge the Attorney General has not carried the burden of demonstrating the asserted federal constitutional error was harmless beyond a reasonable doubt, and that, applying state law, there is a reasonable probability of a more favorable result had the error not occurred.

The claim of federal constitutional error based on the mere fact of defendants' absences is without merit. Defendants make no effort to demonstrate that any of the proceedings were critical stages of the trial under the applicable standard, that their presence was necessary to ensure the full opportunity to defend themselves at a fair trial.

---

[74] Bryant specifically mentions his absence without waivers from a discovery hearing and at the reassignment of the case after the first trial judge had been recused. He also challenges his absences following oral waivers from another discovery proceeding, a hearing on the admissibility of codefendant Settle's post-arrest statements, and during guilt phase deliberations after the jury had reached verdicts on the charges against him.

156

Further, the record does not support such a conclusion. As to waiver, contrary to defendants' arguments, the federal Constitution does not prohibit a capital defendant from waiving his right to be present at a critical trial stage. (*Rundle*, *supra*, 43 Cal.4th at p. 135.) Any statutory error in the trial court's accepting oral, rather than written, waivers is not elevated to federal constitutional error by invoking *Hicks*. (*Rundle*, at p. 136.) In sum, defendants have not established any error that would be subject to the *Chapman* standard. To the extent their absences at proceedings based on oral waivers violated the statutes, defendants have presented no support for the conclusion there is either a reasonable probability at the guilt phase or reasonable possibility at the penalty phase that the outcome would have been more favorable had defendants been required to make written waivers or forced to attend the proceedings despite their wishes to be absent.[75] (See *Rundle*, at pp. 135-136.)

## B. Assertedly Inadequate Appellate Record

Bryant contends various asserted omissions from the appellate record violated his constitutional and statutory rights. These include descriptions of witnesses' physical gestures, unreported discussions, charts and visual aids used by counsel, and some sealed records. We assume Smith and Wheeler have joined this claim. As defendants acknowledge, we have consistently held that "state law entitles a defendant only to an appellate record 'adequate to permit [him or her] to argue' the points raised in the appeal. [Citation.] Federal constitutional requirements are similar. The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective appellate review. [Citations.] Similarly, the Eighth Amendment requires reversal only where the record is

---

[75]  We have assumed that Bryant's absence when Smith made his motion to reopen the jury's deliberations on the guilt phase verdicts does not preclude him from joining the appellate claim of error (see *ante*, pt. III.L.).

157

so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and capricious manner. [Citation.] The defendant has the burden of showing the record is inadequate to permit meaningful appellate review. [Citation.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 857-858.) Defendants present no compelling reason to revisit the requirement that they establish a material omission from the record, nor do they attempt to demonstrate that any of the claimed omissions actually prevent meaningful review. "Human affairs being what they are, . . . perfect records are not always achieved. Appellants must do more than merely complain about omissions; they must demonstrate that the record is insufficient for meaningful appellate review." (*Harris*, *supra*, 43 Cal.4th at p. 1283.)

### C. General Challenges to California's Death Penalty Law

Defendants raise a number of challenges to California's death penalty statute that we have consistently rejected.[76] They present no compelling arguments against those settled precedents.

The death penalty statute does not unconstitutionally fail to adequately narrow the class of murderers eligible for the death penalty. (*Enraca*, *supra*, 53 Cal.4th at p. 769.)

None of the following renders the death penalty statute unconstitutional:

(1) permitting jury consideration of the circumstances of the crime under section 190.3, factor (a) (*Enraca*, *supra*, 53 Cal.4th at p. 769);

(2) permitting jury consideration of a defendant's unadjudicated violent criminal activity under section 190.3, factor (b) (*People v. Blacksher* (2011) 52 Cal.4th 769, 848);

(3) the absence of intercase proportionality review (*Enraca*, *supra*, 53 Cal.4th at p. 769);

---

[76] Defendants have raised a number of related challenges to the penalty phase jury instructions that we addressed *ante*, in parts IV.A and C.

158

(4) the absence of various "safeguards" in the penalty determination, such as written findings, jury unanimity, and a burden of proof regarding the sentence (*Enraca*, *supra*, 53 Cal.4th at p. 769);

(5) the existence of prosecutorial discretion in charging and pursuing the death penalty (*Scott*, *supra*, 52 Cal.4th at p. 495); or

(6) the provision of different procedural rights to capital defendants (*Enraca*, *supra*, 53 Cal.4th at p. 770).

The imposition of the death penalty in accordance with state and federal constitutional and statutory law does not violate international law or the Eighth Amendment to the federal Constitution. (*Enraca*, *supra*, 53 Cal.4th at p. 770.)

## D. Cumulative Prejudice and Reversal of Any Count

Defendants contend the combined guilt and penalty phase errors require reversal of their convictions and death sentences even if the errors are not prejudicial when considered individually. As discussed *ante*, we have concluded that those errors we have found or assumed for the sake of argument are harmless. Even when considered cumulatively, such errors did not deny defendants a fair trial. Because we have not concluded that any count or special circumstance must be reversed, defendants' claim that any such reversal warrants the reversal of the entire judgments against them fails.

## VI. DISPOSITION

We affirm the judgments.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**BRUINIERS, J.  \***

---

\*    Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY LIU, J.**


I join today's opinion except for its conclusion that the trial court acted within its discretion in ordering defendants to wear either shackles or a stun belt. Our case law makes clear that before a trial court may order such restraints, "[t]he record must demonstrate that the trial court independently determined on the basis of an on-the-record showing of defendant's nonconforming conduct that 'there existed a manifest need to place defendant in restraints.' [Citation.]" (*People v. Mar* (2002) 28 Cal.4th 1201, 1218 (*Mar*); *People v. Duran* (1976) 16 Cal.3d 282, 290–291.) The "manifest need" standard "is relatively narrow. [Citation.] 'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . . [Citation.] Moreover, '[t]he showing of nonconforming behavior . . . must appear as a matter of record . . . .' " (*People v. Cox* (1991) 53 Cal.3d 618, 651 (*Cox*); see *Mar*, at p. 1220 [the record must "demonstrate that the trial court actually determined that defendant posed the type of serious security threat at trial that would justify the imposition of restraints under the 'manifest need' standard"].)

In its analysis of the stun belt issue (maj. opn., *ante*, at pp. 50–55), today's opinion does not cite any independent determination by the trial court that an on-

the-record showing of manifest need justified the imposition of restraints on each defendant. And the reason is simple: there is none in this record.

As the court notes, "[d]uring several years of court proceedings none of the defendants had been disruptive in court, nor had any escape plots been uncovered. There was no indication Bryant and Smith had been violent while in pretrial custody." (Maj. opn., *ante*, at p. 54.) Nevertheless, the court says, "[a]s to Bryant, the [trial] court was informed that he had been disciplined in the jail for possessing improper amounts of razor blades and food items, suggesting he was still engaged in organized illicit activities while in custody." (*Id.* at p. 55.) But the trial court made no finding that Bryant posed a threat in the courtroom, and the trial court nowhere relied on Bryant's possession of improper items in jail as a basis for its decision to order restraints. (See *Mar*, *supra*, 28 Cal.4th at p. 1220 [the circumstances justifying the restraint must be "adequately established on the record and actually relied upon by the trial court"].)

As to Wheeler, today's opinion says "the court knew he had been formally charged and held to answer for an attempted murder of a jail inmate and an assault with a deadly weapon on a guard that had occurred during his pretrial incarceration." (Maj. opn., *ante*, at pp. 54–55.) However, when the trial court mentioned this, Wheeler's counsel interjected that there was "no evidence" before the court that Wheeler had done "anything while in custody," only "an allegation." After determining there were two pending cases against Wheeler that were "trailing" this case, the trial court said: "I would assume since they are in superior court some finding has been made by somebody that the allegations are not woven out of cloth. But I will concur that there is no conviction. But they resulted in the filing of two felony matters." The trial court's statement that "some finding has been made by somebody" hardly qualifies as an independent, substantiated finding of manifest need. The fact that Wheeler faced felony charges from the two

2

incidents is insufficient, for we have said that "when the imposition of restraints is to be based upon conduct of the defendant that occurred outside the presence of the court, sufficient evidence of that conduct must be presented *on the record* so that the court may make *its own* determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints; the court may not simply rely upon the judgment of law enforcement or court security officers or the unsubstantiated comments of others." (*Mar*, *supra*, 28 Cal.4th at p. 1221, italics added; see *People v. Hill* (1998) 17 Cal.4th 800, 841 ["A trial court abuses its discretion if it abdicates this decisionmaking authority to security personnel or law enforcement."].)

Today's opinion further says: "Although the court did not conduct a formal hearing with the presentation of evidence, the matter was discussed over the course of two pretrial proceedings, and the court summarized the case-specific information upon which it based its decision." (Maj. opn., *ante*, at p. 53.) Presumably this is a reference to the trial court's statement that "the four defendants, and others that are not before the court, involved themselves for years and years and years in ongoing criminal activity of every description including homicides, drug dealing, et cetera." The record makes clear, however, that the trial court did not indicate that defendants and others had *in fact* been involved in such conduct. It prefaced the quoted statement with the following: "The allegation is, and again it is an allegation, I don't know if it will be proven or not, but the People will try to prove that . . . ." When the court later held another hearing regarding restraints and juror anonymity, it noted: "There will be evidence in the case, from what I am told at least by all counsel, to suggest that over a number of years the defendants in this case involved themselves in a fairly widespread and fairly powerful criminal organization involved in a wide range of criminal activity including narcotic dealing, crimes of violence." These remarks

3

indicate that, to the extent the trial court based its ruling on defendants' long-term involvement in criminal activity, it was relying not on its own independent review of the evidence but on allegations and representations as to the evidence that would be introduced. But again, a trial court "may not simply rely upon the judgment of law enforcement or court security officers or the unsubstantiated comments of others" in ordering restraints. (*Mar*, *supra*, 28 Cal.4th at p. 1221.)

The crux of this court's analysis is its assertion that "[t]he trial court had before it a great deal of credible information from the preliminary hearings, charging documents, trial briefs, other summaries of the intended evidence, and in-court representations of counsel that defendants were part of a large-scale and extremely violent drug organization with many members remaining at large." (Maj. opn., *ante*, at p. 54.) But this litany provides no basis for upholding the trial court's ruling under our well-established standards. First, none of this material — "preliminary hearings," "charging documents," "trial briefs," "intended evidence," "in-court representations" (*ibid.*) — comprised an "on-the-record showing" (*Mar*, *supra*, 28 Cal.4th at p. 1218) or " '[e]vidence' " (*Cox*, *supra*, 53 Cal.3d at p. 651) of the threat posed by any defendant. Second, most of this material suggested what "the Family" might do to disrupt the trial, not what any of the three defendants might do. Third, as noted, the record does not "demonstrate that the trial court *independently* determined on the basis of an on-the-record showing of [each] defendant's nonconforming conduct that 'there existed a manifest need to place [each] defendant in restraints.' " (*Mar*, at p. 1218, italics added.) And fourth, the record does not show that the preliminary hearings or other information in the cited materials was "actually relied upon by the trial court." (*Id.* at p. 1220.) In sum, a straightforward application of our settled law to this record yields the conclusion that the trial court erred in ordering restraints as to each defendant.

4

However, our recent decision in *People v. Jackson* (2014) 58 Cal.4th 724, 742–748, dictates that the erroneous use of stun belts on these defendants must be deemed harmless. *Jackson* held that a stun belt error is harmless beyond a reasonable doubt when the record reveals no "evidence" or "indication" that the stun belt adversely affected the defendant. (*Id.* at p. 748.) In this case, some jurors might have seen a lump under defendants' clothes and inferred that they were wearing a security device. But defendants point to nothing in the record showing that the stun belts adversely affected their demeanor or ability to assist counsel, or otherwise impaired their participation in the trial. Although I believe our penalty-phase holding in *Jackson* contravenes the clear mandate in *Chapman v. California* (1967) 386 U.S. 18, 24, that it is the state's burden to demonstrate lack of prejudice, not the defendant's burden to demonstrate prejudice (see *Jackson*, at pp. 777–778 (conc. & dis. opn. of Liu, J.)), *Jackson* is controlling here and does not authorize reversal of the guilt or penalty verdicts on the basis of the stun belt error. Accordingly, I concur in today's judgment.

LIU, J.

5

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Bryant, Smith and Wheeler
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S049596
**Date Filed:** August 25, 2014
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Charles E. Horan

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Kathleen M. Scheidel, Assistant State Public Defender, for Defendant and Appellant Stanley Bryant.

David H. Goodwin, under appointment by the Supreme Court, for Defendant and Appellant Donald Franklin Smith.

Conrad Petermann, under appointment by the Supreme Court, for Defendant and Appellant Leroy Wheeler.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Victoria B. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathleen M. Scheidel
Assistant State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

David H. Goodwin
P.O. Box 93579
Los Angeles, CA  90093-0579
(323) 666-9960

Conrad Petermann
Law Office of Conrad Petermann
323 East Matilija Street, Suite 110, PMB 142
Ojai, CA  93023
(805) 646-9022

Victoria B. Wilson
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2357